**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, MICHIGAN ENVIRONMENTAL COUNCIL, ENVIRONMENTAL DEFENSE FUND, ENVIRONMENTAL LAW AND POLICY CENTER, VOTE SOLAR, UNION OF CONCERNED SCIENTISTS, ECOLOGY CENTER, and URBAN CORE COLLECTIVE, | ) | Case No. 25-1198 |
| Petitioners | ) | |
| v. | ) | |
| U.S. DEPARTMENT OF ENERGY, and CHRIS WRIGHT, in his official capacity as Secretary of Energy, | ) | |
| Respondents. | ) | |

## PETITION FOR REVIEW

Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, Ecology Center, and Urban Core Collective (collectively, "Public Interest Organizations") petition the Court for review of the Department of Energy's and Secretary of Energy Christopher Wright's (collectively, "DOE") Order No. 202-25-7 dated August 20, 2025 (the "Order") (Exhibit A), DOE's denial by inaction of Public Interest Organizations' request for rehearing of

the Order, and any amendment, modification, or renewal of that Order. Public Interest Organizations petition under section 313 of the Federal Power Act, 16 U.S.C. § 825*l*(b), and section 502 of the DOE Organization Act of 1977, 42 U.S.C. § 7192(a), along with Federal Rule of Appellate Procedure 15(a) and D.C. Circuit Rule 15(a). On September 8, 2025, Public Interest Organizations timely moved to intervene and sought rehearing of the Order (Exhibit B).

The prerequisites for judicial review of this petition have been met. DOE has not acted within 30 days upon Public Interest Organizations' request for rehearing. *See* DOE, *Federal Power Act Section 202(c): Midcontinent Independent System Operator (MISO)* (last visited October 9, 2025), https://www.energy.gov/ceser/federal-power-act-section-202c-midcontinent-independent-system-operator-miso-0 (linking to the Order and associated requests for rehearing submitted to DOE). Public Interest Organizations' request for rehearing is therefore deemed denied. 16 U.S.C. § 825*l*(a). Public Interest Organizations' petition is filed within sixty days after the denial of rehearing. *Id.* § 825*l*(b). This Court has subject matter jurisdiction, Public Interest Organizations are parties aggrieved by the Order, and venue is proper. *Id.* § 825*l*(a)–(b).

Dated: October 9, 2025

[continued for signatures]

Respectfully Submitted,


*/s/ Jennifer Yun*[1]
Jennifer Yun (DC Cir. 66550)
Benjamin Chagnon (DC Cir. 65850)
Michael Lenoff (DC Cir. 66374)
Michael Soules (DC Cir. 60570)
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
jyun@earthjustice.org
bchagnon@earthjustice.org
mlenoff@earthjustice.org
msoules@earthjustice.org

Shannon Fisk
48 Wall St., 15th Floor
New York, NY 10005
(215) 717-4522
sfisk@earthjustice.org

Lauren Piette
Sameer Doshi (DC Cir. 64549)
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell (DC Cir. 64908)
Ada Statler (DC Cir. 65969)
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org
astatler@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*


---

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Danielle C. Fidler*
Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Howard A. Learner*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
BKlein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
KDuckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

## RULE 26.1 DISCLOSURE STATEMENTS

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club.

Natural Resources Defense Council states that it is a non-profit environmental organization. NRDC has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Michigan Environmental Council is a non-profit organization with no parent corporation and no outstanding stock shares or other securities in the hands of the public. Michigan Environmental Council does not have any parent, subsidiary, or affiliate that has issued stock shares or other securities to the public. No publicly held corporation owns any stock in Michigan Environmental Council.

Environmental Defense Fund states that it is a 501(c)(3) non-profit environmental organization dedicated to finding practical solutions to critical environmental problems through the use of law, policy, science, and economics. Environmental Defense Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Environmental Law & Policy Center states that it is a non-profit environmental organization. Petitioner Environmental Law & Policy Center does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Vote Solar states that it is a non-profit environmental organization. Petitioner Vote Solar does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Union of Concerned Scientists states that it is a non-profit environmental organization. Petitioner Union of Concerned Scientists does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Ecology Center states that it is a non-profit environmental organization. Petitioner Ecology Center does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

Urban Core Collective is a non-profit organization. Urban Core Collective does not have any parent corporation and no publicly held corporation owns 10% or more of its stock.

[continued for signatures]

*/s/ Jennifer Yun*[1]
Jennifer Yun (DC Cir. 66550)
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 745-5210
bchagnon@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

*/s/ Gregory E. Wannier*
Gregory E. Wannier (DC Cir. 55920)
Sanjay Narayan (DC Cir. 48545)
Elena Saxonhouse (DC Cir. 56639)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Caroline Reiser*
Caroline Reiser (DC Cir. 62319)
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

[1] Counsel represents that the other parties listed in the signature blocks on this document consent to this filing.

Gavin McCabe (DC Cir. 53966)
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat (DC Cir. 55968)
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org

*Counsel for Natural Resources Defense Council*

*/s/ Danielle C. Fidler*

Danielle C. Fidler (DC Cir. 62486)
Francis W. Sturges, Jr. (DC Cir. 64964)
Veronica Saltzman (DC Cir. 64096)
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us
vsaltzman@catf.us

*Counsel for Michigan Environmental Council*

*/s/ Howard A. Learner*
Howard A. Learner (DC Cir. 61779)
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
HLearner@elpc.org
BKlein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
KDuckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

*/s/ Tomás Carbonell*
Tomás Carbonell (DC Cir 54320)
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statements** and all attachments with the Clerk of the Court using the Court's CM/ECF system.

I further certify that I have on this 9th day of October, 2025, caused copies of the foregoing to be served via certified priority mail, return receipt requested, on:

Chris Wright
Secretary, U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585

Pamela Bondi
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jeffrey Novak
Acting General Counsel
Office of the General Counsel
U.S. Department of Energy
1000 Independence Ave., SW
Washington, D.C. 20585

I also caused copies to be sent via electronic mail to AskCR@hq.doe.gov and The.Secretary@hq.doe.gov.

I have also served a copy of the foregoing on all parties to the proceeding before the DOE via electronic mail.

Dana Nessel,
Michigan Attorney General
Michael E. Moody
Assistant Attorney General
Special Litigation Division
525 W. Ottawa St.
P.O. Box 30755
Lansing, MI 48909
MoodyM2@michigan.gov

Christopher M. Bzdok
Special Assistant Attorney General
420 E. Front St.
Traverse City, MI 49686
chris@tropospherelegal.com

Debra D. Roby
Partner
Washington Energy Law LLP
900 17th St. NW, Suite 500-A
Washington, DC 20006
droby@washingtonenergylaw.com

William F. Fields
Deputy People's Counsel
Maryland Office of People's Counsel
6 St. Paul St., Suite 2102
Baltimore, MD 21202
William.fields@maryland.gov

Kelly M. Hall
Deputy General Counsel and Vice President, Rates and Regulatory
Consumers Energy Co.
One Energy Plaza
Jackson, MI 49201
Kelly.Hall@cmsenergy.com

Keith Ellison,
Attorney General of Minnesota
Peter Surdo
Special Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101
Peter.Surdo@ag.state.mn.us

Kwame Raoul,
Attorney General of the State of Illinois
Samuel C. Lukens,
Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle St., 25th Floor
Chicago, IL 60603
Samuel.Lukens@ilag.gov

Brad Pope
Legal and Regulatory Director
Organization of MISO States
811 E. Washington Ave., Suite 400
Madison, WI 53703
brad@misostates.org

Timothy R. Caister
Vice President, Legal & Federal Regulatory Affairs
Midcontinent Independent System Operator, Inc.
720 City Center Drive
Carmel, IN 46032-3826
tcaister@misoenergy.org

Dated: October 9, 2025

Respectfully submitted,

*/s/Jennifer Yun*
Jennifer Yun

# Exhibit A

**Order No. 202-25-7**

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA), 16 U.S.C. § 824a(c), and section 301(b) of the Department of Energy Organization Act, 42 U.S.C. §7151(b), and for the reasons set forth below, I hereby determine that an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electricity, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

*Order No. 202-25-3*

J.H. Campbell Generating Plant (Campbell Plant) is a 1,420 MW coal-fired plant primarily owned by Consumers Energy Company (Consumers) and located in West Olive, MI. In 2021, Consumers announced that it planned to implement a "speed closure" of the Campbell Plant fifteen years before the end of its scheduled design life.[1] Instead of retiring the Campbell Plant at the end of its design life, Consumers planned to accelerate the Campbell Plant's retirement and discontinue its operations on May 31, 2025.

Order No. 202-25-3, issued pursuant to FPA section 202(c), required that the Campbell Plant remain in operation for 90 days, until August 21, 2025. That order was based on my determination that emergency conditions existed in the region served by the Midcontinent Independent System Operator, Inc. (MISO). Specifically, I determined that MISO likely faced tight reserve margins during the summer 2025 period, particularly during periods of high demand or low generation resource output. I determined that the continued operation of the Campbell Plant would provide additional generation capacity during these periods which would help prevent the potential loss of power to homes and local businesses in the areas that might have been affected by curtailments or outages that would otherwise pose a risk to public health and safety. I determined that the continued operation of the Campbell Plant was necessary to alleviate immediate and anticipated threats to reliability. My determination was based on a number of facts.

First, the North American Electric Reliability Corporation (NERC) released its 2025 Summer Reliability Assessment on May 14, 2025. In its assessment, NERC indicated that "[d]emand forecasts and resource data indicate that MISO is at elevated risk of operating reserve shortfalls during periods of high demand or low resource output."[2] In particular, NERC explained that the retirement of thermal generation capacity increased the likelihood of electricity supply

---

[1] *See Consumers Energy Announces Plan to End Coal Use by 2025; Lead Michigan's Clean Energy Transformation*, Consumers Energy (June 23, 2021), https://www.consumersenergy.com/news-releases/news-release-details/2021/06/23/consumers-energy-announces-plan-to-end-coal-use-by-2025-lead-michigans-clean-energy-transformation. As a coal-fired facility, it would be difficult for the Campbell Plant to resume operations once it has been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline.

[2] *2025 Summer Reliability Assessment*, North American Electric Reliability Corporation, at 16 (May 2025), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf (NERC 2025 Summer Reliability Assessment).

shortfalls. NERC anticipated that the near-term period of greatest capacity shortfall for MISO would likely occur in August.[3]

Second, multiple generation facilities in Michigan have retired in recent years. According to the U.S. Energy Information Administration (EIA), "[s]ince 2020, about 2,700 megawatts of coal-fired generating capacity have been retired and no new coal-fired facilities are planned."[4] Additionally, EIA stated, "[t]ypically, Michigan's nuclear power plants have supplied about 30% of in-state electricity, but the amount of electricity generated by nuclear power plants in Michigan has declined as plants have been decommissioned."[5] The state's Big Rock Point nuclear power plant shut down in 1997, and the Palisades nuclear power plant closed in 2022. While the Palisades nuclear power plant may reopen in 2025, it was not projected to be available during the peak demand period this summer.[6]

Third, the Campbell Plant's retirement would have further decreased available dispatchable generation within MISO's service territory, adding to the loss of the other 1,575 MW of natural gas and coal-fired generation that has retired since the summer of 2024. Although MISO and Consumers have incorporated the planned retirement of the Campbell Plant into their supply forecasts and Consumers acquired a 1,200 MW natural gas power plant in Covert, MI, the NERC Assessment still anticipates "elevated risk of operating reserve shortfalls."[7]

Fourth, MISO's Planning Resource Auction Results for the 2025-2026 Planning Year, released in April 2025, noted that for the northern and central zones, which includes Michigan, "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources."[8] While the results "demonstrated sufficient capacity," the summer months reflected the "highest risk and a tighter supply-demand balance" and these results "reinforce the need to increase capacity."[9]

*Continuing Emergency Conditions*

The emergency conditions that led to the issuance of Order No. 202-25-3 continue, both in the near and long term. The summer season has not yet ended, and the production of electricity from the Campbell Plant will continue to be a critical asset to maintain reliability in MISO this summer. That need is evidenced by the fact that the Campbell Plant was called on by MISO to generate large amounts of electricity during the heat wave that hit MISO this past June. According

---

[3] *Id.*
[4] *Michigan State Profile and Energy Estimates*, U.S. Energy Info. Admin. (Oct. 17, 2024), https://www.eia.gov/state/print.php?sid=MI.
[5] *Id.*
[6] The start-up of Palisades is scheduled for the fourth quarter of 2025.
[7] NERC 2025 Summer Reliability Assessment at 16.
[8] *Planning Resource Auction—Results for Planning Year 2025–2026,* Midcontinent Independent System Operator, Inc., 13 (May 29, 2025), https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf. (MISO Planning Resource Auction – Results for Planning Year 2025-26).
[9] *Id*. at 2,12.

to the U.S. Environmental Protection Agency's data, over the month of June, the Campbell Plant generated approximately 664,000 MWh, running at 61% capacity.[10] In fact, between June 11 and August 18, MISO issued dozens of alerts to manage grid reliability in its Central Region in response to hot weather, severe weather, high customer load, forced generation outages, and transfer capability limits. MISO issued alerts for the Central Region on at least 40 of the 69 days between June 11 and August 18. In June, MISO issued alerts affecting the Central Region on 18 days, including an Energy Emergency Alert (EEA) level 1 ("Max Gen Step 1b") on June 23 to enable MISO to take emergency action to ensure grid stability, including bringing additional resources online.[11] The Central Region had alerts on 21 days in July, including one Max Generation Warning on July 29 and two Max Generation Alerts on July 28 and 29.[12] Two Capacity Advisory Initiate alerts have been issued in August to date.[13] Moreover, the May 2025 NERC Summer Reliability Assessment referenced a Seasonal Outlook issued by the National Oceanic and Atmospheric Administration (NOAA), which estimates that much of the Midwest has a 33%-40% chance to experience above-normal temperatures this summer.[14] The Seasonal Outlook released by NOAA on July 17, 2025, increased this estimate for much of the region to a 40%-50% chance.[15]

MISO's resource adequacy problems are not limited to the summer. In 2022, MISO requested Federal Energy Regulatory Commission (FERC) approval of its filing to revise its resource adequacy construct (including the Planning Resource Auction or PRA) to establish capacity requirements for each of the four seasons of the year rather than on an annual basis determined by peak summer demand.[16] MISO justified this revision by explaining that "Reliability risks associated with resource adequacy have shifted from 'Summer only' to a year-round

---

[10] *See, Custom Data Download, EPA CAMPD (Clean Air Markets Program Data),* *https://campd.epa.gov/data/custom-data-download (search criteria to produce these results could include Emissions >> Monthly >> Unit (default) >>Apply >>"2025" and "June." The data can then be filtered to only include the Campbell Plant.)*

[11] An Energy Emergency Alert is an alert declared by the Transmission Provider in accordance with the NERC Operating Manual associated with the Transmission Provider's inability to provide for the Energy and Operating Reserve requirements of the MISO Balancing Authority Area. For more information, see MISO, FERC Electric Tariff, Module A, § 1.E (Definitions) (92.0.0). For more information on Energy Emergency Alert levels, see North American Electric Reliability Corporation. (n.d.). *EOP-011-1 Emergency Operations*. https://www.nerc.com/pa/stand/reliability%20standards/eop-011-1.pdf.

[12] A Max Gen Alert occurs when MISO is forecasting a potential capacity shortage. A Max Gen Warning is a warning to prepare for a possible Max Gen Event. *See* MISO Operating Procedures, https://efis.psc.mo.gov/Document/Display/9379 (20180920).

[13] A Capacity Advisory alert is an advisory issued based on the potential for limited operating capacity margins (<5%) in the following 2-3 days. *See* MISO Operating Procedures, https://efis.psc.mo.gov/Document/Display/9379 (20180920).

[14] NERC 2025 Summer Assessment at 9.

[15] *Seasonal Outlook*, NOAA Climate Prediction Ctr., (July 17, 2025), https://www.cpc.ncep.noaa.gov/products/predictions/long_range/seasonal.php?lead=1.

[16] M*idcontinent Independent System Operator, Inc.*, FERC Docket No. ER22-495-000 (Nov. 30, 2021). This request was approved by FERC on August 31, 2022. Midcontinent Independent System Operator, Inc., 180 FERC ¶ 61,141 (2022).

concern."[17] MISO noted that over 60 percent of all "MaxGen" events (events when MISO initiates emergency procedures because of concerns over the adequacy of available generation) occurred outside of the summer season.[18]

In December of 2023, MISO released an "Attributes Roadmap," in which it presented "an in-depth look at the challenges of operating a reliable bulk electric system in a rapidly transforming energy landscape."[19] Among other things, this report described changes in the time of year during which the risk of the loss of load was greatest. For the 2023/24 Planning Year, the greatest risk of loss of load was in the summer, but it is expected that by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons. MISO also projects that the risk of loss of load in the winter and spring seasons, although not as high as in the summer or fall, will nevertheless increase over time.[20]

More recently, MISO affirmed the resource adequacy problems occurring outside of its summer season in its 2024 report entitled, "*MISO's Response to the Reliability Imperative.*"[21] In a section of that report entitled "Risks in Non-Summer Seasons," MISO again stressed that it has resource reliability concerns outside of the summer season.

> Widespread retirements of dispatchable resources, lower reserve margins, more frequent and severe weather events and increased reliance on weather-dependent renewables and emergency-only resources have altered the region's highest historic risk profile, creating risks in non-summer months that rarely posed challenges in the past.[22]

These MISO studies indicate that the emergency conditions caused by the loss of generation capacity in MISO extend past the summer season.

The evidence indicates that there is also a potential longer term resource adequacy emergency in MISO. When MISO reported the results of its PRA for the 2025-26 Planning Year, it noted that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources" in the northern and central zones, which include Michigan.[23]

On June 6, 2025, subsequent to the issuance of Order No. 202-25-3, the Organization of MISO States (OMS) and MISO issued the results of their survey, which has been conducted annually for many years to determine the degree to which expected capacity resources satisfy

---

[17] MISO Transmittal Letter at 3, FERC Docket No. ER22-495-000 (Nov. 30, 2021).
[18] *Id.* at 3-4.
[19] *Attributes Roadmap*, MISO (Dec. 2023), https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf.
[20] *Id.* at 11.
[21] *MISO's Response to the Reliability Imperative*, MISO (Updated Feb. 2024), https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf.
[22] *Id.* at 12.
[23] MISO Planning Resource Auction – Results for Planning Year 2025-26 at 13.

planning reserve margin requirements.[24] The 2025 Survey presented projections of resource adequacy for the summer of 2026 and subsequent years. Although the survey projected a potential capacity surplus for the summer of 2026, it also projected that at least 3.1 GW of additional generation capacity beyond currently committed generation capacity must be added to meet the projected planning reserve margin.[25] The survey also projected that there would be insufficient capacity to meet the peak demand for electricity in each of the following four summers, increasing from a deficit of 1.4 GW in 2027 to 8.2 GW in 2030.[26] Similar results were projected for MISO's winter seasons, with a small surplus of generation capacity in 2026, followed by increasing deficits the following four years.[27]

The primary reasons for these projected deficits also are shown on the OMS-MISO survey. Large amounts of existing generation capacity are projected to be retired each year while, at the same time, the demand for electricity is projected to increase at an accelerating pace.[28] Although the OMS-MISO survey projects generation capacity to continue to increase in the coming years with the addition of new potential generation assets, the increase in capacity is largely offset by the projected retirements, and does not keep up with the growth in demand.[29]

MISO has been taking steps to address these projected deficits. For example, on June 6, 2025, MISO submitted a proposal to FERC to establish an Expedited Resource Addition Study (ERAS) process to provide a framework for the expedited study of interconnection requests to address urgent resource adequacy and reliability needs in the near term. This proposal was approved by FERC on July 21, 2025.[30] The ERAS process should help expedite the construction of needed new capacity. However, resources studied under the ERAS will have commercial operation dates that are at least three years away, and are provided an additional three year grace period to commence commercial operations.[31] In addition, supply chain constraints impeding the acquisition of critical grid components, including large natural gas turbines and transformers, are likely to further hinder rapid construction and exacerbate reliability concerns.[32] Consequently, the new ERAS process is unlikely to result in the addition of any new generation capacity in the next few years.

---

[24] *2025 OMS-MISO Survey Results*, OMS and MISO (Updated June 6, 2025) https://cdn.misoenergy.org/20250606%20OMS%20MISO%20Survey%20Results%20Workshop%20Presentation702311.pdf.

[25] *Id.* at 2.

[26] *Id.* at 7.

[27] *Id.* at 9.

[28] *Id.* at 7, 9.

[29] *Id.*

[30] M*idcontinent Independent System Operator, Inc.*, 192 FERC ¶ 61,064 (2025).

[31] 192 FERC ¶ 61,064 at P 84.

[32] *See generally*, *US Gas-Fired Turbine Wait Times as Much as Seven Years; Costs Up Sharply*, S&P Global (May 2025), US gas-fired turbine wait times as much as seven years; costs up sharply | S&P Global. "With demand for natural gas-fired turbines in the US rapidly accelerating amid power demand growth forecasts driven by AI, manufacturing, and electrification, wait times for turbines are anywhere between one and seven years depending on the model, and costs have increased considerably, experts told Platts."

Order 202-25-3 was preceded by executive orders on January 20, 2025, and April 8, 2025, in which President Donald J. Trump underscored the dire energy challenges facing the Nation due to growing resource adequacy concerns. Specifically, in Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[33] President Trump likewise recognized, in Executive Order 14156, "Declaring a National Energy Emergency," that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[34] The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[35]

The Department's July 2025 Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid, issued pursuant to the President's directive in Executive Order 14262, details the myriad challenges affecting the Nation's energy outlook. "Absent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[36] The prolific growth of data centers for the development of AI, as well as their immense energy needs, presents a new and unexpected source of load growth. This growth is illustrated by the fact that there are more than twenty AI companies operating in Michigan alone.[37] In addition, as just one example, Consumers has announced an additional 1 GW of new power to a planned hyperscale data center and "continue[s] to see positive momentum with data centers within the 9 GW pipeline . . . ."[38]

Grid operators—including MISO itself—have likewise acknowledged the Nation's current energy crisis. For instance, during a March 25, 2025, hearing before the House Committee on Energy and Commerce, Jennifer Curran, Senior Vice President, Planning and Operations, MISO, testified that "the MISO region faces resource adequacy and reliability challenges due to the

---

[33] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (*Strengthening the Reliability and Security of the United States Electric Grid*), https://www.whitehouse.gov/presidential-actions/2025/04/strengthening-the-reliability-and-security-of-the-united-states-electric-grid/.

[34] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (*Declaring a National Energy Emergency*), https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.

[35] *Id*.

[36] *See also Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, U.S. Department of Energy (July 2025), at 1, https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.

[37] Ekku Jokinen, *Top 21 Artificial Intelligence Companies in Michigan*, (last accessed Aug. 13, 2025), https://www.inven.ai/company-lists/top-21-artificial-intelligence-companies-in-michigan.

[38] *See Michigan utility Consumers Energy to provide 1GW of power to new hyperscale data center*, Data Center Dynamics (August 05, 2025), https://www.datacenterdynamics.com/en/news/michigan-utility-consumers-energy-to-provide-1gw-of-power-to-new-hyperscale-data-center/ (quoting Consumers Energy CEO Garrick Rochow).

changing characteristics of the electric generating fleet, inadequate transmission system infrastructure, growing pressures from extreme weather, and rapid load growth."[39] Ms. Curran also described "much stronger growth [in demand for electricity] from continued electrification efforts, a resurgence in manufacturing, and an unexpected demand for energy-hungry data centers to support artificial intelligence."[40] She added, "[a] growing reliability risk is that the rapid retirement of existing coal and gas power plants threatens to outpace the ability of new resources with the necessary operational characteristics to replace them."[41]

*ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of the Department of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . . such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[42] This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of the Campbell Plant when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here. As described above, the emergency conditions resulting from increasing demand and accelerated retirements of generation facilities supporting the issuance of Order No. 202-25-3 will continue in the near term and are also likely to continue in subsequent years. This could lead to the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages, presenting a risk to public health and safety. Given the responsibility of MISO to identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, continued additional dispatch of the Campbell Plant is necessary to best meet the emergency and serve the public interest under FPA section 202(c).

To ensure the Campbell Plant will be available if needed to address emergency conditions, the Campbell Plant shall remain in operation until November 19, 2025.[43]

---

[39] Keeping the Lights On: Examining the State of Regional Grid Reliability Before the House Committee on Energy and Commerce, Subcommittee on Energy, 119th Cong. (Mar. 25, 2025) (statement of Ms. Jennifer Curran, Senior Vice President for Planning and Operations, Midcontinent Independent System Operator), at 5, https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/witness-testimony_curran_eng_grid-operators_03.25.2025.pdf.
[40] *Id.* at 6.
[41] *Id.* at 7.
[42] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of the Department of Energy. *See* 42 U.S.C. § 7151(b) (2018).
[43] 16 U.S.C. § 824a(c)(4).

Based on my determination of an emergency set forth above, I hereby order:

A. From August 21, 2025, MISO and Consumer Energy shall take all measures necessary to ensure that the Campbell Plant is available to operate. For the duration of this Order, MISO is directed to take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers. Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices. Consumers Energy is directed to comply with all orders from MISO related to the availability and dispatch of the Campbell Plant.

B. To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters as determined by MISO pursuant to paragraph A. MISO shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether the Campbell Plant has operated in compliance with the allowances contained in this Order.

C. All operation of the Campbell Plant must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions. This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D. By September 4, 2025, MISO is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of the Campbell Plant consistent with this Order. MISO shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E. Consumers is directed to file with the Federal Energy Regulatory Commission Tariff revisions or waivers to effectuate this Order. Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F. This Order shall not preclude the need for the Campbell Plant to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G. Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, the Campbell Plant shall not be considered a capacity resource.

H. This Order shall be effective from 00:00 Eastern Daylight Time (EDT) on August 21, 2025, and shall expire at 00:00 EDT on November 19, 2025, with the exception of applicable compliance obligations in paragraph D.

I. Issued in Norfolk, Virginia at 8:50pm Eastern Daylight Time on this 20th day of August 2025.

Chris Wright

Chris Wright
Secretary of Energy

cc: **<u>FERC Commissioners</u>**
Chairman David Rosner
Commissioner Lindsay S. See
Commissioner Judy W. Chang

**<u>Michigan Public Service Commissioners</u>**
Chairman Dan Scripps
Commissioner Katherine Peretick
Commissioner Shaquila Myers

# Exhibit B

BEFORE THE UNITED STATES DEPARTMENT OF ENERGY

| | | |
|---|---|---|
| Federal Power Act Section 202(c) Emergency Order: Midcontinent Independent System Operator (MISO) | ) ) ) ) ) | Order No. 202-25-7 |

Motion to Intervene and Request for Rehearing and Stay of Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Defense Fund, Environmental Law and Policy Center, Vote Solar, Union of Concerned Scientists, the Ecology Center and Urban Core Collective (collectively, "Public Interest Organizations")

**I. INTRODUCTION** ........ 3
**II. STATEMENT OF ISSUES AND SPECIFICATION OF ERROR** ........ 4
**III. INTERVENORS' INTERESTS** ........ 6
**IV. BACKGROUND** ........ 12
A. *The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.* ........ 12
1. The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources. 12
2. MISO Protects Resource Adequacy Through FERC-Regulated Reserve Margin Requirements and a Residual Capacity Auction........ 14
3. MISO Also Continuously Monitors the Grid to Balance Supply and Demand, and to Prevent Blackouts Using an Escalating Sequence of Real-Time Alerts that Activate Reserve Resources in a Specific, Predetermined Order. ........ 17
4. Michigan Protects Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements........ 19
5. NERC Protects Reliability via Standards and Regular Assessments........ 20
B. *The Evidence Shows No Resource Adequacy Crisis in MISO for Summer 2025, Fall 2025, and Thereafter.* ........ 21
1. There Is No Evidence of a Resource Adequacy Crisis in Summer 2025. .. 21
2. There is No Evidence of a Resource Adequacy Crisis in Fall 2025. ........ 24
3. There Is No Evidence of a Resource Adequacy Crisis After Fall 2025...... 26
C. *Campbell Should Retire ASAP.* ........ 28
1. Campbell Is a Power Plant in Michigan Originally Built in 1962. ........ 28

2. Consumers Energy, an Investor-Owned Utility in Michigan, Is Campbell's Majority Owner. ........ 30
3. Campbell Is Old, Unreliable, Inflexible, Dirty, and Expensive. ........ 30
4. Campbell's May 31, 2025 Retirement Has Been Carefully Planned and Well Executed to Ensure Resource Adequacy. ........ 36

*D. The Department Persists in Preventing Campbell's Retirement Through Another Unneeded, Expensive, and Harmful Misstep.* ........ 41

**V. REQUEST FOR REHEARING** ........ 43

*A. The Department Has Not Demonstrated, and Cannot Demonstrate, an Emergency Permitting the Department to Control Generation Under Section 202(c).* ........ 45

1. Legal Framework: Section 202(c) Empowers the Department Only to Respond to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply. ........ 45
2. The Order 's Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c) ........ 53
3. The Order's Secondary Basis of Near-Term (Summer/Fall) Resource Adequacy Concerns Is Not, and Could Not Be, Sufficient to Warrant Invocation of the Department's 202(c) Authority. ........ 62

*B. The Order Fails to Set Terms that Best Meet the Emergency and Serve the Public Interest.* ........ 68

1. Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest. ........ 68
2. The Order Fails to Impose Requirements that Best Meet the Claimed Emergency and Serve the Public Interest. ........ 69

*C. The August Order Exceeds Other Limits on the Department's Statutory Jurisdiction.* ........ 76

1. The Department Lacks Jurisdiction to Impose the Availability Requirements. ........ 76
2. The Department Lacks Jurisdiction to Disallow Treatment of Campbell as a Capacity Resource. ........ 79

*D. The Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under 202(c).* ........ 81

1. The Order May Result in a Conflict with Federal, State, or Local Environmental Law or Regulation. ........ 82
2. The Order Lacks the Conditions Required by Section 202(c). ........ 85

**VI. REQUEST FOR STAY** ........ 89

**VII. CONCLUSION** ........ 93

# I. Introduction

J.H. Campbell spent the Summer sputtering along, racking up costs for no good reason. The power plant was not needed: Even at peak demand last Summer, the regional grid operator maintained an unused surplus of resources greater than *ten times* the power provided by Campbell. Ex. 70 at ¶¶ 16–17 (Konidena Decl.). And—as would be expected from an aging plant slated for retirement—Campbell units suffered multiple lengthy outages, demonstrating their unreliability to meet any unexpected shortfall that could have arisen. Ex. 69 at 5–7 (Powers Sept. Declaration). All the while the bill grew, with a "net financial impact" of $29,000,000 set to hit wallets across eleven states. *See* Ex. 73 at 62 (Consumers' July 2025 10-Q). That financial hit only covers the plant's activities for about 39 days through June 30. The harm to ratepayers is likely to grow with Campbell's continued operation; for most of the last year (79% of hours from July 2024 through June 2025), market prices were below Campbell's operating costs. *See* Ex. 68 at 5–6 (Grid Strategies Sept. Report).

The Department of Energy and Secretary Wright ("Department") now renew the emergency order requiring continued operation of J.H. Campbell Generating Plant ("Campbell Plant" or "Campbell")—an extraordinarily expensive, unreliable, and polluting plant that was, until the Department's intervention, slated for retirement pursuant to a settlement approved by the Michigan Public Service Commission (the "Michigan Commission"), and agreed to by a wide array of stakeholders. The Department has issued that renewal (Order No. 202-25-7, or the "August Order") despite the absence of any request from the Midcontinent Independent System Operator ("MISO") or any other party, and even though the Campbell Plant proved (contrary to the Department's claims) wholly unnecessary to sustain grid operations during the summer period covered by the Department's order issued last May.

The August Order is, like the Department's original order (Order No. 202-25-3, or the "May Order"), unlawful. Its main premise—a "longer term resource adequacy" deficiency arising sometime after 2027, Ex. 67 at 4–5 (August Order)—would not be an "emergency" within the meaning of Section 202(c) of the Federal Power Act, even if it existed. Section 202(c) authorizes the Department to mandate generation when faced with an imminent, near-term shortfall; it does not permit the Department to override the Act's separate procedures addressing long-term reliability. And the Department's claim of a long-term energy shortfall ignores the steps MISO and others are taking pursuant to those statutory processes—steps that promise to ensure long-term resource adequacy without the expense and pollution of Campbell's continued operation.

The August Order half-heartedly claims a near-term need for Campbell. But it does not—and cannot—offer more than general speculation that such an energy shortfall might arise somewhere within MISO. That speculation does not describe any imminent exigency that could justify the exercise of the Department's Section

202(c) authority. Moreover, the Department's assertions misstate the sources on which they rely; MISO has maintained, and continues to maintain, more than adequate resources to render Campbell's continued operation unnecessary. In fact, MISO's risk of shedding load for the Fall, Winter, and Spring seasons is less than or equal to one expected event in the next 100 years, an order of magnitude more protective than the already conservative industry standard.

The August Order also contains many of the same flaws that made its original May Order unlawful. There is no reason to believe that ordering Campbell's continued operation—which was unable to operate for large portions of the past summer—would be the "best" means of addressing the resource shortfalls claimed by the Order (even if they existed). 16 U.S.C. § 824a(c)(1). The order imposes requirements that are beyond the Department's authority. And it lacks the conditions required by Section 202(c)(2) where, as here, the Department orders operations that may conflict with federal, state, or local environmental requirements. *Id.* § 824a(c)(2).

At root the August and May Orders represent an effort to transform a statutory system designed to achieve resource adequacy through State and market-led decision-making, subject to carefully constrained federal oversight, into one of centralized command-and-control by the Department of Energy. That effort is contrary to law and unsupported by the facts. And it is deeply unwise. It will dramatically increase costs to the rate-paying public and badly exacerbate pollution—all to sustain an aging, outdated fossil-fuel plant incapable of providing reliable generation. The Department should withdraw the Order and allow Campbell to retire.

## II. Statement of Issues and Specification of Error

The undersigned Public Interest Organizations move to intervene and request rehearing and a stay pursuant to Section 313(a) of the Federal Power Act, 16 U.S.C. § 825*l*(a), and the applicable rules of practice and procedure, 18 C.F.R. §§ 385.203, .214, .713; *see* Ex. 8 (Cooke Email to Alle-Murphy) (recommending that "a party seeking rehearing can look for procedural guidance to [Federal Energy Regulatory Commission's ("FERC")] Rules of Practice and Procedure, 18 CFR Part 385.").[1]

---

[1] Until sometime after June 18, 2025, the Department maintained a webpage with procedures for intervention and rehearing requests. U.S. Dep't of Energy, *DOE 202(c) Order Rehearing Procedures* (visited June 18, 2025), https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures (attached as Ex. 30) [hereinafter "DOE Rehearing Procedures"]. The Public Interest Organizations relied on that webpage in challenging the May Order. *See, e.g.*,

Public Interest Organizations' motion and requests are based upon the following errors and issues:

A. The Department has not demonstrated that an emergency exists in any portion of the Midwest region of the United States as required by Section 202(c) of the Federal Power Act; nor has the Department demonstrated that an emergency exists as defined in the implementing regulations for Section 202(c). *See, e.g.*, 16 U.S.C §§ 824(a)–(b), 824a(a)–(c); 10 C.F.R. § 205.371–.375; *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984 (Aug. 6, 1981); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000); *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961); *Citizens Action Coal. v. FERC*, 125 F.4th 229 (D.C. Cir. 2025); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *Alcoa Inc. v. FERC*, 564 F.3d 1342 (D.C. Cir. 2009); *Cal. Indep. Sys. Op. Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004); *Otter Tail Power Co. v. Federal Power Commission*, 429 F.2d 232 (8th Cir. 1970); *Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978); *Duke Power Co. v. Fed. Power Com.,* 401 F.2d 930, 938 (D.C. Cir. 1968).

B. Even if the emergency described by the Order did exist—it does not—the Department has not demonstrated a reasoned basis for its determination that additional dispatch of Campbell is necessary to "best meet the emergency and serve the public interest." *See, e.g.*, 16 U.S.C. § 824a(c); 10 C.F.R. § 205.373; *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1 (2020); *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009); *Allentown Mack Sales*

---

Ex. 71 at 4, 50 (Public Interest Organizations' June Rehearing Request). The webpage with those procedures is no longer accessible. Public Interest Organizations have not been notified of any change to the procedures or any repudiation by the Department of the DOE Rehearing Procedures. The Department maintains another website which currently states, "All public comments and requests related to FPA section 202(c) should be sent via email to AskCR@hq.doe.gov. . . . Additional information about 202(c) procedures, if necessary, will be announced on this page. The provision of this process for submission of correspondence or comments on any pending application is for purposes of ensuring the receipt by the appropriate office and personnel within the Department. Establishment of this email address does not establish a 'docket,' and those submitting correspondence do not constitute parties or intervenors to any proceeding." U.S. Dep't of Energy, *DOE's Use of Federal Power Act Emergency Authority* (last visited Sept. 7, 2025), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority (attached as Ex. 74) [hereinafter "DOE 202(c) Webpage"]. Public Interest Organizations' instant motion and requests are also pursuant to the DOE 202(c) Webpage and the DOE Rehearing Procedures.

*& Service, Inc. v. NLRB*, 522 U.S. 359 (1998); *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747 (1973); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482 (1962); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414 (1952); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200 (D.C. Cir. 2013); *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133 (D.C. Cir. 2005); *Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980 (D.C. Cir. 2004); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105 (D.C. Cir. 2001).

C. The Order's availability requirements and the Order's override of Campbell's tariff-defined capacity treatment each exceed the Department's authority. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824a(b)–(c); *Gallardo v. Marstiller*, 596 U.S. 420 (2022); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260 (2016); *Gomez-Perez v. Potter*, 553 U.S. 474 (2008); *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453 (1972); *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515 (1945); *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009).

D. The Department has unlawfully failed to ensure that the August Order compels generation only during hours necessary to meet the emergency and serve the public interest, that operations are consistent with any applicable environmental laws to the maximum extent practicable, and that any adverse environmental impacts are minimized; there is no indication that the Department consulted with the primary Federal agency with expertise in the environmental interests protected by the laws and/or regulations with which the operations required by the August Order may conflict; and the Department has not included in the August Order or made public any conditions that may have been submitted by that Federal Agency, explained why such conditions might prevent the order from adequately addressing the emergency, or made that explanation public. *See, e.g.*, 16 U.S.C. §§ 824a(c)(2), 824a(c)(4)(B); *Fla. Power & Light Co. v. FERC*, 88 F.3d 1239 (D.C. Cir. 1996); *City of New Orleans v. FERC*, 67 F.3d 947 (D.C. Cir. 1995).

## III. Intervenors' Interests

As further discussed below, each of the Public Interest Organizations has interests that may be directly and substantially affected by the outcome of this proceeding. Each party may therefore intervene in this proceeding. 18 C.F.R. § 385.214; *see* Ex. 30 (DOE Rehearing Procedures); Ex. 74 (DOE 202(c) Webpage); Ex. 8 (Cooke Email to Alle-Murphy).

Each of the Public Interest Organizations also demonstrates a concrete injury arising from the Order that is redressable by a favorable outcome. Each

organization is therefore aggrieved by the Department's Order and may properly apply for rehearing. *See* Federal Power Act, § 313(a), 16 U.S.C. § 825*l*(a); *Wabash Valley Power Ass'n, Inc. v. FERC*, 268 F.3d 1105, 1112 (D.C. Cir. 2001); 18 C.F.R. §§ 385.203, 385.713; Ex. 30 (DOE Rehearing Procedures); Ex. 74 (DOE 202(c) Webpage); Ex. 8 (Cooke Email to Alle-Murphy).

*A. Sierra Club*

As of July 2025, over 17,500 Sierra Club members reside in Michigan; over two dozen of those members reside within just three miles of the Campbell Plant and thousands more live in nearby townships and further downwind. Sierra Club members are harmed by pollution produced by operating the Campbell Plant. The Order to operate the plant beyond its planned retirement date will subject Sierra Club members to additional air and water pollution in the areas where they live and recreate. Sierra Club members also hear the plant operating and hear coal trains delivering coal to the plant. In addition, Sierra Club members include people who pay for electricity from Consumers Energy Company ("Consumers Energy" or "Consumers").

Sierra Club has a demonstrated organizational commitment to the above-described interests. Sierra Club's Beyond Coal Campaign seeks to reduce the pollution currently being produced by coal-fired power plants such as Campbell, and to reduce energy bills by ensuring that ratepayers do not fund the cost of continuing to operate uneconomic coal plants like Campbell. To those ends, Sierra Club has participated in multiple regulatory proceedings relating to the Campbell Plant, including the 2021 Integrated Resource Plan proceeding that resulted in the settlement agreement requiring Campbell to retire by May 31, 2025. Sierra Club was heavily involved in the Integrated Resource Plan proceeding from its earliest stages and is a signatory to the settlement. Sierra Club invested in participating (through staff, volunteers, and members) in multiple stakeholder meetings held by Consumers in 2020 to inform its Integrated Resource Plan filing, galvanized hundreds of its members to submit comments to Consumers, formally intervened once Consumers filed its Integrated Resource Plan, and sponsored extensive expert testimony in that proceeding to demonstrate that the Campbell Plant's existing and likely future costs fully justified its closure by 2025. Sierra Club supported the settlement agreement because it would advance the organization's and its members' interests in reducing pollution and energy bills. By denying these and other benefits of the Campbell Plant's retirement, the Order harms Sierra Club and its members.

*B. Natural Resources Defense Council*

Natural Resources Defense Council ("NRDC") is a national non-profit membership organization whose mission includes ensuring the rights of all people to clean air, clean water, and healthy communities. Toward this goal, NRDC works to achieve clean energy solutions that will lower consumer energy bills, meet U.S.

carbon reduction goals, accelerate the use of renewable energy, and ensure that clean energy is affordable and accessible to all. NRDC has approximately 5,960 members in Michigan, including members who pay for electricity from Consumers Energy and who live and recreate near the Campbell Plant, where they are harmed by the plant's pollution.

NRDC has a longstanding organizational commitment to protecting the interests of its members and reducing pollution caused by coal-fired power plants, such as Campbell. To that end, NRDC has participated in multiple regulatory proceedings relating to the Campbell Plant, including Consumers Energy's 2021 Integrated Resource Plan proceeding. NRDC was a party to the 2022 settlement agreement that required Consumers Energy to close the Campbell Plant and end the utility's use of coal by May 31, 2025. NRDC supported the settlement agreement because it furthered the organization's and its members' interests in reducing costs to ratepayers and transitioning from fossil fuels to cheaper and more sustainable clean energy. By denying these and other benefits of the Campbell Plant's retirement, the Order harms NRDC and its members.

*C. Michigan Environmental Council*

Michigan Environmental Council ("MEC") is a statewide environmental nonprofit organization founded in 1980 and based in Lansing, Michigan. MEC pays for electricity from a utility located in MISO Zone 7. MEC has over 100 member groups and a collective membership of over 300,000 people. MEC's membership includes people who consume energy in MISO Zones 2 and 7 and who live and recreate near the Campbell Plant and are harmed by the plant's pollution. On behalf of its members, MEC advocates at the local, state, and federal level for lasting protections of its members' health and economic well-being, as well as protections for Michigan's air, water, and land. This includes promoting policies that protect Michigan residential utility ratepayers, increase adoption of clean energy sources, reduce harmful pollution, and address the causes of climate change.

Since 1999, MEC's advocacy on these issues has included participation as an intervening party in hundreds of Michigan Commission cases to represent the interests of its members in lower-cost, cleaner energy generated from renewable sources. In 2022, MEC was a party to the settlement agreement that required Consumers Energy to close the Campbell Plant and end the utility's use of coal by May 31, 2025. MEC supported the settlement agreement because it would provide both cost and health benefits to MEC members and would further MEC's and its members' interest in developing a cheaper, less-polluting electric grid. The settlement agreement was designed to provide reliable energy at significantly lower cost while also improving public health and reducing harmful environmental impacts. The Order harms MEC and its members because it deprives them of these and other benefits by delaying the Campbell Plant's retirement.

*D. Environmental Defense Fund*

The Environmental Defense Fund ("EDF") is a nonprofit membership organization with hundreds of thousands of members nationwide, including more than 1,200 members who live within 50 miles of the Campbell Plant. EDF's members include people who pay for and consume electricity in MISO Zones 1-7, and who are harmed by pollution from the Campbell Plant. EDF's mission is to build a vital Earth for everyone by preserving the natural systems on which all life depends. Guided by expertise in science, economics, law, and business partnerships, EDF seeks practical and lasting solutions to address environmental problems and protect human health, including in particular by addressing pollution from the power sector. On behalf of its members, EDF works with partners across the private and public sectors to engage in utility regulatory forums at the federal level and throughout the United States to advocate for policies that will create an affordable, reliable, and low pollution energy system. The Campbell Plant's retirement would help create an affordable, reliable, and low pollution energy system. Because the Order denies these and other benefits of the plant's retirement, the Order harms EDF members.

*E. Environmental Law and Policy Center*

Environmental Law and Policy Center ("ELPC") is a not-for-profit environmental organization with members, contributors, and offices throughout the Midwest, including in Michigan. ELPC's members include Michiganders who pay for electricity from Consumers Energy and own property and recreate near the Campbell Plant, where they are harmed by the plant's pollution. ELPC also has an office and pays for electricity in Des Moines, Iowa, located in MISO Zone 3.

Among other things, ELPC advocates before the Michigan Commission and the Federal Energy Regulatory Commission for clean, reliable energy generation in order to reduce ratepayer costs and improve environmental outcomes. ELPC has a long history of participating in regulatory proceedings involving Consumers. With respect to the Campbell Plant, ELPC played a key role in the 2021 Integrated Resource Plan proceeding from its earliest stages and is a signatory to the settlement agreement in which Consumers committed to retiring the plant by May 31, 2025. ELPC supported the settlement agreement because it would advance the organization's and its members' interests in reducing pollution in a cost-effective way. By denying these and other benefits of the Campbell Plant's retirement, the Order harms ELPC and its members.

Since the settlement, ELPC has played a role in upholding the public's interest and refining the details as to the future of the Campbell site. In partnership with

other stakeholders, ELPC has engaged and will continue to engage in negotiations with Consumers and other community members in pursuit of conservation, recreation, and clean energy goals at the site.

*F. Vote Solar*

Vote Solar is an independent 501(c)(3) nonprofit working to re-power the U.S. with clean energy by making solar power more accessible and affordable through effective policy advocacy. Vote Solar is not a trade organization, nor does it have corporate members. Vote Solar is committed to promoting clean, renewable energy and transitioning away from coal generation. Toward this goal, Vote Solar seeks to promote the development of solar at every scale across the country, including in Michigan.

Vote Solar has over 90,000 members nationally and over 2,700 members in Michigan, including members who pay for electricity from Consumers Energy and are harmed by pollution from the Campbell Plant. Vote Solar has provided testimony and comments in many regulatory dockets in front of the Michigan Commission, including the 2021 Integrated Resource Plan proceeding that resulted in the settlement agreement requiring the Campbell Plant's retirement. Vote Solar signed the settlement agreement because it furthered the organization's and its members' interests in reducing air pollution, reducing energy burden, and ensuring regulatory processes reflect cost-effective, community-supported energy planning. By denying these and other benefits of the Campbell Plant's retirement, the Order harms Vote Solar and its members.

*G. Union of Concerned Scientists*

The Union of Concerned Scientists ("UCS") is a national non-profit organization headquartered in Cambridge, Massachusetts, with additional offices in Washington, D.C.; Berkeley, California; and Chicago, Illinois. UCS is a public interest organization with more than 55 years of experience advocating for science-based policies, including responsible energy policy and utility oversight at the state and federal levels, and with over a decade working in Michigan on these issues. UCS has approximately 5,800 supporters, 1,800 members, and 500 Science Network members in Michigan, including members who use electricity and pay electric bills in Consumers Energy's service territory and who live and recreate near the Campbell Plant and are harmed by the plant's pollution.

UCS intervened and participated fully as a party in Consumers' 2021 Integrated Resource Plan proceeding, including authoring expert testimony and supporting resolution of that case through the settlement agreement that included retirement of the Campbell Plant. UCS signed the settlement agreement because it furthered the organization's and its members' interests in reducing pollution in a cost-

effective way. By denying these and other benefits of the Campbell Plant's retirement, the Order harms UCS and its members.

*H. The Ecology Center*

The Ecology Center is a Michigan-based nonprofit organization headquartered in Ann Arbor, Michigan, with additional offices in Detroit, Michigan. The Ecology Center has approximately 450 members in Michigan, including members who use electricity and pay electric bills in Consumers Energy's service territory and who are harmed by pollution from the Campbell Plant. The Ecology Center's mission is to improve environmental quality and protect human health, particularly in Michigan. Toward that goal, the organization fights for clean air throughout the state and advocates before the Michigan Commission to accelerate the shift to clean energy and reduce energy burden for residential ratepayers.

The Ecology Center has participated in cases at the Michigan Commission involving Consumers Energy's power plants since 2015, including by intervening in Consumers' 2021 Integrated Resource Plan proceeding. The Ecology Center signed the settlement agreement that required Consumers to retire the Campbell Plant by May 31, 2025 because it supported the organization's and its members' interest in reducing air pollution in a cost-effective way. By denying these and other benefits of the Campbell Plant's retirement, the Order harms UCS and its members.

*I. Urban Core Collective*

The Urban Core Collective ("UCC") is a non-profit organization with three member groups. UCC's main office is in Grand Rapids, Michigan, where the organization receives and pays for electricity from Consumers Energy. UCC advocates for strengthening democracy, leadership development, education reform, and climate and environmental justice. Much of UCC's work has involved advocating for policies that move Michigan toward a transition from fossil fuels to renewable energy sources that are affordable, reliable, and do not contribute to climate change. UCC advocates for those affected first and most severely by pollution from fossil fuels, including coal.

UCC regularly participates in Michigan Commission cases, including by intervening in Consumers Energy's 2021 Integrated Resource Plan proceeding. During that proceeding, UCC was heavily involved in engaging community members, collaborating with other stakeholders, and advocating for the Campbell Plant's retirement. UCC signed the settlement agreement that required the Campbell Plant's retirement because it furthered the organization's interest in promoting environmental justice, reducing pollution, and advancing the transition to cleaner energy sources. By denying these and other benefits of the Campbell Plant's retirement, the Order harms UCC.

## IV. Background

### A. *The Primary Actors in the Electric Industry Already Protect Resource Adequacy Without Intrusion from the Department.*

#### 1. *The Federal Energy Regulatory Commission Regulates Wholesale Electricity Markets and Mechanisms that Acquire Adequate Resources.*

FERC regulates wholesale sales and transmissions of electric energy in interstate commerce. 16 U.S.C. § 824(b)(1). Federal authority over the electric grid dates back at least to 1935, when the Federal Power Act became law and the Federal Power Commission administered the Act.

Congress did not give the federal agency plenary authority over the electric grid. Instead, Congress provided that federal regulation shall "extend only to those matters which are not subject to regulation by the States" and provided that "[t]he Commission" does not have jurisdiction, "except as specifically provided in [the Federal Power Act], over facilities used for the generation of electric energy." *Id.* at § 824(a)–(b)(1). As such, authority over generation facilities belongs to the states. *See id.*

In 1977, through the Department of Energy Organization Act, Congress reorganized the agencies that administer the Federal Power Act. Congress created the Department of Energy and FERC. 42 U.S.C. §§ 7131, 7171(a). Congress also transferred certain functions of "the Commission" in the Federal Power Act to the Department and other functions to FERC, thereby abolishing the Federal Power Commission. *See id.* §§ 7151(b), 7172(a)(1). FERC retained authority over rates and charges for the transmission or sale of electric energy, and the non-emergency interconnection of facilities for the generation, transmission, and sale of electric energy. *Id.* § 7172(a)(1)(B). The Department's authority over functions of "the Commission" in the Federal Power Act include certain functions under Section 202 of the Act. *See id.* § 7151(b). The 1977 reorganization did not expand the role of the "the Commission" at the expense of state authority or shrink states' authority over generation facilities. *See, e.g.*, *id.* at § 7113 ("Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction.").

As part of its regulatory oversight, FERC has promoted the role of nonprofit entities, known as Independent System Operators or Regional Transmission Organizations. *See Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *Regional Transm. Orgs.*, Order No. 2000, 65 Fed. Reg. 810, 811 (Jan. 6, 2000); *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transm. Servs. by Pub. Utils. and Recovery of Stranded Costs by Pub. Utils. and Transm. Utils.*, Order No. 888, 61 Fed. Reg. 21,540, 21,542 (May 10, 1996). FERC generally regulates these entities pursuant to its authority over rates and charges for wholesale sales and transmissions of electric energy. *See, e.g.*, Order

No. 2000, 65 Fed. Reg. at 811. These entities, referred to here as Independent System Operators or RTOs, perform a variety of functions, including:

- Ensuring the electric grid operates reliably in a defined geographic footprint;
- Balancing supply and demand instantaneously and maintaining sufficient operating reserves;
- Dispatching system resources as economically as possible;
- Coordinating system dispatch with neighboring balancing authority areas (BAAs);
- Planning for transmission in its footprint;
- Coordinating system development with neighboring systems and participating in regional planning efforts; and
- Providing non-discriminatory transmission access.

Ex. 46 at 53 (FERC Energy Primer). Some Independent System Operators "also operate capacity markets, which, along with underlying resource adequacy rules, ensure sufficient capacity is available." *Id.* at 68.

The Independent System Operators now span much of the country, excluding portions of the Southeast, Southwest, and Northwest regions of the country. *See id.* at 37. The map below depicts the geographic footprint of the various Independent System Operators.




Source: Ex. 46 at 67 (FERC Energy Primer).

2. *MISO Protects Resource Adequacy Through FERC-Regulated Reserve Margin Requirements and a Residual Capacity Auction.*

MISO is an Independent System Operator and the grid operator for territory stretching roughly from North Dakota to Michigan and down to Louisiana. This territory is organized into zones numbered 1 through 10, as shown in MISO's FERC-approved tariff and reproduced below.




Source: Ex. 75 (MISO Tariff Zonal Map).

MISO implements resource adequacy standards across its territory to ensure it achieves a level of grid reliability meeting both industry standards and those of the North American Electric Reliability Corporation ("NERC"). To meet its resource adequacy requirements, MISO utilizes a series of interconnected mechanisms that both measure current and future system needs and help the utilities in its region secure the resources that best meet those needs at least cost. *See generally* Ex. 46 at 66–75, 87–90 (FERC Energy Primer).

i. *Reserve Margin Requirements.*

The foundation of MISO's resource adequacy implementation process is its Loss of Load Expectation ("LOLE") study, which measures whether available generation capacity is capable of meeting load demand under various conditions, including low probability but high impact events (such as extreme weather). *See generally* Ex. 38 (MISO LOLE Presentation). MISO runs its LOLE study every year. It utilizes a systemic model, taking inputs from the past thirty years of weather data as well as resource performance characteristics from a broad range of operating conditions. Using this wealth of information, MISO then runs thousands of simulations looking to future years. Each of the simulations examines the system at every individual

hour of each year being studied. These simulations thereby identify circumstances that could most stress the system, while also predicting how the system's fleet of resources will perform. *See* Ex. 58 (MISO Tariff Module E-1). MISO runs this model annually, based on the latest available data.

MISO uses its LOLE study results in conjunction with its system-wide peak demand forecast, which it develops from projections provided by each of the load-serving entities within its territory. It combines these inputs to determine how much generating capacity is required to meet MISO's industry-standard goal of experiencing no more than one day with a loss of load event every ten years. *See* Ex. 2 at 2–5 (Grid Strategies June Report). The result of this calculation is a reasonable buffer of extra capacity to account for potential emergencies and other conditions, which is known as the regional Planning Reserve Margin ("Reserve Margin"). The Reserve Margin, stated as a percentage, reflects the amount of generating capacity that must be procured in each season to meet resource adequacy standards across the region. MISO develops a separate Reserve Margin for each season of the year. An illustrative calculation of a Reserve Margin is below.

**<u>Illustrative Reserve Margin Calculation</u>**

| | |
|---:|---|
| Expected Peak Demand | 100,000 MW |
| Extra Buffer | 7,000 MW |
| **Reserve Margin** | **7%** |

After developing the system-wide Reserve Margin, MISO uses it to convert the peak demand projection for each zone into a capacity requirement (in accredited megawatts, or "MW") that each zone must meet for each season. The requirement for each zone is known as that zone's Planning Reserve Margin Requirement ("Reserve Margin Requirement"), which is the amount of megawatts of capacity that must be procured for each zone. These megawatts can come from inside or outside the zone, so long as they are deliverable to the zone.

As with the zonal calculation, MISO also converts each individual load-serving entity's projected peak demand into a capacity requirement using the system-wide Reserve Margin. A load-serving entity is, like Consumers, an entity that "has undertaken an obligation to serve [l]oad for end-use customers by statute, franchise, regulatory requirement or contract." *See* MISO's FERC-Approved Tariff at Module A (as currently effective), *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 (defining "Load Serving Entity"). And the Reserve Margin Requirement for each zone is, roughly speaking, the sum of all load-serving entities' obligations in that zone.

Finally, MISO assigns to each individual resource a capacity value based on its conservative estimate of how likely that generator is to be able to provide energy during peak net demand conditions. The purpose of this estimate is to determine a percentage of resources' maximum capacity (their "accredited capacity") that can be

used by load-serving entities or in the Planning Resource Auction to achieve Reserve Margin Requirements, and it reflects that resources cannot always ensure that they will operate at their maximum possible capacity. Generally speaking, MISO's approach combines probabilistic modeling with historic and unit-specific performance. Through the capacity accreditation process, MISO fully accounts for the limitations of each resource's ability to contribute to MISO's resource adequacy during peak demand conditions or during times of overall system stress (*e.g.*, when extreme weather affects unit performance). And MISO's capacity accreditation rules are regulated and overseen by FERC. *See, e.g.*, *Midcontinent Indep. Sys. Op., Inc.*, 180 FERC ¶ 61,141, at P 1 (2022) (approving MISO's seasonal resource adequacy construct); *see also Midcontinent Indep. Sys. Op., Inc.*, 189 FERC ¶ 61,065, at P 1 (2024) (approving new methodology applicable to 2028/2029 delivery year).

*ii. MISO's Residual Capacity Market.*

Once MISO (1) establishes the regional Reserve Margin, (2) converts it to a Reserve Margin Requirement for each zone using peak demand projections, (3) apportions each zone's Reserve Margin Requirement among load-serving entities, and (4) determines all eligible resources' accredited capacity, the load-serving entities must meet their capacity obligations.

Load-serving entities have a few options for procuring capacity. First, they can use generating capacity they already own. Second, they can contract with another entity that owns generating capacity to promise to sell energy in the future when called upon by MISO to do so. Third, as a final fallback option they can obtain capacity through a residual capacity market run by MISO known as the Planning Resource Auction ("Planning Auction" or "PRA").

MISO conducts the Planning Auction every year. The Planning Auction is actually four separate simultaneous seasonal auctions. In each auction, MISO solicits operational commitments for each season from a suite of generation resources that will ensure resource adequacy. Many resources provide an "offer" identifying what price they would need to be paid to keep operational (*i.e.*, remain capable of delivering power upon command) all or part of the resource's accredited capacity for each of the four seasons. Other resources, including those already committed to operate via outside contracts, are self-scheduled into the auction process, meaning that MISO treats them as price takers or $0 offers. MISO then stacks each of these resources in ascending cost order, forming a supply curve.

The supply curve crosses a preset sloped demand curve, known as the Reliability Based Demand Curve. The sloped demand curve is designed by MISO to procure a certain amount of capacity at each price point; although it is tethered around MISO's goal of experiencing no more than one loss of load event per decade, it will obtain more capacity if it is cheaper and less if it is more expensive. This is consistent with the general principle that grid operators must always balance the

tradeoff between resource adequacy and cost. *See* Ex. 2 at 2–3 (Grid Strategies June Report).

The point where the supply and demand curves intersect is called the capacity market clearing price. All resources on the supply curve with offers at or below that amount are then committed to remain operational and be available for the respective season(s) in which they cleared, with the owners of those resources' capacity rights receiving the clearing price. Ex. 58 (MISO Tariff Module E-1).

3. *MISO Also Continuously Monitors the Grid to Balance Supply and Demand, and to Prevent Blackouts Using an Escalating Sequence of Real-Time Alerts that Activate Reserve Resources in a Specific, Predetermined Order.*

In addition to annually securing the set of resources it has determined will meet its regional reliability standard, MISO also operates the grid on a daily and hourly basis to match the resources it has available with load (*i.e.*, demand) over the course of each day. During normal operational periods, MISO uses its energy markets to receive information from every potential resource in the region (generators, batteries, etc.) about how much power they believe they can create and at what price, and then to issue instructions to the set of resources it needs to meet projected demand at least cost to the system. *See generally Elec. Power Supply Ass'n*, 577 U.S. at 268 (citation omitted) ("Each administers a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably. And still more important for present purposes, each operator conducts a competitive auction to set wholesale prices for electricity. These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day.").

On occasion, the total electric generation that is freely offered in MISO's day-ahead market is less than the MISO region's projected demand. That mismatch between projected demand and voluntary supply does not, however, of itself produce any disruption to the grid. In these instances, MISO implements a well-defined process to identify additional resources until the projected shortfall is addressed.

MISO has enshrined its process for securing extra resources to address projected shortfalls, which it deems "Max Gen Emergencies," in its operational tariff. Ex. 33 at §§ 4.2–4.3 (MISO Market Capacity Emergency) (describing Max Gen Emergency Event procedures). As described there, MISO often can address any shortfall simply by issuing a capacity advisory to double check its numbers, followed by a so-called "max-gen" alert to facility operators to suspend any optional maintenance or other activities that might be interfering with resources' power output (*i.e.*, to achieve maximum generation from all available resources). *Id.* at §§ 4.1, 4.2.2. MISO can then issue a warning of a potential shortfall and start curtailing exports and coordinating with its neighbors to bring in imports from adjacent regions. *Id.* at

§ 4.2.3. If these preliminary measures don't address the shortfall, MISO will then proceed step by step through a series of five steps with subparts (labeled "1a" through "5") of increasingly stringent mitigation measures to increase generation or reduce usage of electricity during the period at issue. Only on the final step (step "5) does any involuntary load shedding (*i.e.*, a blackout) occur; Steps "1a" through "4b" describe an increasing list of mitigation measures MISO will employ, including requesting power transfers from neighboring regions, turning on backup generators, utilizing contracted demand response resources, and asking the public for voluntary reductions. The following table, prepared by MISO, describes these steps (without delineating between "step 1a," "step 1b," etc.).

Attachment 8 — Summary of Market Capacity Emergency Procedure Steps




Source: Ex. 33 at 41 (MISO Market Capacity Emergency).

Through a combination of responsible grid management and capacity retention policies, MISO has avoided the need to utilize the full ten steps of its emergency process in recent years. MISO has not faced a Market Footprint Maximum Generation Emergency Event Step of 3 or higher since 2009, according to the most recent summation available (through June 2024)—and there was also not one in the summer 2025 season that just concluded. *See* Ex. 32 at 4–27 (MISO Emergency Declarations); Ex. 68 at 3–4 (Grid Strategies Sept. Report).

*4. Michigan Protects Resource Adequacy Through Integrated Resource Planning and Annual Capacity Demonstration Requirements.*

MISO is not the only entity monitoring resource adequacy. Michigan, like other states in MISO, closely governs its electricity market to ensure that its citizens enjoy ample supply from generators at reasonable cost, and in keeping with the state's other policy preferences.

The Michigan Commission regulates certain aspects of the energy industry in Michigan. It exercises key authorities of the state to, among other things, ensure resource adequacy and choose the state's preferred mix of energy generation resources. *See generally Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 205 (1983) (explaining that states have characteristically governed the need for new power facilities and their economic feasibility); *Citizens Action Coal. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025) ("[T]he States retain authority to choose their preferred mix of energy generation resources."). The Michigan Commission performs this function through, *inter alia*, review of utilities' Integrated Resources Plans. *See* MCL § 460.6t.

Michigan state law requires that electric utilities file an Integrated Resource Plan with the Michigan Public Service Commission at least every five years. *Id.* Those Integrated Resource Plans serve both to ensure resource adequacy and to ensure implementation of the state's and each utility's preferred mix of generation. Pursuant to state law, the Integrated Resource Plan is required to:

> Provide . . . a 5-year, 10-year, and 15-year projection of the utility's load obligations and a plan to meet those obligations, to meet the utility's requirements to provide generation reliability, including meeting planning reserve margin and local clearing requirements determined by the commission or the appropriate independent system operator, and to meet all applicable state and federal reliability and environmental regulations over the ensuing term of the plan.

*Id.* § 460.6t(3). Each Integrated Resource Plan must include a broad range of information and analysis regarding forecasted energy and capacity needs, supply-side generating resources (*i.e.*, electric generating facilities), and demand-side resources such as energy waste reduction and demand response measures. *Id.* § 460.6t(5).

The Integrated Resource Plan statute requires the Michigan Commission to establish modeling scenarios and assumptions to be used in each Integrated Resource Plan filing. *Id.* §§ 460.6t(1) (modeling scenarios and assumptions), 460.6t(3) (filing requirements). Once an Integrated Resource Plan is filed, the Michigan Commission reviews the plan through a year-long contested case process under the Michigan Administrative Procedures Act, *see id.* §§ 460.6t(7), 24.271–

.288, pursuant to which interested parties may intervene, conduct discovery, submit expert testimony, and present and cross-examine witnesses at an evidentiary hearing. The Michigan Commission is statutorily required to approve an Integrated Resource Plan if it determines that "[t]he proposed integrated resource plan represents the most reasonable and prudent means of meeting the electric utility's energy and capacity needs." *Id.* § 460.6t(8)(a). In deciding whether the Integrated Resource Plan satisfies that standard, the statute directs the Michigan Commission to consider several factors, including resource adequacy and capacity to serve anticipated peak electric load, applicable planning reserve margin, and local clearing requirement; reliability; commodity price risks; and diversity of generation supply. *Id.*

Under Michigan law, electric utilities are also required to make annual capacity demonstration filings that project the utility's capacity position over a four-year planning period. *Id.* § 460.6w. After auditing each year's submissions, the Michigan Commission Staff prepares an annual report that discusses resource adequacy throughout the state. *See, e.g.*, Ex. 28 at 16 (2028/2029 Michigan Commission Staff Capacity Demonstration Results) (finding that Michigan meets resource adequacy requirements); *see also* Ex. 27 at PDF 14–15, 26–27, 38–39 (Consumers 2028/2029 Capacity Demonstration) (showing that Consumers meets resource adequacy requirements, including in Summer, Fall, and Winter 2025).

### *5. NERC Protects Reliability via Standards and Regular Assessments*

NERC is the "Electric Reliability Organization" under section 215 of the Federal Power Act. *N. Am. Elec. Reliab. Corp.*, 116 FERC ¶ 61,062, at P 3, *order on reh'g & compliance*, 117 FERC ¶ 61,126 (2006); *see* 16 U.S.C. § 824o(a)(2). This role dates back to 2005, after Congress added Section 215 to the Act and FERC certified NERC as the Electric Reliability Organization. Energy Policy Act of 2005, Pub. L. No 109-58, Title XII, Subtitle A, section 1211(a), 119 Stat. 594, 941 (2005), 16 U.S.C. 824o (2000 & Supp. V 2005); 116 FERC ¶ 61,062, at P 3.

As the Electric Reliability Organization, NERC is responsible for establishing and enforcing reliability standards for the Bulk-Power System. 16 U.S.C. § 824o(a)(2); 18 C.F.R.§ 39.1. NERC's reliability standards are subject to FERC's review and approval. 16 U.S.C. § 824o(d); Ex. 2 at 7 (Grid Strategies June Report).

The NERC-developed and FERC-approved reliability standards apply to all users, owners, and operators of the Bulk–Power System within the continental United States. 16 U.S.C. § 824o(b)(1); 18 C.F.R. §§ 39.2, 40.1(a), 40.2(a); *see id.* § 39.1 (defining "Bulk–Power System"). Each reliability standard identifies the types of entities that must comply with the standard, like generator owners, transmission owners, or transmission operators. *Reliability Standard Compliance and Enforcement in Regions with Regional Transm. Orgs. or Indep. Sys. Ops.*, 122 FERC ¶ 61,247, at P 4 (2008); *e.g.*, *Emergency Ops.*, EOP-011-4, *available at*

https://www.nerc.com/pa/Stand/Reliability%20Standards/EOP-011-4.pdf (stating requirements applicable to, *inter alia*, balancing authorities, reliability coordinators, and transmission operators for the purpose of "address[ing] the effects of operating Emergencies by ensuring each Transmission Operator and Balancing Authority has developed plan(s) to mitigate operating Emergencies and that those plans are implemented and coordinated within the Reliability Coordinator Area as specified within the requirements"). Independent System Operators like MISO must comply with applicable NERC standards, and they are subject to penalties for noncompliance. 122 FERC ¶ 61,247, at PP 1, 5, 16; *see also* MISO's FERC-Approved Tariff at Schedule 34, *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 (setting forth allocation costs associated with monetary penalties assessed against MISO for violation of NERC standards).

NERC performs other functions in addition to development and enforcement of reliability standards. For instance, NERC annually assesses seasonal and long-term reliability of the bulk power system and monitors system performance. Ex. 2 at 7–8 (Grid Strategies June Report); *see also* 18 C.F.R. § 39.11. As part of these assessments, an "elevated risk" designation does not constitute an emergency because it does not indicate the possibility of imminent shortfalls; indeed, it is only the second of three risk levels offered by NERC. Since it began providing standardized "risk" assessments by region in the summer of 2021, NERC has adhered to a three-tiered assessment of risk: areas facing the least risk are "low" or "normal" risk regions, areas facing the most risk are "high" risk regions, and areas in between are "elevated" risk regions. *See* Ex. 42 at PDF 74, 124, 170, 218 (2019–24 NERC Summer Reliability Assessments). NERC's determination of "elevated" risk indicates only that there is a "[p]otential for insufficient operating reserves in above-normal conditions." Ex. 41 at 6 (NERC 2025 Summer Reliability Assessment).

### B. *The Evidence Shows No Resource Adequacy Crisis in MISO for Summer 2025, Fall 2025, and Thereafter.*

#### 1. *There Is No Evidence of a Resource Adequacy Crisis in Summer 2025.*

The Department's August Order purported to address "resource adequacy problems" for the Summer 2025 season, although only 11 days remained in the Summer season as defined by MISO (from June 1 to August 31) when the Order was issued. *See* Ex. 67 at 2–3 (August Order). The Summer 2025 season was demonstrated in advance to have adequate supplies, which has been borne out by the past three months of experience.

As previously discussed in response to the May Order, the 2025–2026 Planning Resource Auction "secured [for Summer 2025] an overall 9.8% Reserve Margin—almost two percentage points more than the 7.9% target that MISO determined was

needed to meet resource adequacy requirements." Ex. 71 at 24–25 (Public Interest Organizations' June Rehearing Request) (citing Ex. 31 at 5 (MISO 2025–26 Auction Results)). Public Interest Organizations also described how Local Resource Zone 7 (Michigan's Lower Peninsula) had local capacity offers within the recent Planning Resource Auction totaling "over 98% of the Zone's required Reserve Margin in Summer 2025, which in combination with transmission availability from neighboring Zones was more than enough to maintain the Zone's resource adequacy." *Id.* at 25 (citing Ex. 31 at 18 (MISO 2025–26 Auction Results)); *see generally* Ex. 34 (Ramey MISO Comments) (testifying that no capacity deficits have materialized in 2025).

The August Order also notes that "MISO issued alerts for the Central Region on at least 40 of the 69 days between June 11 and August 18." Ex. 67 at 3 (August Order). However, none of these alerts cited by the Department progressed past the Max Gen Event Step 1b, meaning MISO did not even need to access previously contracted demand response and other resources to address the shortfall, and was several steps away from actually needing to shed firm load (Step 5). Ex. 68 at 3–4 (Grid Strategies Sept. Report); *see supra* sec. IV.A.2.ii. In other words, MISO's system did not come close in Summer 2025 to an actual generation shortfall.

Throughout June 2025, MISO received supply offers more than sufficient to meet each day's peak load. MISO receives these offers shortly before the generators are to supply power, making them a reliable and conservative indicator of available resources. Ex. 70 at ¶ 13 (Konidena Decl.). MISO recently demonstrated the excess offers on each day of June over and above that day's peak load, as shown in the graph below.




Ex. 111 at 33 (MISO June Operations Report).

Examining real-time operations on the tightest-margin day of the Summer—June 23, when MISO declared an EEA 1b emergency—is instructive here. At peak load, which occurred between 4PM to 5PM Eastern, MISO had more than enough resources offered into its markets to meet demand. As Public Interest Organizations' expert engineer Rao Konedina explains, MISO had 3,323 MW of surplus offers above what it needed to meet demand:

| | | |
|---|---|---|
| | Offered Supply | 122,635 MW |
| - | Peak Load | 119,312 MW |
| = | Surplus | 3,323 MW |

Ex. 70 at ¶ 14 (Konidena Decl.).

Additionally, MISO had over 7,000 MW of emergency headroom resources (*i.e.*, additional generation it could obtain from resources that can meet the grid's needs by surpassing a limit placed for economic purposes). *Id.* at ¶ 16. Some of those resources were instantaneously available to MISO operators if needed (committed emergency headroom) and some were available on short notice, mostly less than 4 hours (uncommitted emergency headroom). *Id.* The offered supply and emergency headroom was well more than needed to cover peak load and ensure MISO could cover contingencies through its operating reserves of 2,710 MW, as the expert engineer further demonstrates:

| | | |
|---|---|---|
| | Offered Supply | 122,635 MW |
| + | Committed Emergency Headroom | 3,946 MW |
| + | Uncommitted Emergency Headroom | 3,382 MW |
| - | Peak Load | 119,312 MW |
| - | Operating Reserve | 2,710 MW |
| = | **Surplus** | **7,941 MW** |

Id. at ¶¶ 15–16.

By comparison, Campbell Units 1 and 2 were completely offline when demand peaked on MISO's system, and Unit 3's contribution maxed out at around 760 MW. *See* Ex. 68 at 5 (Grid Strategies Sept. Report); Ex. 104 (CAMPD Campbell Hourly Emissions Data). This is consistent with Campbell's general history of only having 70% of its capacity available for MISO max generation events in recent years. Ex. 68 at 4 (Grid Strategies Sept. Report). It also means that MISO's surplus of 7,941 MW was over 10 times greater than the amount of power Campbell was providing at the time. Ex. 70 at ¶ 17 (Konidena Decl.). Thus, even at its peak demand, MISO did not need Campbell to have sufficient supply to maintain reliability for the region. *Id.*

In fact, among the resources available to MISO were 8,610 MW of demand response programs, called Load Modifying Resources, that can help reduce peak demand by, for example, cycling air conditioning loads and using behind-the-meter generation. *Id.* at ¶ 21. The demand response programs have varying notification times, which gives MISO flexibility to react as conditions develop. *Id.* at ¶¶ 21–22. And MISO can even ask for voluntary load reductions if needed. *Id.* at ¶ 23. MISO could have even requested or directed some resources on planned outage to return to service sooner than scheduled. *Id.* at ¶¶ 20, 23. Thus, the evidence strongly suggests that MISO's system would have operated just fine without Campbell.

In addition to the information about Summer 2025 market conditions available to the Department at the time of the August Order, a simple review of the weather forecast on August 20, the day before the Department issued the August Order, could have allayed any concerns about resource adequacy in the final 11 days of MISO's summer season. A weather report issued on that day indicated that "[t]emperatures [were] expected to run 10 to 25 degrees below average from the Plains to the Midwest—and even reach into parts of the South," and predicted that these below average temperatures would last through the end of August across the majority of MISO's footprint. Ex. 88 at 2–3 (August 20 weather report). This is noteworthy because summer-season strain to the grid is near-universally caused by heat waves.

Finally, it is instructive to retrospectively examine the performance of the MISO system in the final days of the Summer season, *following* the August Order. MISO issued Capacity Advisories—a step that precedes Max Gen status and the multi-step process discussed *supra* sec. IV.A.3—for each of August 27–30, based on forced generation outages in the MISO South subregion. However, MISO announced no real-time operations notifications covering MISO North/Central in that time period.[2] At no point this past summer, including in the final 11 days, did MISO come close to an actual loss of load.

In sum, there were no looming "resource adequacy problems" for the remainder of the Summer 2025 season in MISO at the time the Department issued the August Order.

*2. There is No Evidence of a Resource Adequacy Crisis in Fall 2025.*

MISO is also entering the Fall 2025 season having secured more than enough capacity to meet its resource needs. Specifically, in the 2025–2026 Planning Auction, the RTO exceeded its Fall 2025 procurement target (in megawatts), the

---

[2] MISO, Real Time Operations Notifications, https://www.misoenergy.org/markets-and-operations/notifications/real-time-operations-notifications (last visited Sept. 3, 2025).

Reserve Margin Requirement,[3] by 2.6%, meaning that MISO entered the fall season (as it did the summer) with *more* resources than its own analysis has indicated are actually needed to ensure grid reliability. Ex. 31 at 19 (MISO 2025-26 Auction Results); *see also* Ex. 59 (MISO 2025–2026 Prelim. PRA Report with Final Results). In MISO North (Zones 1–7 in Ex. 75 (MISO Tariff Zonal Map)), the offers to supply capacity also exceeded the Reserve Margin Requirement by about 4,000 MW. *Id.* By itself, this fact is sufficient evidence to conclude that MISO does not face a resource adequacy shortfall for the season.

The August Order suggests that this Fall season is part of the "year-round" risk that MISO identified as a future possibility nearly *four years ago.* Ex. 67 at 3 n.16 (August Order) (citing Ex. 77 (MISO Transmittal Letter dated Nov. 30, 2021)). However, when placed in context unexamined in the August Order, the 2021 letter comes nowhere near supporting the notion of a resource adequacy crisis this Fall. In fact, MISO actually expected to procure enough resources during non-Summer seasons to be ten times more protective than the industry standard. When MISO first introduced its new seasonal resource adequacy structure to FERC, its expert described its modeling of seasonal LOLE as follows:

> MISO proposes to round [Loss of Load Expectation] targets up to a minimum of 0.01 day per year for any Season(s) with LOLE less than 0.01 day per year and maintain LOLE targets for the Seasons with LOLE greater than 0.01 day per year.

Ex. 78 at 11:12–15 (McFarlane Testimony). In other words, MISO contemplated that its Monte Carlo modeling exercise might predict that MISO experiences *less than a hundredth* of a day of lost load every year in non-Summer seasons, which is equivalent to less than a single day of lost load *every 100 years*. Nowhere in that filing did MISO express any expectation that the Fall season risk would even approach that of the Summer season anytime soon. And FERC approved this aspect of MISO's seasonal modeling (together with the remainder of MISO's seasonal capacity construct) the following year, indicating its general agreement. Ex. 79 at P 87 (MISO 2022 Accreditation Order).

In the years since that statement was made, MISO has had the chance to calculate actual seasonal risks with the benefit of additional data. The extensive quantitative analyses of resource adequacy MISO has published in the intervening

---

[3] For the 2025–2026 Planning Auction, following FERC's order in Docket No. ER23-2977-000, MISO introduced for the first time a concept called the "Final PRMR" in addition to "Initial PRMR," where the latter was synonymous with the PRMR as determined for all prior Planning Resource Auctions. Public Interest Organizations here use the term "Reserve Margin Requirement" to mean Initial PRMR.

years uniformly confirm MISO's initial expectations and find no near-term material risk outside of Summer.

The clearest evidence of the absence of non-Summer risk in the MISO system comes from the most recent iterations of MISO's LOLE study. *See supra* sec. IV.A.2.i (explaining the loss of load expectation study process). All of MISO's recent LOLE simulations since it shifted to a seasonal resource adequacy construct find extremely low risk of loss of load in the Fall season, far below the industry standard risk tolerance of 1 day in 10 years. In 2023, MISO's LOLE analysis calculated that, for the MISO-wide region, there would be *zero* risk of outages in the Fall, Winter and Spring seasons; per its seasonal accreditation policy MISO manually adjusted the LOLE for these non-Summer seasons up to .01 days of LOLE/year (or 1 outage every 100 years). Ex. 80 at 33 (MISO 2023-24 LOLE Study Report); Ex. 81 at 49:15–17 (Joundi Testimony). MISO's 2024 and 2025 LOLE studies posted the same .01 LOLE (likely similarly adjusted upward) in the non-Summer seasons. Ex. 82 at 33 (MISO 2024-25 LOLE Study Report); Ex. 83 at 34 (MISO 2025-26 LOLE Study Report); *see also* Ex. 68 at 2 (Grid Strategies Sept. Report). Notably, MISO's 2025 analysis was conducted with the expectation—dating back to 2022—that Campbell would retire on May 31, 2025, at the outset of the 2025–2026 planning year. *Accord* Ex. 67 at 2 (August Order) (acknowledging that "MISO and Consumers have incorporated the planned retirement of the Campbell Plant into their supply forecasts").

MISO has reached the same conclusions regarding risk in the lower peninsula of Michigan. Its zonal-specific modeling in the 2025 LOLE also posted .01 LOLE (1 event per 100 years) for this Fall and the coming Winter and Spring (which were also likely adjusted upward). Ex. 83 at 34–35 (MISO 2025-2026 LOLE Study Report) (noting that "a minimum seasonal LOLE criterion of 0.01 will be used to calculate the LRR in seasons with less than 0.01 LOLE risk under the annual case"). *Id.* Thus, there is also no basis for concern in the immediate region around Campbell.

*3. There Is No Evidence of a Resource Adequacy Crisis After Fall 2025.*

The MISO system is also set up to operate smoothly for years beyond the 90-day timeframe of the August Order. There is ample evidence demonstrating that this is true for the remainder of the 2025–2026 planning year that MISO has already secured; for the next couple years after that; and even out through the 2030 time horizon that the Department identifies as a long-term source of concern.

First and most directly, MISO has secured the stability of its grid through at least the end of May 2026 by operation of its 2025–2026 Planning Auction. As explained above, the auction secures in April of each year the resources necessary to ensure grid reliability individually for each of the four subsequent seasons. *See supra* sec. IV.A.2.ii. The 2025–2026 Planning Auction exceeded its target Reserve

Margin Requirements for the Winter and Spring seasons by 6.1% and 1.5% respectively, meaning that (as it did for the Summer and Fall seasons) MISO will enter those seasons with *more* resources than its own analysis has indicated are actually needed to ensure grid reliability. Ex. 31 at 5 (MISO 2025-26 Auction Results). Furthermore, as with the Fall season, MISO's modeling in conjunction with its shift to a seasonal resource adequacy construct indicated that the loss of risk in Winter and Spring (as with Fall) is very low. Ex. 81 at 49:15–17 (Joundi Testimony); *see also* Ex. 82 at 33 (MISO 2024-25 LOLE Study Report); Ex. 83 at 34 (MISO 2025-26 LOLE Study Report). Thus, there is no basis for any resource adequacy concern for either the Winter or Spring seasons. And of course, all of this is recently confirmed by MISO itself, which has noted that "MISO's 2025–2026 Planning Resource Auction indicated adequate resources to meet anticipated demand." Ex. 117 (RTO Insider Article on August Order).

Second, although MISO has not yet conducted its 2026–2027 Planning Auction (or the auctions for subsequent years), there is not a single projection that indicates the possibility of a regional resource adequacy shortfall through May 2027. MISO's joint annual survey with the Organization of MISO States ("OMS"), which forecasts generation capacity supply and system load (the "OMS-MISO Survey"), evaluates a range of potential outcomes years into the future, using a set of assumptions ranging from extremely conservative to a match of utility projections. *See infra* sec. V.A.2.ii. The most recent edition of that survey, completed June 2025, predicts a *surplus* of between 1.4 and 6.6 gigawatts ("GW") for Planning Year 2026–2027 (*i.e.*, June 2026–May 2027), and its projection range for Planning Year 2027–2028 ranges from a surplus of 6.4 GWs to a small deficit of 1.4 GWs. Ex. 89 at 7 (2025 OMS-MISO Survey). In other words, the survey provides no basis for any concern about MISO's ability to meet resource adequacy needs through at least May 2027. And a series of unlikely events would have to occur for the region to see even a minor (1–2 GW) deficit through May 2028, as further explained below. MISO's system is robust, and even without significant intervention (also discussed below), it was on track as of early June 2025 to ensure that its grid remains robust for approximately the next three years. And this is also true in the local region where Campbell is located: as discussed in its most recent annual report, issued on May 12, 2025, the Michigan Commission Staff found that Consumers meets resource adequacy requirements for both the 2025/26 year, and through the 2028/29 year. Ex. 28 at 16 (2028/2029 Michigan Commission Staff Capacity Demonstration Results).

Third, although MISO has spoken publicly about its long-term resource adequacy concerns heading into Summer 2028 and beyond, those concerns remain extremely remediable through policy measures and other strategies to ensure any projected shortfall is addressed before it becomes a meaningful problem. And MISO is not standing still in this regard: as MISO has explained:

> "State regulators along with utilities have the responsibility of ensuring resource adequacy. MISO remains focused on reliably operating the grid

> using the resources our members provide, while working closely with stakeholders and regulatory partners, providing visibility into system needs and sending market signals to inform long-term resource planning."

Ex. 117 at 3 (RTO Insider Article on August Order). Generally speaking, from FERC down to stakeholders everyone working regularly in the energy regulatory world recognizes that the industry is dynamic, and everyone is engaging to ensure there are adequate resources going forward. Just three months ago, FERC hosted a technical conference where MISO, the market monitor, and other contributors highlighted that the system is in good shape today, and outlined plans to ensure that remains the case down the road. *See, e.g.*, Ex. 35 at 1 (Patton MISO Comments) ("The resource adequacy challenges and risks in MISO are not nearly daunting as portrayed by MISO planning reports or the NERC 2024 Long-Term Reliability Assessment."); *see also* Ex. 62 at 13 (FERC Technical Conference Notice).

In fact, MISO has already taken tangible steps to address what it perceived to be a potential for resource adequacy shortfalls down the road: it developed, and secured FERC approval for, an Expedited Resource Addition Study (ERAS) pathway for generator interconnection. *See generally* Ex. 90 at 1 (MISO ERAS Transmittal Letter); Ex. 91 at P 1 (MISO ERAS Decision). The ERAS proceeding demonstrates how effectively the system already works: in response to somewhat conjectural resource adequacy shortfall projections, MISO launched an entirely new interconnection process that is currently underway and even at just over two-thirds full is projected to add over 26.5 GW of new capacity to the system, most of which will be provided by gas plants. Ex. 109 at 1 (MISO ERAS News Release). That 26.5 GW of nameplate capacity by itself would more than cover the OMS-MISO Survey's maximum projected needs under the most conservative assumptions. (The survey did not account for ERAS projects because it predated FERC's approval of ERAS.) Thus, MISO does not simply have a plan to address the possibility of shortfalls three-plus years down the road: a key pillar of its plan is already underway.

### *C. Campbell Should Retire ASAP.*

#### *1. Campbell Is a Power Plant in Michigan Originally Built in 1962.*

Campbell is a power plant originally commissioned in 1962. It is located in West Olive, Michigan, 30 miles west of Grand Rapids and alongside Lake Michigan.



Source: Google Maps.

Campbell relies on burning coal to generate electricity. The plant has three generating units, which are between 45 and 63 years old. Ex. 11 at 7 (Blumenstock 2024 Direct Testimony).


Source: Garrett Ellison, *Consumers Energy Agrees to Retire Full Campbell Plant, End Coal by 2025* (Apr. 20, 2022), https://www.mlive.com/public-interest/2022/04/consumers-energy-agrees-to-retire-full-campbell-plant-end-coal-by-2025.html.

2. *Consumers Energy, an Investor-Owned Utility in Michigan, Is Campbell's Majority Owner.*

Consumers Energy is the second largest electric utility in Michigan. The utility serves 1.9 million customers across a broad swath of the state's Lower Peninsula. It is a wholly owned subsidiary of CMS Energy Corp., a publicly traded corporation. *See* Ex. 73 at 16 (Consumers' July 2025 10-Q).

To meet its customers' energy needs, Consumers owns and operates, or contracts for, a wide array of resources, including gas, oil, hydroelectric, renewables, and hydro-pumped storage. *See* Ex. 27 (2028/2029 Consumers Capacity Demonstration); Ex. 11 at 7 (Blumenstock 2024 Direct Testimony). Consumers also deploys load-modifying resources that significantly reduce energy needs during periods of peak demand. Ex. 27 at PDF 50 (2028/2029 Consumers Capacity Demonstration). Consumers is also a MISO member, meaning among other things that it participates in MISO-run wholesale interstate markets including energy, ancillary service, and capacity markets, and that it allows MISO to operate its transmission grid.

Consumers wholly owns Campbell Units 1 and 2. Ex. 73 at 5 (Consumers' July 2025 10-Q). Consumers owns about 93% of Unit 3, the Michigan Public Power Agency owns 4.8%, and Wolverine owns less than 2%. Ex. 24 at 2 ¶ 4 (Mich. Pub. Power Agency Petition to Intervene); Ex. 13 at 6 (Kapala Direct Testimony); Ex. 20 at PDF 28 (King Direct Testimony).

3. *Campbell Is Old, Unreliable, Inflexible, Dirty, and Expensive.*

   i. *Campbell Is Old and Unreliable.*

Campbell Units 1 and 2 are beyond the typical operational life of coal units, Ex. 3 at 15 (Powers June Decl.) (citing Exs. 63 (Palgrave Handbook) and 64 (IEA Report)), and all three units have experienced long and recurrent outages in recent years that reflect aged, worn components that are expensive and may be difficult to repair or replace, *id.* at 4, 15. In the tables below, and with further context in his declaration, Public Interest Organizations' expert engineer Bill Powers identifies the duration and reasons for the units' longest outages in the past two years based on Consumers' filings with the Michigan Commission. *Id.* at 5. (For reference, there are 8,760 hours in a year.)

**Longest 2024 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|---|---|---|
| 1 | • Degraded governing valve (3 outages)<br>• Worn leaking superheater tube (1 outage) | 911<br>491 |
| 2 | • Obsolete boiler feedwater pump failure (1 outage)<br>• Degraded valve(s) malfunction (3 outages)<br>• Worn equipment leaks, various (4 outages) | 1,417<br>1,723<br>854 |
| 3 | • Worn/failed turbine turning gear (1 outage)<br>• Worn tube leak (1 outage) | 1,104<br>356 |

The numbers above are rounded to the nearest hour.

**Longest 2023 Outages by Type**

| Unit | Outage Description | Total Duration (hours) |
|---|---|---|
| 1 | • Worn leaking valve and superheater tube (2 outages) | 661 |
| 2 | • Obsolete boiler feedwater pump failure (4 outages)<br>• Worn equipment leaks (3 outages) | 3,445<br>571 |
| 3 | • Worn leaking boiler/superheater tubes (3 outages)<br>• Worn/vibrating turbine bearings (1 outage) | 1,857<br>426 |

The numbers above are rounded to the nearest hour.

The outages demonstrate Campbell's increasing inability to consistently perform even under normal conditions, let alone to meet an emergency. All three Campbell units have been unexpectedly unable to produce power during significant portions of recent years (known as the units' "forced outage rate"[4]). *Id.* at 4 (*citing* Consumers' filings with the Michigan Commission). In 2023, the units' forced outage rates were 18.66% (Unit 1), 57.32% (Unit 2), and 22.41% (Unit 3). *Id.* In 2024, the rates were 14.84% (Unit 1), 48.07% (Unit 2), and 19.25% (Unit 3). *Id.* By contrast, the national average forced outage rate for coal-burning units is approximately 12%. *Id.*

New data from EPA indicates that Campbell has continued to operate unreliably since the Department issued its May Order. As explained in an updated declaration from Mr. Powers, both Campbell Units 1 and 2 experienced long outages in June 2025, the first full calendar month of operation under the May Order. Ex. 69 at 5

[4] Consumers Energy typically uses the phrase "random outage rate" in place of "forced outage rate."

(Powers Sept. Decl.). Unit 1 experienced an outage on June 23 and remained offline the rest of the month. *Id.* (citing Ex. 102 (CAMPD Campbell Daily Emissions Data)). Unit 2 produced power on *only four* of 30 days in June. *Id.* (citing Ex. 102 (CAMPD Campbell Daily Emissions Data)). The unit originally was "out of service" due to repairs and maintenance work on May 23 through June 25 and went offline again due to a "water intake issue" starting on July 4. *Id.* 5–6 (citing Ex. 101 at Question 4 (Consumers June Responses to AG) and Ex. 103 (July 17 Email from Consumers to EGLE)). Ultimately, Unit 2 produced more than nominal amounts of power on *only three* days total in June—June 28, 29, and 30—and, even then, operated at approximately 50 percent of its rated capacity. *Id.* at 5 (citing Ex. 102 (CAMPD Campbell Daily Emissions Data)). In short, "Units 1 and 2 demonstrated they [could not] stay online continuously in June 2025 and that they [had to] stop and start, with long outages between stops, due to their unreliable condition." *Id.* at 7.

This pattern of unreliable operations is unsurprising considering Consumers significantly decreased capital expenditures and maintenance in Campbell since the 2022 settlement. As Mr. Powers detailed in his June declaration and reiterates in his September declaration, Consumers transitioned from a preventative approach to a "fix it if it breaks" approach at Campbell in recent years. *Id.* at 4; Ex. 3 at 15–17 (Power June Decl.). Consumers' filings with the Michigan Commission show that the company reduced its capital spending by approximately 91 percent across Campbell Units 1, 2, and 3 compared to the amount the company projected to spend if Units 1 and 2 had continued operating until 2031 and Unit 3 until 2039. Ex. 69 at 3 (Powers Sept. Decl.); Ex. 3 at 5–6 (Powers June Decl.) (citing Consumers' filings with the Michigan Commission); *see also* Ex. 101 at Question 1 (Consumers June Responses to AG) (stating that Consumers "has not recorded any capital expenditures at the Campbell plant in the two-year period prior to May 31, 2025"). Likewise, Consumers reduced its major maintenance spending by approximately 62 to 78 percent across Units 1, 2, and 3 compared to the amount the company projected to spend if Units 1 and 2 had operated until 2031 and Unit 3 until 2039. Ex. 69 at 3 (Powers Sept. Decl.); Ex. 3 at 5–6 (Powers June Decl.) (citing Consumers' filings with the Michigan Commission). All told, Consumers cancelled $161 million in planned capital and major maintenance projects at Campbell in recent years. Ex. 69 at 7 (Powers Sept. Decl.). As a result, "it is unlikely Campbell can be depended upon to operate reliably." *Id.*

*ii. Campbell Is Inflexible.*

On top of Campbell's reliability problems, the plant also takes significant time to start up from a cold condition, as shown in the following table.

| Unit 1 | Unit 2 | Unit 3 |
|---|---|---|
| 24 hours | 36 hours | 72 hours |

*Id.* at 6; *see also* Ex. 101 at Question 5 (Consumers June Responses to AG). These startup times are very long, even for coal units. Ex. 69 at 6 (Powers Sept. Decl.); *see* Ex. 118 (RMI Analysis of Coal Plants' Threats to Reliability) (stating that the average coal plant takes 12 hours to reach max capacity from a cold start); Ex. 55 (IEA Flexibility Report) (similar). Even if Campbell could provide power reliably—and it cannot—the units' long start times mean the plant is ill-suited to provide peaking power during periods of high demand. Ex. 69 at 6 (Powers Sept. Decl.). In other words, Campbell's inflexibility makes it unsuitable for providing power during precisely the kind of periods the plant is supposed to be operating pursuant to the August Order.

*iii. Campbell Is Dirty.*

Campbell has been a significant source of pollution. Each year when operating, the plant emitted around one hundred thousand pounds of air toxics, hundreds of thousands of pounds of particulate matter, many millions of pounds of nitrogen oxides and sulfur dioxide, and over ten billion pounds of carbon dioxide. *See* U.S. Envtl. Prot. Agency ("EPA"), ECHO, https://echo.epa.gov/air-pollutant-report?fid=110000411108 (last visited Sept. 3, 2025); *see also* EPA, eGRID, https://www.epa.gov/egrid/egrid-pm25 (Jan. 15, 2025). In fact, Campbell emitted more sulfur dioxide and particulate matter than any other plant in Consumers' generation fleet. Ex. 23 at 10–12 (Bilsback Direct Testimony). Campbell also used approximately *one billion gallons* of water per day from Lake Michigan while discharging significant amounts of contaminated wastewater back into the lake. *See* Ex. 3 at 21 (Powers June Decl.) (*citing* Ex. 48 (2021 CWA Permit)). In 2023, for example, the plant discharged approximately 96,000 pounds of pollution into Lake Michigan, including 10,000 pounds of toxic metals. EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000411108 (last visited Sept. 3, 2025). Additionally, burning coal at Campbell creates toxic coal ash. The plant already holds roughly 6.2 million cubic yards of coal ash in an on-site landfill. Ex. 47 at 4 (2024 Coal Ash Inspection Report).

Recent information shows that Campbell continues to be a significant source of pollution. In just one month (June 2025) of operation pursuant to the May Order, Campbell emitted approximately 694,696 pounds of sulfur dioxide, 483,868 pounds of nitrogen oxides, and 1,453,247,200 pounds of carbon dioxide. Ex. 69 at 11 (Powers Sept. Decl.) (citing Ex. 102 (CAMPD Campbell Daily Emissions Data)). Between June 1 and July 31, Campbell also withdrew approximately 40 billion gallons of water from Lake Michigan and discharged approximately the same amount back into the lake. *Id.* (citing Campbell's discharge monitoring reports).

Campbell's air pollution harms its neighbors. When nitrogen oxide and sulfur dioxide are emitted into the air, they can irritate the lungs and harm respiratory systems. *Id.* at 11; *see also* EPA, *Basic Information about NO2*, https://www.epa.gov/no2-pollution/basic-information-about-no2 (last visited Sept. 3,

2025); EPA, *Sulfur Dioxide Basics*, https://www.epa.gov/so2-pollution/sulfur-dioxide-basics (last visited Sept. 3, 2025). Nitrogen oxide is also a precursor to ozone formation, and sulfur dioxide contributes to the formation of acid rain. *Id*. Particulate matter emissions can cause serious health problems when inhaled, and can also contribute to haze that impacts visibility. EPA, *Particulate Matter (PM) Basics*, https://www.epa.gov/pm-pollution/particulate-matter-pm-basics (last visited Sept. 3, 2025). Emissions of volatile organic compounds also harm human health and air quality. EPA, *Volatile Organic Compounds' Impact on Indoor Air Quality*, https://www.epa.gov/indoor-air-quality-iaq/volatile-organic-compounds-impact-indoor-air-quality (last visited Sept. 3, 2025). Prior expert analysis of the Campbell units' pollution found that retiring the plant would eliminate annual emissions into the air of 538 tons of particulate matter, 13 tons of volatile organic compounds, 2,918 tons of nitrogen oxides, 5,244 tons of sulfur dioxide, and 8.2 million tons of carbon dioxide based on 2019 operational levels. Ex. 23 at 11 (Bilsback Direct Testimony). Each year, those emissions led to modeled mortality impacts of 36–81 premature deaths and $389–$879 million in health impact costs, including non-fatal respiratory and cardiovascular harms affecting people. *Id.* at 15.

Campbell's water usage and pollution also causes harm. For example, coal plants' withdrawal and discharge of water—like the 40 billion gallons from Lake Michigan Campbell used and discharged in June through July—can harm marine life. Ex. 69 at 11 (Powers Sept. Decl.). Marine animals can be caught up and cycled through water circulation pumps at the point of water intake and subjected to much higher water temperatures at the point discharge. *Id*.

Campbell's pollution adds to and exacerbates significant other burdens on nearby communities. According to the Michigan Department of Environment, Great Lakes, and Energy, the census tract in which Campbell is located has far more "adverse environmental factors"—like water pollution and proximity to toxic waste dumps—than the rest of the state, and the tract also has a high socioeconomically vulnerable population compared to the rest of the state. Mich. Dep't of Env't, Great Lakes, and Energy, MiEJScreen, https://www.michigan.gov/egle/maps-data/miejscreen (last visited Sept. 3, 2025); *see also* Mich. Dep't of Env't, Great Lakes, and Energy, MiEJScreen Factsheet, https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Offices/OEJPA/MiEJScreen/MiEJScreen-Factsheet.pdf (last visited Sept. 3, 2025). Nearby Grand Rapids has communities that are significantly overburdened by environmental pollution and populations that are uniquely sensitive to pollution due to socioeconomic factors, high rates of disease, and other factors. *Id.*

As Public Interest Organizations' expert engineer concludes based on his review of the new air emission and water discharge data from June and July: "In my professional opinion, and based on my 40 years of experience in coal boiler air emissions assessment and utility resource planning . . . the [] emissions and discharge data show substantial and unnecessary environmental impact caused by

operation of Campbell when lower-emitting, lower cost alternatives are available." Ex. 69 at 12 (Powers Sept. Decl.).

*iv. Campbell Is Expensive.*

Campbell is also an expensive plant to run. In 2021, Consumers projected that retiring Campbell in 2025 would avoid $365,008,000 in capital expenditures and major maintenance costs. Ex. 13 at 3–4 (Kapala Direct Testimony) (summing "avoided capital expenditures" and "avoided major maintenance expenses" for Units 1–3). At that time, the cost of power generated by Campbell—including capital, operation, maintenance, and fuel costs—was $33.64 per megawatt hour ("MWh"). Ex. 49 (2025 Energy Innovation Dataset) (compiling data from the U.S. Energy Information Administration).

Campbell has gotten even more expensive to run since 2021. In 2024, the cost of Campbell's power rose to $40.65 per MWh, a 21% increase over the 2021 cost. *Id.* This means the cost of Campbell's power grew significantly faster than inflation (roughly 16%) over the same period. Ex. 50 at 3 (2025 Energy Innovation Coal Cost Report); *see also* Ex. 51 at 12 (2023 Energy Innovation Coal Cost Report) (describing the same methodology used in the 2025 report).

As Public Interest Organizations' expert analyst Michael Goggins explains, the available data demonstrates that Campbell "operated at an overall loss even during a high-demand summer period that included the June 23 event." Ex. 68 at 6 (Grid Strategies Sept. Report). And there is good reason to believe this will continue; looking to Campbell's recent operating costs, Mr. Goggins determines,

> These costs are higher than average prices in the MISO market during a typical year, and even during high demand periods like MISO experienced in June 2025. Over the one-year period from July 2024 through June 2025, the MISO Day-Ahead price at the Campbell market node exceeded $40.74/MWh in only 21% of hours. Thus, in 79% of hours, Campbell could not earn enough to cover its operational costs.

*Id.* (footnote omitted).

Consumers Energy recently reported on part of the tremendous economic burden caused by Campbell's operation under the May Order. In just first five weeks of operations under that Order (from May 23 through June 30, 2025), Consumers' "net financial impact of complying with the order was $29 million." Ex. 73 at 62 (Consumers' July 2025 10-Q); *see* Consumers Energy Co., FERC Form 3-Q Quarterly Financial Report at 120–21 (Aug. 14, 2025), Accession No. 20250814-8001, https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250814-8001&optimized=false&sid=1e90ede4-da17-4482-8e6d-e346192d0609 [hereinafter [Consumers' FERC 3-Q"] (same). Consumers further makes clear that, for this amount, "recovery will be sought through FERC in a subsequent proceeding after a

modification to the MISO Tariff is established." Ex. 73 at 62 (Consumers' July 2025 10-Q); Consumers' FERC 3-Q at 120–21. And as Consumers has explained: "For the avoidance of doubt, Consumers Energy only seeks to recover its Order Costs net of market revenues earned from the Campbell Plant's operation." *Consumers Energy v. Midwestern Independent Sys. Operator, Inc.*, Complaint Requesting Fast Track Processing, FERC Docket No. EL25-90, at 13 (June 6, 2025), Accession No. 20250606-5231; *accord id.* at 2 & 2 n.7, 4–6, 12, 17, 20, 22. As such, there is good reason to believe that the $29,000,000 "net financial impact" reflects Consumers' costs caused by the Department's order *after* accounting for any revenues the utility earned.

The bills for the Department's Campbell orders are set to hit ratepayers across eleven states in the MISO footprint. *Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39–40 (2025); *see also* Ex. 16 at 2 (DOE Letter to FERC) (stating that the Department is referring to FERC the rate issues relating to the May Order).

***

All of these harms could be avoided by retiring Campbell. As further discussed below, Consumers Energy wanted to retire the plant on May 31, 2025. The Michigan Commission and the regional grid operator MISO approved the retirement.

4. *Campbell's May 31, 2025 Retirement Has Been Carefully Planned and Well Executed to Ensure Resource Adequacy.*

    i. *Campbell's May 31, 2025 Retirement Was the Product of Careful Planning from Diverse Stakeholders Under a Settlement that Improves Resource Adequacy.*

In 2021, Consumers Energy filed an Integrated Resource Plan that proposed retiring Campbell in 2025, acquiring the 1,176 MW New Covert gas plant in 2023, and making substantial investments in new generation and storage resources. Following a lengthy contested case process—with thousands of pages of testimony, multiple rounds of briefing, and an evidentiary hearing—the Michigan Commission approved in 2022 a comprehensive settlement agreement ("2022 Settlement") that established Consumers' long-term resource plan and provided for Campbell's May 31, 2025 retirement. Ex. 9 at PDF 95, 100–02 (Order Approving Campbell Settlement Agreement and Settlement Agreement). The 2022 Settlement was negotiated and signed by a wide array of parties in the Integrated Resource Plan case, including:

- Michigan Public Service Commission Staff;
- Michigan's Attorney General;
- Consumers Energy;
- residential ratepayer advocates;
- commercial and industrial customers;
- businesses in the energy sector;
- advocacy groups such as Sierra Club, Natural Resources Defense Council, Michigan Environmental Council, Environmental Law and Policy Center, Vote Solar, the Ecology Center, the Union of Concerned Scientists, and Urban Core Collective;
- a transmission company; and
- third-party energy developers.

*Id.* at PDF 116–130; Ex. 18 at 5–6 (Proudfoot Rebuttal Testimony); *see also* Ex. 53 (Consumers News Release) ("A key regulatory decision today cleared the way for Consumers Energy to stop burning coal to generate electricity by 2025 — 15 years faster than previously planned — and provide reliable electricity for Michigan. . . . A broad coalition of supporters for the plan includes customer groups, environmental organizations, MPSC staff, energy industry representatives and the Michigan Attorney General.").

While the 2022 Settlement included some elements of Consumers' original Integrated Resource Plan, such as acquiring the New Covert gas plant, it also made several changes that further bolstered the plan's ability to ensure resource adequacy both within the state and across MISO. In particular, as part of the 2022 Settlement, Consumers agreed to extend to 2031 the operation of two oil- and gas-fired peaker units at the utility's Karn plant from their originally proposed retirement date of 2023. Ex. 9 at PDF 101–02 (Order Approving Campbell Settlement Agreement and Settlement Agreement). Doing so added approximately 784 MW of generating capacity compared to the original plan. Ex. 56 at 21 (Blumenstock 2021 Second Rebuttal Testimony); Ex. 19 at PDF 94 (Walz Direct Testimony). Under the 2022 Settlement, Consumers would also solicit power purchase agreements to provide capacity beginning in the 2025/2026 planning year. Ex. 9 at PDF 103–04 (Order Approving Campbell Settlement Agreement and Settlement Agreement). Such solicitation would be for up to 500 MW of thermal generation, and up to 200 MW of clean energy resources. *Id.* Under the settlement, Consumers would also add new battery storage assets (a dispatchable resource) in the 2024–2027 timeframe. *Id.* at PDF 101; Ex. 57 at 18 (Jester 2021 Direct Testimony).

In approving the 2022 Settlement, the Michigan Commission specifically addressed the importance of maintaining resource adequacy. Ex. 9 at PDF 93–95 (Order Approving Campbell Settlement Agreement and Settlement Agreement). The Commission imposed requirements to consider resource adequacy for a utility's own customers, MISO zones, and other regions. *Id.* at PDF 93. It found that the

plan embodied in the settlement was supported by substantial evidence and "is the most reasonable and prudent means of meeting Consumers' energy and capacity needs and otherwise meets the requirements of" Michigan's Integrated Resource Plan statute. *Id.* at PDF 95.

A few parties challenged the 2022 Settlement on various grounds. Of note, Wolverine Power Supply Cooperative ("Wolverine"), a minority owner of Campbell Unit 3 with a stake less than 2%, raised concerns about resource adequacy. The Michigan Public Power Agency, the other joint owner of Unit 3, did not oppose Consumers' decision to retire Unit 3. Under the ownership agreements that govern Unit 3, Consumers has the sole authority to decide when to retire it. Ex. 20 at 95 (King Direct Testimony).

The Michigan Commission explained why objections to the settlement based on resource adequacy were unpersuasive. The Michigan Commission discussed the record evidence regarding acquisition of the 1,176 MW New Covert gas-fired power plant, extended operation of Karn units 3 and 4, new battery storage, and ongoing investments in solar, energy waste reduction, and demand response. *Id.* at PDF 90–93. The Michigan Commission then found that "the approval of the settlement agreement enhances zonal resource adequacy in the short, medium, and long term(s)." *Id.* at PDF 92. As such, the Michigan Commission found that the 2022 Settlement "provides a reasonable and prudent plan for meeting resource adequacy requirements." *Id.* at PDF 91.

Wolverine in turn appealed the Michigan Commission's decision to the Michigan Court of Appeals. The court rejected the challenge, noting in part that Wolverine "mischaracterize[d]" the Michigan Commission's handling of the resource adequacy issue, and "fail[ed] to address the substantive basis for the [Michigan Commission's] conclusion" that the 2022 Settlement properly addressed resource adequacy. *Wolverine Power Supply Coop., Inc. v. Mich. Pub. Serv. Comm'n*, No. 362294, 2023 WL 2620437, at *5 (Mich. Ct. App. Mar. 23, 2023).

*ii. MISO Approved Campbell's May 31, 2025 Retirement Upon Finding No Local Reliability Violations.*

Pursuant to MISO's FERC-approved tariff, a utility within MISO seeking to suspend the operation of a generating unit must provide an "Attachment Y" notice to MISO. Ex. 60 at 1 (MISO Tariff Section 38.2.7); Ex. 61 (MISO Tariff Attachment Y); *see also* MISO's FERC-Approved Tariff at Attachment Y, *available at* https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 (containing prior versions of the tariff). The purpose of the notice is to enable MISO to evaluate the potential local grid reliability impacts of such suspension. *See* Ex. 60 at 1 (MISO Tariff Section 38.2.7).

Consumers submitted the required notice to MISO in December 2021. Ex. 29 at PDF 6 (2024 Consumers ELG Annual Report). Consumers stated its intent to suspend operation of Campbell Units 1–3 effective June 1, 2025. *Id.*

In March 2022, MISO notified Consumers that it had reviewed the Campbell retirement for "power system reliability impacts," and concluded that retirement "would not result in violations of applicable reliability criteria." *Id.* at PDF 9. As such, MISO concluded that the retirement could proceed "without the need for the generators to be designated as a System Support Resource ('SSR') units [*sic*]," a designation that allows MISO to retain generators needed for reliability reasons. *See id.* MISO has not acted to revise its conclusion that Campbell could retire without implicating local reliability issues in the area around the facility.

*iii. Consumers Has Been Winding Down Campbell and Ramping Up Replacement Resources.*

Following its filing of the Integrated Resource Plan and the Michigan Commission's approval of the 2022 Settlement, Consumers changed its approach to Campbell. Rather than invest in and maintain the plant to provide an adequate level of reliability, Consumers transitioned to a reactive, "fix it if breaks" approach to Units 1–3. Ex. 3 at 15–16 (Powers June Decl.). Public Interest Organizations' expert engineer Bill Powers provides the following summary of the significant decline in capital expenditures and maintenance of the units. *Id.* at 6 (developed based on testimony from Consumers witnesses Kapala and Blumenstock, Exs. 10–13).

**Reductions in Capital and Major Maintenance Spending at Campbell for 2022–2025**

| | **Pre-IRP Projected Spend** | **Post-IRP Actual/Projected Spend** | **Reduction** |
|---|---|---|---|
| **Capital Spending** | | | |
| Units 1&2 | $60.6 Million | $4.1 Million | 93% |
| Unit 3 | $85.5 Million | $8.4 Million | 90% |
| **Major Maintenance Spending** | | | |
| Units 1&2 | $14.4 Million | $5.5 Million | 62% |
| Unit 3 | $23.5 Million | $5.1 Million | 78% |

The figures above are rounded to the nearest decimal shown. "IRP" refers to Consumers' 2021 Integrated Resource Plan proceeding, which concluded with the Michigan Commission's approval of the 2022 Settlement.

The expert engineer further details Consumers' canceled projects and explains the cancellations' likely impact on the units' reliability. *Id.* at 5–16. As just one example among the dozens that he identifies, Consumers canceled a $7.9 million turbine overhaul project to maintain Unit 3 scheduled to take place in 2024. *Id.* at

13, 16. In April 2024, the turbine failed, resulting in a 46-day outage. *Id.* The turbine was eventually repaired, but *only for the limited objective of allowing Unit 3 to continue to operate until the planned retirement in May 2025*. *Id.* at 5 n.9, 13, 16.

As a result of the canceled projects and forgone maintenance and capital expenditures, it is unlikely that Campbell can reliably dispatch without significant further expense. *Id.* at 5–6, 13, 15–17. The Chair of the Michigan Commission reportedly believes the costs to render Campbell operational range from a minimum of tens of millions of dollars to close to $100,000,000. Ella Nilsen, CNN, *The Trump Admin Ordered a Coal Power Plant to Stay on Past Retirement. Customers in 15 States Will Foot the Bill* (June 6, 2025), https://www.cnn.com/2025/06/06/climate/michigan-coal-plant-energy-cost-wright.

The evidence bears out the plant's unreliability. As explained *supra* sec. IV.C.3.i, the Campbell units have demonstrated their inability to consistently perform in recent years and even during June 2025, including on the very day—June 23—highlighted in the August Order as justification for the order. This unreliability reflects the impact of worn and difficult-to-repair or replace components, causing outages that tended to be long and recurrent. Ex. 69 at 2–8 (Powers Sept. Decl.); Ex. 3 at 4 (Powers June Decl.).

At the same time that Consumers has prepared to retire the aging and increasingly unreliable units at Campbell, Consumers has taken multiple steps over the last several years to bring substantial new generating capacity online that bolsters resource adequacy and reliability in Michigan, MISO Zone 7, and the region. In the years since the Michigan Commission approved Consumers' 2021 Integrated Resource Plan, and since MISO's considered determination that retiring Campbell did not present reliability concerns, Consumers proceeded with acquiring or constructing many of the generating assets called for under the 2022 Settlement. In 2023, Consumers completed its acquisition of the Covert plant, a three-unit combined cycle gas plant. Ex. 12 at 8 (Blumenstock 2025 Direct Testimony). By acquiring Covert and transferring the plant to MISO, Consumers added 1,090 MW of net generating capacity to MISO Zone 7. Ex. 21 at 7–9 (Bleckman Direct Testimony); *see also* Ex. 22 at 8 (Hahn Direct Testimony). Consumers has continued developing renewable assets, including a 198 MW wind facility that went into service in 2024, and several solar projects, totaling 1,421 MW, with commercial operation dates in 2026–28. Ex. 21 at 7–9 (Bleckman Direct Testimony). Ultimately, Consumers intends to develop 6.6 gigawatts of solar and wind generation resources. *Id.* at 8. Consumers has also entered into long-term contracts for three large battery storage projects, a power purchase agreement that will provide 175 accredited MW of gas-fired generation capacity in the 2025 and 2026 MISO planning years, and another power purchase agreement providing a further 100 MW of capacity in the 2025–27 planning years. Ex. 12 at 8–9 (Blumenstock 2025 Direct Testimony).

*iv. Consumers Has Continued to Demonstrate Resource Adequacy.*

Apart from the Integrated Resource Plan proceeding—which, as noted above, resulted in a plan that bolsters resource adequacy in MISO—Consumers has also consistently met Michigan's resource adequacy requirements to demonstrate capacity each year under MCL Section 460.6w. Consumers' filings have consistently shown that the company is maintaining and procuring sufficient capacity to serve its customers, while meeting the necessary reserve margin. Ex. 25 (2026 Consumers Energy Capacity Demonstration); Ex. 26 (2027/2028 Consumers Energy Capacity Demonstration); Ex. 27 (2028/2029 Consumers Capacity Demonstration). For the Summer 2025 season, Consumers had surplus resources. Ex. 27 at PDF 14 (Consumers 2028/2029 Capacity Demonstration). Consumers has sufficient resources for the Fall and Winter 2025 seasons too. *Id.* at PDF 26–27, 38–39. And as discussed in its most recent annual report, issued on May 12, 2025, the Michigan Commission Staff found that Consumers meets resource adequacy requirements for both the 2025/26 year, and through the 2028/29 year. Ex. 28 at 16 (2028/2029 Michigan Commission Staff Capacity Demonstration Results). As a result of the most recent MISO Planning Resource Auction, the Michigan Commission Staff noted that MISO Zone 7 "cleared above seasonal reliability targets, representing additional reliability value at cost competitive prices." *Id.*

*D. The Department Persists in Preventing Campbell's Retirement Through Another Unneeded, Expensive, and Harmful Misstep.*

In its May 23, 2025 order, the Department mandates that MISO and Consumers "take all measures necessary to ensure that" Campbell "is available to operate" and directs MISO "to take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers" until August 21, 2025. Ex. 1 at 2 (May Order). The Department's August 20, 2025 order mandates "continued additional dispatch of the Campbell Plant." Ex. 67 at 7 (August Order). In doing so, the Department largely ignores all of the foregoing, much of which was provided to the Department by the Public Interest Organizations' request for reconsideration of the May Order. *See* Ex. 71 at *passim* (Public Interest Organizations' June Rehearing Request); Ex. 72 (Department's July Notice).

The Department's August Order mandates Consumers and MISO take the same steps as the May Order. As before, the entities are directed to "take all measures necessary to ensure that the Campbell Plant is available to operate" and "take every step to employ economic dispatch of the Campbell Plant to minimize cost to ratepayers." Ex. 67 at 8 (August Order). The August Order serves to renew the May Order, resting in large part on the claim that "the emergency conditions that led to issuance of [the May Order] continue," and (like the May Order) asserting as its main predicate that "an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electricity, and other causes." *Id.* at 1 (August Order); *see* Ex. 1 at 1

(May Order) (claiming a shortage of facilities for the generation of "electric energy" instead of "electricity"). The August Order, like the May Order, does not explain the location of those "portions of the Midwest region."

In addition to asserting that the claimed emergency underlying the May Order continues, the August Order sets its horizon to both "the near and long term." Ex. 67 at 2 (August Order). The August Order points to, among other things, portions of: (1) past conditions on the MISO grid during Summer 2025; (2) past weather forecasts; (3) changes to the MISO capacity market to procure capacity on a seasonal rather than annual basis; (4) an assortment of MISO planning documents; (5) two executive orders; and (6) a July 7 report from the Department. *See id.* at 2–7.

At bottom, the August Order selectively cites projections of retiring generation capacity and projections of increasing electricity demand and expresses the Department's dissatisfaction with the steps taken by the Michigan and MISO to meet those projections. It deems that dissatisfaction an "emergency," and on that basis replaces the resource-planning regime currently being implemented by the state and RTO with a command-and-control generation mandate. That commandeering of state authority and private economic choices takes place against a backdrop of a larger effort by the current Presidential Administration to favor the fossil-fuel industry at the expense of cleaner, cheaper, and more modern competitors—an effort that has ranged from asserting that the modernization of the American electric grid is an "emergency," Exec. Order 14156 of Jan. 20, 2025, *Declaring a National Energy Emergency*, 90 Fed. Reg. 8,433, 8,433 (Jan. 29, 2025) (Energy Emergency EO), to declaring national policy to utilize particular types of generators, Exec. Order 14262 of Apr. 8, 2025, *Strengthening the Reliability and Security of the U.S. Electric Grid*, 90 Fed. Reg. 15,521, 15,521 (Apr. 14, 2025) (Grid EO), to seeking regulatory means to hinder the growth of cheaper alternatives, Exec. Order of Apr. 8, 2025, *Reinvigorating America's Beautiful Clean Coal Industry and Amending Exec. Order 14241*, 90 Fed. Reg. 15,517, 15,517 (Apr. 14, 2025), to attempting to transgress state energy authority, Exec. Order 14260 of Apr. 8, 2025, *Protecting American Energy from State Overreach*, 90 Fed. Reg. 15,513, 15,513 (Apr. 14, 2025). The May and August Orders—like the Administration's broader campaign to force continued use of economically non-competitive fossil fuels—are unnecessarily and unlawfully increasing ratepayer burdens across MISO, and subjecting nearby residents to continued, and devastating, pollution.

## V. Request for Rehearing

The August Order is a manifestation of the Department's overarching policy to systematically misapply Section 202(c) of the Federal Power Act to preserve fossil-fueled power plants that otherwise would be retired. That policy aims to bolster the fossil energy industry, irrespective of need, expense, and harm. In its zeal to implement its policy through issuance of the August Order, (1) the Department has exceeded the authority Congress gave it, using its "emergency" powers in the absence of any real shortfall to impose federal control of basic generation and supply decisions; and (2) the Department has done so without reasoned decision-making and on the basis of facts that are not, and could not be, supported by any credible record. *See Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Rel. Bd.*, 522 U.S. 359, 374 (1998) (explaining agency obligation to undertake reasoned-decision-making); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 429 U.S. 29, 43 (1983) *same); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The agency must make findings that support its decision, and those findings must be supported by substantial evidence."); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position."); *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (explaining that, absent statutory authorization, an agency's action is contrary to law). Numerous examples of the Department's APA violations are described throughout section V. The only plausible explanation for these repeated legal foot faults is that the Department has prioritized implementing its policy over compliance with law.

Congress never conferred on the Department the broad authority over the country's mix of power generation resources that the Department seeks to wield under the pretense of responding to claimed "emergencies." To the contrary, as explained below, Congress explicitly reserved authority over resource adequacy and grid reliability to the states, FERC, and NERC. *See, e.g.*, 16 U.S.C. §§ 824(a)–(b), 824o; *Pac. Gas & Elec.*, 461 U. S. at 205. Both the policy and the August Order exceed the Department's authority and are therefore contrary to law.

Before tackling the August Order's legal faults and issues, *see infra* secs. V.A through V.D, it is useful to understand the broader context of the Department's policy. The Department acknowledges that its Order is based on a government-wide policy—dictated by Executive Order—of promoting fossil-based energy through the use of any and all emergency powers executive departments and agencies could find. Ex. 67 at 6 (August Order). The August Order relies upon the Energy Emergency EO, 90 Fed. Reg. 8,433, which directs the heads of all executive departments and agencies to use "emergency authorities" and "other lawful authorities" to facilitate the production, extraction, creation, and generation of coal and other fossil fuels. *Id.* (relying on Ex. 92 (Energy Emergency EO)).

The August Order also relies on another executive order, the Grid EO. *Id.* (relying on Ex. 93 (Grid EO)). The Grid EO was issued at the same time as three other executive actions aimed at supporting the coal industry, and was announced at a White House political event focused on promoting coal. Ex. 94 (NY Times Coal Article). In essence, the Grid EO calls on the Department to assume the authority for resource adequacy and grid reliability decision-making that the Federal Power Act reserves to others, and to "systemize" the issuance of Section 202(c) orders for that improper purpose. *See* Ex. 93, 90 Fed. Reg. at 15,521–22 (Grid EO) (directing the Department to "streamline, systemize and expedite" the issuance of Section 202(c) orders; to develop a "uniform methodology" for assessing reserve margins and a protocol to retain generators the Secretary deems critical to system reliability; and to prevent certain generators from leaving the bulk-power system or converting to a different fuel source).

The Department's words and actions following issuance of the Grid EO reveal its efforts to unlawfully arrogate for itself others' lawful authority through systematic misapplication of Section 202(c) to prop up fossil-burning power plants. The Department's initial steps included issuing a Section 202(c) order to prevent Campbell's well-planned retirement. *See* Ex. 1 at *passim* (May Order). The Department's order was clear on one point—Campbell cannot be allowed to retire—but left many scratching their heads about almost everything else in the order. *See, e.g.*, *Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39–40 (2025) (recognizing the variety of interpretations of the order and settling on "the most reasonable reading of the DOE Order's intended scope"). The May Order failed to make clear even where the grid supposedly needs Campbell, much less examine the sources the Department selectively quoted or heed Congress' explicit limitations on the Department's Section 202(c) powers. Ex. 71 at *passim* (Public Interest Organizations' June Rehearing Request).

After preventing Campbell's retirement, the Department continued to act on its policy. It issued another Section 202(c) order to prevent another fossil-burning plant's retirement. Ex. 95 (Eddystone May Order). Then, on July 7, 2025, the Department published the "methodology" required by the Grid EO, which the Department explained will "guide reliability interventions," including the use of Section 202(c) orders. Ex. 96 at vi (July Resource Adequacy Report); *see also* Ex. 97 (DOE July 7 Press Release) ("The methodology also informs the potential use of DOE's emergency authority under Section 202(c) of the Federal Power Act."). The report identifies no present or imminent emergency; at most, using deeply flawed methodology, it identifies a theoretical shortfall of generation in 2030. *See infra* sec. V.A.2.ii.c.

The Department has now extended both the Campbell and Eddystone emergency orders for another 90 days. Ex. 67 at *passim* (August Order); Ex. 98 (Eddystone August Order). Similar to the July Resource Adequacy Report on which it relies, the

August Order focuses on a longer term, purely theoretical resource adequacy shortfall and lacks evidentiary support for its emergency finding.

Taken together, the Energy Emergency EO, Grid EO, July Resource Adequacy Report, and the Department's recent Section 202(c) orders reflect a policy to promote the long-term preservation of fossil-powered electric generation by using the Department's emergency authority under Section 202(c). To the extent these actions left any room for doubt that the Department has such a policy, Energy Secretary Wright's own words have removed it. In a recent visit to Morgantown, West Virginia, Secretary Wright said he intends to stop the closure of up to forty coal plants slated to retire this year and has the authority to do so. *See* Ex. 76 (Secretary Wright's West Virginia Remarks).

### *A. The Department Has Not Demonstrated, and Cannot Demonstrate, an Emergency Permitting the Department to Control Generation Under Section 202(c).*

#### *1. Legal Framework: Section 202(c) Empowers the Department Only to Respond to Imminent, Certain, and Unexpected Shortfalls in Electricity Supply.*

The Order invokes Section 202(c) of the Federal Power Act, which provides:

> During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation of transmission of electric energy . . . the Commission shall have authority . . . with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, deliver, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest.

16 U.S.C. § 824a(c)(1). That authority was transferred to the Department by the Department of Energy Organization Act. *See* 42 U.S.C. § 7151(b).

Section 202(c)'s text and context establish that an "emergency" enabling the Department to over-ride state and private decision-making must be an event that is imminent, certain, and unexpected. 16 U.S.C. § 824a(c). The constrained scope of Section 202(c)'s emergency authority is confirmed by the broader statutory context—in particular, the separate regime delineating federal authority over bulk-system reliability in Section 215 of the Federal Power Act, *id.* § 824o—as well the Department's regulations, caselaw applying Section 202(c), and the Department's consistent past practice.

*i. The Text and Context of Section 202(c) Confine an Emergency to Imminent, Certain, and Unexpected Events*

Section 202(c)'s text empowers the Department to require generation only in an "emergency." *Id.* § 824a(c). Both the ordinary meaning of the term (which the statute does not expressly define) and statutory context limit the Department's emergency authority to imminent, unexpected, and certain events. At the time Congress enacted Section 202(c), Webster's New International Dictionary of the English Language (1930) defined "emergency" as, with emphasis added here, a "*sudden* or *unexpected* appearance or occurrence… An *unforeseen* occurrence or combination of circumstances which calls for *immediate* action or remedy; *pressing* necessity; exigency." Contemporary dictionaries similarly define "emergency" as demanding imminence: an emergency is "an *unforeseen* combination of circumstances or the resulting state that calls for *immediate* action." Merriam Webster's Dictionary 407 (11th ed. 2009) (emphasis added); *see* 3 Oxford English Dictionary 119 (1st ed. 1913) (defining emergency similarly as "a state of things *unexpectedly* arising, and urgently demanding *immediate* action" (emphasis added)); *see also* Benjamin Rolsma, *The New Reliability Override*, 57 Conn. L. Rev. 789, 812 n.147 (2025) (noting that dictionaries have given the term "emergency" the "same meaning for many years").

The remainder of Section 202(c) underscores the exigency inherent in the governing term "emergency." The authority granted by Section 202(c) is, in the first instance, a war-time power. 16 U.S.C. § 824a(c) (beginning with "[d]uring the continuance of any war in which the United States is engaged"); *see Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that statutory terms should be interpreted in the context of nearby parallel terms "in order to avoid the giving of unintended breadth to the Acts of Congress"). An "emergency" under the statute is limited to circumstances of similar urgency: "a *sudden* increase in the demand for electric energy," for example. 16 U.S.C. § 824a(c) (emphasis added); *see Richmond Power & Light v. FERC*, 574 F.2d 610, 615 (D.C. Cir. 1978) (holding that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances"); S. Rep. No. 74-621, at 49 (1935) (explaining that Section 202(c) provides "temporary power designed to avoid a repetition of the conditions during the last war, when a serious power shortage arose").

The text's use of the present tense accentuates its focus on imminent and certain shortfalls: It empowers the Department to act only where "an emergency *exists*." 16 U.S.C. § 824a(c) (emphasis added). The Section's title and text both emphasize that it provides a "temporary" authority, further emphasizing that its emphasis on immediate—not far-distant—needs. *Id.* § 824a(c), (c)(1); *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (cleaned up) ("The title of a statute and the heading of a section are tools available" to resolve "the meaning of a statute," and "a title is especially valuable where it reinforces what the text's nouns and verbs independently suggest."). That near-term focus precludes use of Section 202(c) to

pursue broader or long-term energy-policy goals, such as "fear of overdependence" on foreign oil supplies, *Richmond Power & Light*, 574 F.2d at 617, or "energy independence," Ex. 96 at 1 (July Resource Adequacy Report); *see also Richmond Power & Light*, 574 F.2d at 614 (Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply and not those in which supply is adequate but a means of fueling its production is in disfavor.").

Section 202's overall structure further highlights Section 202(c)'s emphasis on imminent, near-term concerns. The preceding subsections 202(a) and (b) together define and limit the tools by which the federal government may pursue "abundant" energy supplies in the normal course. 16 U.S.C. § 824a(a) (seeking "abundant supply of electric energy" by directing the federal government to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy"); *id.* § 824a(b) (allowing federal government to order "physical connection . . . to sell energy to or exchange energy" upon application, and after an opportunity for hearing). The resulting statutory "machinery for the promotion of the coordination of electric facilities" comprises the following: in subsection (a), an instruction to establish a general framework meant to facilitate "coordination by voluntary action;" in subsection (b), "limited authority to compel interstate utilities to connect their lines and sell or exchange energy," subject to defined procedural and substantive requirements, when "interconnection cannot be secured by voluntary action;" and in subsection (c), "much broader" but "temporary" authority "to compel the connection of facilities and the generation, delivery, or interchange of energy during times of war or other emergency." S. Rep. No. 74-651 at 49 (1935).

That tiered structure—placing primary emphasis on voluntary resource adequacy planning, 16 U.S.C. § 824a(a), specifying limited authority where that voluntary system fails, *id.* § 824a(b), and allowing for "temporary" central command-and-control only in case of "emergency," *id.* § 824a(c)—requires that Section 202(c) remain narrowly bounded to instances of an immediate and unavoidable "break-down in electric supply," S. Rep. No. 74-651 at 49 (1935), rather than mere want of more abundant supply in the future, *cf.* Ex. 67 at 7 (August Order) (emphasis added) (pointing to conditions offered in support for the May Order that "will continue in the near term" and "*likely* to continue in *subsequent years*" that "*could* lead to the *potential* loss of power . . . in the areas that *may* be affected by curtailments or outages, presenting a *risk* to public health and safety"). That structure authorizes increasingly intrusive federal intervention, but under increasingly narrow circumstances. Interpreting Section 202(c)'s "emergency" powers to permit the Department to compel generation based merely on generalized "challenges of operating a reliable bulk electric system in a rapidly transforming energy landscape," or concerns over "potential longer term resource adequacy," Ex. 67 at 4 (August Order), would unwind the careful balance of voluntary, market-driven action and federal power set out in Sections 202(a) and 202(b). Such an

interpretation cannot be squared with the statutory text and structure. *See Otter Tail Power Co. v. Fed. Power Comm'n*, 429 F.2d 232, 233–34 (8th Cir. 1970) (holding that Section 202(c) "enables the Commission to react to a war or national disaster," while Section 202(b) "applies to a crisis which is likely to develop in the foreseeable future").

*ii. Congress' Enactment of a Specific, Cabined Scheme to Address Reliability Concerns Confirms That Generalized or Long-Term Bulk-Power System Reliability Concerns Are Not an "Emergency" Under Section 202(c).*

That the Department's Section 202(c) emergency powers do not extend to general supervision of bulk-power-system reliability is confirmed by Section 215 of the Federal Power Act—which specifically and directly delineates the scope of federal authority to enforce mandatory reliability requirements for the bulk-power system. 16 U.S.C. § 824o. Congress added Section 215 to the Federal Power Act in 2005 precisely because the Act as it then existed—including Section 202—did not provide the federal government with the power to enforce measures designed to ensure bulk-system reliability. *See Rules Concerning Certification of the Elec. Reliab. Org.; and Procedures for the Establishment, Approval, and Enforcement of Elec. Reliab. Standards*, 70 Fed. Reg. 53,117, 53,118 (Sept. 7, 2005) ("In 2001, President Bush proposed making electric Reliability Standards mandatory and enforceable," leading to enactment of Section 215 in 2005); *Report of the Nat'l Energy Pol'y Dev. Grp.* at page 7-6 (May 2001), https://www.nrc.gov/docs/ml0428/ml042800056.pdf (noting that "[r]egional shortages of generating capacity and transmission constraints combine to reduce the overall reliability of electric supply in the country" and that "one factor limiting reliability is the lack of enforceable reliability standards" because "the reliability of the U.S. transmission grid has depended entirely on *voluntary* compliance," and then recommending "legislation providing for enforcement" of reliability standards (emphasis added)); S. Rep. No. 109-78 at 48 (2005) (stating that Section 215 "changes our current voluntary rules system" for bulk-system reliability "to a mandatory rules system"); *see also Alcoa, Inc. v. FERC*, 564 F.3d 1342, 1344 (D.C. Cir. 2009) (noting that prior to the Energy Policy Act of 2005, "the reliability of the nation's bulk-power system depended on participants' voluntary compliance with industry standards").

By enacting Section 215, Congress provided a comprehensive and carefully circumscribed scheme to empower the federal government to enforce bulk-system reliability requirements. That statutory scheme strikes a careful balance between state and federal authority, and between private, market-driven decisions and top-down control. Reliability standards are devised by NERC independent "of the users and owners and operators of the bulk-power system" but with "fair stakeholder representation." 16 U.S.C. § 824o(c)–(d); *see also id.* § 824o(a)(3) (defining reliability standards as "a requirement . . . to provide for reliable operation of the bulk-power system"). FERC may approve or remand those standards (but not replace them with

its own) and is required to "give due weight" to NERC's "technical expertise" while independently assessing effects on "competition." *Id.* § 824o(d)(2)–(4). Section 215 provides specified enforcement mechanisms and procedures for reliability standards—which mechanisms conspicuously exclude the power to command specific generation resources to remain operational. *Id.* § 824o(e). And Section 215 carefully preserves state authority over "the construction of additional generation" and in-state resource adequacy, establishing regional advisory boards to ensure appropriate state input on the administration of reliability standards. *Id.* § 824o(i)–(j).

Interpreting Section 202(c) to permit the Department to mandate generation based on its own unfettered assessment of bulk-system reliability needs would effectively allow the Department to bypass Section 215's procedural safeguards, constraints on federal authority, and protection of state power. Such a bypass would impermissibly "contradict Congress' clear intent as expressed in its more recent," reliability-specific legislation, enacted "with the clear understanding" that the Department had "no authority" to address long-term reliability through Section 202(c). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 142 & 149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) ("Congress's specific and limited enumeration of [agency] power" over a particular matter in one Section of the Federal Power Act "is strong evidence that [a separate Section] confers no such authority on [agency]."). Congress has, in Section 215, directly established the mechanisms (and limitations) by which the federal government may compel action to ensure the reliability of bulk-power electric system. In so doing, it has confirmed that the Department may not, through Section 202(c) "emergency" orders, use those reliability concerns to mandate the generation it views as required to address broad "resource adequacy problems," Ex. 67 at 4 (August Order); its emergency authority is confined to specific and imminent supply shortfalls requiring immediate response.

*iii. The Department's Regulations Similarly Establish that Section 202(c) Emergency Authority Can Only Be Invoked to Address Imminent, Certain Supply Shortfalls Requiring Immediate Response.*

The Department's regulations demonstrate its own long-standing understanding that Section 202(c)'s emergency authority is confined to imminent, certain and unavoidable resource shortages, and does not provide a mechanism to address broad, long-term concerns as to the reliability of the bulk-power system. The regulations recognize that an emergency under Section 202(c) requires, first, "a *specific* inadequate power supply situation." 10 C.F.R. § 205.371 (emphasis added). The Department's non-specific dissatisfaction with regional power planning does not, consequently, empower the Department to override that planning by emergency order. The need for both specificity and certainty is repeated in the Department's regulations defining an inadequate energy supply: "A system may be considered to have" inadequate supply when "the projected energy deficiency . . .

*will* cause the applicant [for a 202(c) Order] to be unable to meet its normal peak load requirements based upon use of all of its otherwise available resources so that it *is* unable to supply adequate electric service to its customers." 10 C.F.R. § 205.375 (emphasis added). The same provision suggests that an emergency will generally exist only when "the projected energy deficiency . . . without emergency action by the [Department], will equal or exceed 10 percent of the applicant's then normal daily net energy for load." *Id.*

The regulations further recognize that Section 202(c) does not provide a means of planning against months-off expectations or risks. They define an emergency as "an *unexpected* inadequate supply of electric energy which may result from the *unexpected* outage or breakdown" of generating, transmission, or distribution facilities—not a tool to ensure future energy abundance, or override state and private planning that the Department deems inadequate. 10 C.F.R. § 205.371 (emphasis added). Emergencies are characterized by shortages produced by "weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." *Id*. Where the culprit is increased demand, it must be "a *sudden* increase in customer demand," *id.* (emphasis added), rather than demand projections producing non-immediate reliability concerns.

And while the regulations suggest that "inadequate planning or the failure to construct necessary facilities can result in an emergency," they recognize that the Department may not utilize a "continuing emergency order" to mandate long-term system planning. *Id.* The regulations also recognize that "where a shortage of electricity is projected due solely to the failure of parties to agree to terms, conditions, or other economic factors" there is no emergency "unless the inability to supply electric service is *imminent*." *Id.* (emphasis added). An emergency may exist where past planning failures produce an immediate, present-tense shortfall (that is where, a shortfall *results* from insufficient planning); the Department has no authority to commandeer bulk-system reliability planning merely because it deems current plans inadequate. *See* 10 C.F.R. § 205.375 (requiring present inability to meet demand to demonstrate inadequate energy supply). As the Department stated when it promulgated those regulations, the statute allows the Department to provide "assistance [to a utility] during a period of unexpected inadequate supply of electricity," but does not empower it to "solve long-term problems." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981).

*iv. Courts Have Uniformly Held that Section 202(c) Can Be Invoked Only in Immediate Crises.*

Caselaw applying Section 202(c) further supports the narrow circumstances under which it permits the Department to seize command of the power system. *Richmond Power and Light* arose out of the 1973 oil embargo. The Federal Power Commission responded by calling for voluntary transfer for electricity from non-oil

power plants to areas of the country that relied heavily on oil, such as New England. 574 F.2d at 613. The New England Power Pool was not convinced that the voluntary program would work and petitioned the Commission for a 202(c) order. *Id*. Rather than issue such an order, the Commission facilitated an agreement between state commissions and supplying utilities, which satisfied the New England Power Pool and it withdrew its petition. *Id*. A dissatisfied utility sought judicial review of the Commission's decision to allow the withdrawal of the Section 202(c) petition. *Id*. at 614.

The court easily upheld the Commission's decision not to invoke Section 202(c). *Id*. Though the oil embargo had ended, the utility argued that the "high cost and uncertain supply of imported oil" justified an emergency order. *Id*. The Commission countered that the voluntary program had worked, the New England Power Pool never interrupted service, there was no need for a Section 202(c) order, and the court agreed. *Id*. at 615. The utility alternatively argued that "dependence on imported oil leaves this country with a *continuing* emergency." *Id*. (emphasis added). The court observed that Section 202(c) "speaks of 'temporary' emergencies, epitomized by wartime disturbances." *Id*. Interpreting this statutory language, the court upheld the Commission's view that Section 202(c) cannot be used when "supply is adequate but a means of fueling its production is in disfavor." *Id*. Section 202(c) is not an appropriate means to implement long-term national policy to switch fuels. It is only a temporary fix for a temporary problem.

The Eighth Circuit has similarly held that Section 202(c) can only be used to respond to immediate crises. In *Otter Tail Power*, a utility insisted that the only way for the Federal Power Commission to properly order the utility to connect to a municipal power provider was to issue a Section 202(c) order. 429 F.2d at 234. Demand for electricity in the city had increased, and the peak load of the municipal power provider was getting to be so high that both of its two generators would likely need to be used simultaneously in the near future, "causing a possible loss of service should one malfunction during a peak period." *Id*. at 233–34. To avoid this possible loss of service, the Federal Power Commission issued a Section 202(b) order, requiring the utility to connect the municipal power provider. The utility argued that the Federal Power Commission used the wrong Section and should have used Section 202(c) instead.

The court explained that Section 202(c) "enables the Commission to react to a war or national disaster" by ordering "immediate" interconnection during an "emergency." *Id*. at 234 (citing 16 U.S.C. § 824a(c)). For non-emergency situations, "[o]n the other hand, Section 202(b) applies," including when there is a "crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission." *Id*. The court upheld the Commission's use of Section 202(b) instead of Section 202(c) because there was no immediate emergency. The case law uniformly supports the interpretation that Section 202(c) can only be used in acute, short-term, urgent emergencies.

*v. The Department's Prior Orders Recognize that Section 202(c) Does Not Confer Plenary Authority Over Bulk-System Resource Adequacy.*

The Department's consistent application of Section 202(c) further corroborates the urgency of the emergency conditions that are the necessary predicate for any Department intervention under that Section. *See Fed. Trade Comm'n v. Bunte Brothers, Inc.*, 312 U.S. 349, 352 (1941) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it is equally significant in determining whether such power was actually conferred."). The Department has (outside wartime) consistently used Section 202(c) to address specific, imminent, and unexpected shortages—not to address longer-term reliability concerns or demand forecasts. *See, e.g.*, Ex. 5 at 1 (DOE Order No. 202-22-4) (responding to ongoing severe winter storm producing immediate and "unusually high peak load" between Christmas Eve and Boxing Day); Ex. 17 at 1–2 (DOE Order No. 202-20-2) (responding to shortages produced by ongoing extreme heat and wildfires); Ex. 105 at 1 (DOE Order No. 202-08-1) (ordering temporary connection of facilities in response to "massive devastation caused by Hurricane Ike," leaving "large portions" of Texas "without electricity"); *see also* Rolsma, 57 Conn. L. Rev. at 803–04 (describing "sparing[]" use of Section 202(c) outside of war-time shortages during the twentieth century).[5] Public Interest Organizations are not aware of any instance in which the Department has utilized Section 202(c) to mandate generation the Department views as necessary to ensure long-term resource sufficiency, or in response to generalized regional risks that have not produced any particular, defined generation shortfall, and for good reason: Any such use would exceed the Department's statutory authority.

[5] The Department has also narrowly tailored the remedies in Section 202(c) orders to ensure that the orders only address the stated emergency, to limit the order to the minimum period necessary, and to mitigate violations of environmental requirements and impacts to the environment. *See, e.g.*, Ex. 5 at 4–7 (DOE Order No. 202-22-4) (limiting order to the 3 days of peak load, directing PJM to exhaust all available resources beforehand, requiring detailed environmental reporting, notice to affected communities, and calculation of net revenue associated with actions violating environmental laws); Ex. 17 at 3–4 (DOE Order No. 202-20-2) (limiting order to the 7 days of peak load, directing CAISO to exhaust all available resources beforehand, requiring detailed environmental reporting).

*2. The Order 's Primary Focus is Long-Term Bulk-System Reliability, Which Is Not a Basis to Mandate Generation Under Section 202(c)*

The August Order primarily relies upon assertions of long-term bulk-system reliability concerns. Ex. 67 at 4–7 (August Order). Those concerns—even if fully substantiated—would not be a sufficient basis to mandate Campbell's continued operation. And they are not adequately substantiated. As the August Order acknowledges, MISO and others are taking steps to address those concerns before any resource shortfall arises.

*i. Even If Supported by Evidence, 2026-Onwards Concerns Are Too Distant To Be an "Emergency" Within the Meaning of 202(c).*

The August Order claims "a potential longer term resource adequacy emergency in MISO," acknowledging a "capacity surplus for the summer of 2026," but citing projections of possible "insufficient capacity to meet the peak demand for electricity in each of the following summers"—that is, arising no earlier than the summer of 2027. Ex. 67 at 5 (August Order) (also noting "surplus of generation capacity" in the winter of 2026, "followed by increasing deficits for the following four years."). Even if those "deficits" were established (they are not), reliability concerns arising in 2027—two full years in the future—are not an emergency under Section 202(c). None of those 2027-onwards deficits are imminent, and they cannot plausibly be an "emergency" characterized a "*sudden* increase in the demand for electric energy." 16 U.S.C. § 824a(c)(2). Nor do they suggest any exigent "shortage" in electric energy, generation, or transmission that could qualify as an "emergency." *Id.* That is all the more so for claimed shortfalls arising even further in the future—for example, the 2030-onwards resource concerns purportedly described by the Department's July 2025 Resource Adequacy Report. Ex. 67 at 6 (August Order). *See generally* Ex. 99 (PIOs' RFR of July Resource Adequacy Report).

At most the August Order describes long-term trends that may affect the reliability of the bulk power system—matters for which Section 215 defines, and limits, the scope of federal regulatory authority. 16 U.S.C. § 824o(a)(3)–(4). The Order purports to mandate generation, based upon the Department's assessment of the bulk-power system's long-term reliability needs—a power Congress chose not to provide *any* federal agency. *See* 16 U.S.C. § 824o(e) (specifying enforcement mechanisms for federal reliability standards). And what authority Congress has authorized to implement mandatory reliability standards, it provided to FERC—not the Department. *Alcoa v. FERC,* 564 F.3d at 1344. Reliability concerns two years in the future are not an emergency within the meaning of Section 202(c).

The August Order's references to "projected demand for manufacturing, re-industrialization, and data centers driving artificial (AI) innovation," August Order at 6, may express the Department's belief that future electricity supplies will be insufficiently abundant to meet its policy preference. But Section 202(a)—not

Section 202(c)—provides the statutory tools by which the federal government may further "an abundant supply of electric energy," and those tools do not include the power to seize command-and-control authority over generating resources like Campbell. 16 U.S.C. § 824a(a). Absent imminent exigency—which cannot be shown by potential reliability issues two years in the future—the Department cannot invoke Section 202(c)'s emergency powers.

Section 202(c) provides an explicitly "temporary" authority, 16 U.S.C. § 824(a)(2), preventing any interpretation of its terms that might encompass a "potential longer term resource adequacy emergency," Ex. 67 at 4 (August Order). That expansive interpretation of the Department's emergency power to compel generation is further precluded by the Federal Power Act's express background principles of permitting "Federal regulation" only of "matters which are not subject to regulation by the States," and disavowing "jurisdiction, except as specifically provided" over "facilities used for the generation of electric energy." 16 U.S.C. § 824(a)-(b)(1). *See Duke Power Co. v. Fed. Power Com.,* 401 F.2d 930, 938 (D.C. Cir. 1968) (explaining that the Federal Power Act's policy declarations are "relevant and entitled to respect as a guide in resolving any ambiguity or indefiniteness in the specific provisions which purport to carry out its intent").

The Order's fundamental claim is that "demand for electricity is projected to increase at an accelerating pace," and that even though "MISO has been taking steps to address these projected deficits," the Department deems those steps insufficient to secure adequate "resource adequacy." Ex. 67 at 5 (August Order)—largely based on the Department's views as to "reliance on foreign energy" and exposure to "swings within international commodity markets," *id.* at 6, as well a desire to privilege the coal industry over other cleaner and less expensive fuels, Executive Order 14261, 90 Fed. Reg. 15,517 (Apr. 14, 2025); Executive Order 14156, 90 Fed. Reg. 14,156 (Jan. 20, 2025). The Department thereby expressly seeks to override the decisions of MISO and private utilities pursuant to the mechanisms established by Congress to ensure abundant electricity supplies and the reliability of the bulk-electric system. 16 U.S.C. §§ 824a(a)–(b), 824o.

Section 202(c) does not permit that effort to transform the statutory scheme from one driven primarily by market-based and State decision-making to one of centralized command-and-control. And it especially does not permit that transformation in service of the Department's desire to dictate "how much coal-based generation there should be over the coming decades"—a power that the Supreme Court has found Congress "highly unlikely" to have left to agency discretion. *West Virginia v. EPA*, 597 U.S. 697, 729 (2022).

*ii. The Order Does Not Demonstrate Any Resource Adequacy Concerns that Are Not Already Being Addressed Through Statutorily Approved Channels.*

In addition to being an invalid basis for Department action under Section 202(c), the August Order's discussion of long-term resource adequacy concerns is inaccurate, both because it overestimates the potential of a shortfall and because it underestimates the ability of existing processes to address any projected shortfall. The following sections examine the several bases for the Department's claim of a long-term emergency; as they explain, none of those bases provide any actual evidence that Department intervention is necessary.

*a. The Department Misinterprets the OMS-MISO Survey.*

One of the Department's principal citations for its claim that MISO faces a long-term shortfall is the OMS-MISO Survey. Ex. 67 at 4–5 (August Order) (discussing Ex. 89 at 2, 7, 9 (2025 OMS-MISO Survey)). As discussed above, *supra* sec. IV.B.3, the Survey is structured to evaluate a range of potential outcomes, including a worst-case scenario that relies on extremely conservative assumptions about how much of the new generation that utilities have actively planned for is able to become operational. *See* OMS-MISO Survey at 5-6. Unfortunately, the Department's description of the OMS-MISO Survey is fundamentally flawed, because it cherry-picks the data in the Survey that confirm its own biases (exclusively that based on the survey's most conservative assumptions), and studiously ignores the rest. Broadly speaking, the purpose of the OMS-MISO Survey is to explore a wide range of potential outcomes based on current trends, to ensure that MISO is aware of the full spectrum of possibilities (including remote ones) for which it may need to secure adequate resources to ensure grid reliability. In keeping with that purpose, the Survey applies assumptions to the bottom end of its forecasts that are extremely unlikely to reflect reality. But in attempting to create the illusion of a long-term emergency, the Department cites only to this bottom edge, studiously ignoring the rest of the range of outcomes that were considered.

No example of the Department's selective interpretation of the evidence is more obvious than the Department glossing over the fact that the OMS-MISO Survey projects a near-certain surplus of resources through at least May 2027. Order at 5. In other words, the Department's own citation provides no basis to think that Campbell is needed *for almost two years*. The Department attempts to undermine this projection by calling it "potential" and suggesting that "at least 3.1 GW of additional generation capacity" would need to be added," Order at 5. But this phrasing is not consistent with the study, whose *most conservative* estimate concludes there will be a surplus in 2026; and it ignores the reality that new resources are built in MISO every year: 3.1 GW is fewer resources than came online per year over the past three years, and that was before utilities began accelerating new resource development in response to increasing load projections. The

Department's claim that MISO needs *at least* 3.1 GW of new generation is also factually incorrect because it ignores 1.4 GW of existing resources that are *not* currently committed to retire, but which were excluded from the Survey's projections because they were identified as having a "low certainty" of continued operation in 2026—if even one of those resources doesn't end up retiring, it would reduce the need for new resources below 3.1 GW. Ex. 89 at 5, 7 (2025 OMS-MISO Survey).

The Department's discussion of later-year projections is even more misleading. The OMS-MISO Survey examines MISO's resource adequacy projections using two alternate assumptions for how quickly new resources can be built: a "historical" projection that predicts 3.5 GW of new resources per year based on a three-year historical average (plus 1.2 GW of replacement resources based on historical levels); and an "emerging" projection that predicts 6.2 GW per year of new additions "based on member submittals to the OMS-MISO Survey" (*i.e.* what utilities have told OMS-MISO they are actually planning to build) and 2.4 GW per year of replacements. Ex. 89 at 5–6 (2025 OMS-MISO Survey). The Survey's "historical" projection also assumes that only half of utilities' planned upgrades to existing facilities will actually take place. *Id.*

The Department cites exclusively to the "historical projection, ignoring the "emerging" projection entirely—but this paints an excessively pessimistic picture of the future. The Survey's estimated 1.4 to 8.2 GW deficits from 2027/28 to 2030/31 in the historical projection are more than matched by its forecast 6.4 to 11.4 GW surpluses over the same period in its emerging projection. Ex. 89 at 7 (2025 OMS-MISO Survey). And again, both of these projections ignore entirely the possibility that any of the 1.4 to 3.8 GW of "potentially unavailable resources" turns out to in fact still be available. The Department's decision to ignore the half of the OMS-MISO Survey that is inconsistent with its emergency declaration has no basis in the structure of the Survey: the two projections are explicitly presented as "bookend capacity forecasts." OMS-MISO Survey at 6.

In ignoring the emerging projection, the Department unreasonably fails to take into account several key factors that support that projection. First, the historical 2022-24 new capacity build rate is not likely to be reflective of future build because the scope of the need for new generation only became clear in the past year or two: indeed, MISO added almost 5 GW of new resources in 2024, which was about 50 percent more than the MISO region had ever built before. OMS-MISO Survey at 6]. Second, the historical projection underestimates future contributions of storage,

because MISO currently only has roughly 164 MW of operational storage,[6] meaning that the historical trend still does not account for the coming influx of battery storage resources. And third, the historical projection's assumption that only half of utilities' "replacement" and "surplus" projects will actually occur has no actual historical basis, because these are new categories of projects that MISO therefore has no historical data on. Ex. 89 at 5 (2025 OMS-MISO Survey) (indicating that replacement and surplus projects were not considered for the 2024 Survey).

The Department has also ignored other information in the OMS-MISO Survey that indicates the possibility of even more new generation coming online than either of the two projections in the Survey anticipate. For instance, the survey indicates that 54 GW of projects have a signed generator interconnection agreement but are waiting to interconnect. OMS-MISO Survey at 6. A review of historic trends is instructive here: ninety percent of projects with signed generator interconnection agreements ultimately get built. *See* Ex. 120 at 6 n.* (2024 OMS-MISO Survey). Assuming that trend continues—and the circumstances of increasing demand provide good reason to think it will—48 GW of the total 54 GW projects currently with signed generator interconnection agreements will come online. [7]

Additionally, there are about 291 GW of projects currently in MISO's interconnection queue. Ex. 121 at 7:15–17 (Witmeier 2025 ERAS Testimony). MISO's historic interconnection queue completion rate is twenty-one percent, *see* Ex. 112 at 21:2–5 (Witmeier 2024 Queue Cap Testimony), which would equate to another 61 GW (291 GW × 21% = 61.1 GW) of new projects interconnecting from the current queue. Together, those two groups represent more than 109 GW of new resource additions that MISO could reasonably expect to come online in the next several years.

---

[6] MISO, *Storage*, at 4 (Mar. 12, 2025) ("AC Board Storage Presentation"), https://cdn.misoenergy.org/20250312%20AC%20Item%2006%20Session%20with%20the%20Board%20of%20Directors%20-%20Storage%20_%20Introduction684557.pdf (Presentation before the Advisory Committee Session with the Board of Directors).

[7] This statistic is particularly noteworthy because, as it did last year, the OMS-MISO Survey includes resources with signed Generator Interconnection Agreements in its definition of "potential new capacity," even though such projects are more likely than most to come online. OMS-MISO Survey at 6. This further underscores the conservative nature of even the "emergent" version of the Survey's new capacity projections.

*b. Neither The Energy Emergency Executive Order nor the Grid Reliability Executive Order provides a valid basis to declare an emergency under Section 202(c).*

The Department also cites to the Energy Emergency EO and the Grid EO claiming that there is an energy emergency and that the grid is being stressed by unprecedented demand. Neither of these executive orders is valid evidence of an actual energy emergency. If the Orders' reference to a national energy emergency is meant to serve as evidence of an emergency as defined under Section 202(c), it is insufficient. Claims recited in an Executive Order are not substantial evidence supporting agency action. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chritton v. Nat'l Transp. Safety Bd.,* 888 F.2d 854, 856 (1989) (internal quotation marks omitted). And an emergency under Section 202(c) must be a *specific* inadequate power supply situation. *See supra* sec. V.A.1; *e.g.*, 10 C.F.R. § 205.371 (emphasis added). In the quoted passages from the Energy Emergency EO, the President offered his perspective on issues relating to the nexus between energy usage and "our Nation's economy, national security, and foreign policy." But these themes are simply not relevant to assessing whether an "emergency" has occurred under Section 202(c)(1) and the Department's regulations under 10 C.F.R. § 205.371. Thus, the Orders provide no specific evidence of inadequate generation nationwide, let alone in Michigan or even in MISO specifically. Nor does it explain how the retirement of a single power plant in a single state—Michigan—supports the existence of an emergency in the MISO region, let alone the whole country. An emergency under Section 202(c) also must be imminent. *See supra* sec. V.A.1. But even the Department's other cited evidence demonstrates clearly that there is nothing imminent about even the most tenuous projected shortfalls.

Even if the declared national energy emergency were legitimate, a presidential declaration of an emergency does not unlock unlimited agency powers. *See Biden v. Nebraska*, 600 U.S. 477, 500-01 (2023) (presidential declaration of national emergency does not change the limitations on agency's emergency authority as written into statute). President Trump issued the Energy Emergency EO pursuant to authority from the National Emergencies Act.[8] Congress explained that the

---

[8] Under the National Emergencies Act, no emergency powers unlocked by a Presidential declaration of a national emergency "shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act." 50 U.S.C. § 1631 (emphasis added). The Energy Emergency EO does not adhere to this requirement. Ex. 92, 90 Fed. Reg. at 8,434 (Energy Emergency EO) (generically directing agencies to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the . . . generation of domestic energy resources.").

National Emergencies Act "is not intended to enlarge or add to Executive power. Rather, the statute is an effort by Congress to establish clear procedures and safeguards for the exercise by the President of emergency powers conferred on him by other statutes." S. Rep. No. 94-1168, 3 (1976), (emphasis added). But Section 202(c)'s authority is not triggered by a Presidential emergency declaration; the statute requires that "the *Commission* determine[] that an emergency exists." 16 U.S.C. § 824a (emphasis added).[9] Thus, the burden is on the Department to demonstrate that there is an emergency pursuant to the narrow language of Section 202(c); simply pointing to the Energy Emergency EO or the Grid Reliability EO without providing actual evidence that an emergency exists results in an arbitrary and capricious order.

*c. The Department's July Resource Adequacy Report does not substantiate its claim of a long-term resource adequacy shortfall.*

The Order also briefly cites to the Department's July Resource Adequacy Report as evidence of a potential emergency years down the road. Ex. 67 at 6 (August Order) (citing Ex. 96 (July Resource Adequacy Report)). But that Report does not credibly project conditions in 2030 because of its many inaccurate assumptions and methodological errors.[10]

Most glaringly, the Report overestimates demand growth and expected facility retirements while underestimating the likelihood of new entry. This biases the entire report in the direction of over-identifying resource adequacy concerns. Ex. 113 at 21–25 (Inst. Pol'y Integrity Report); *see also* Ex. 68 at 7 (Grid Strategies Sept. Report) (explaining that the July Resource Adequacy Report relies on load growth and capacity retirement assumptions that are "drastically higher" than those provided by the U.S. Energy Information Administration, the arm of the Department tasked with "independent statistics and analysis"); Ex. 122 at 2–3 (GridLab Report) (noting that the July Resource Adequacy Report fails to account for the potential flexibility of data center load additions; that the Report assumes double the retirements and only a quarter of the firm resource additions assumed by the Energy Information Administration; and that the report ignores "fast-track" interconnection processes recently approved by FERC for multiple RTOs); Ex. 99 at 34-35 (PIOs' RFR of July Resource Adequacy Report) (citing multiple expert reports and initiatives demonstrating the potential for flexibility of large data center loads, including Ex. 123 (Duke University Rethinking Load Growth Study)).

---

[9] The Department has exercised certain powers under Section 202(c) since the DOE Organization Act of 1977. 42 U.S.C. § 7151(b).

[10] A subset of PIOs have raised several concerns with this order in a separate rehearing request. *See generally* Ex. 99 (PIOs' RFR of July Resource Adequacy Report).

The Report also "departs from best [modeling] practices by using a deterministic modeling rather than a probabilistic approach," and thereby fails to account for necessary uncertainties. Ex. 113 at 19 (Inst. Pol'y Integrity Report). And in many places the Department simply does not explain its own methodology. The report states that its model is derived from NERC's Interregional Transfer Capability Study, which is focused on the ability of the transmission system to transfer power between regions. Ex. 96 at 2 (July Resource Adequacy Report). However, the report inexplicably excludes new transmission projects from its analysis, ignoring that transmission improvements can be the most cost-effective way to improve grid reliability. The Department's report also appears to misunderstand certain principles of statistical reasoning, calling out PJM for failing loss-of-load criteria under *one* realization of a possible weather year that would include Winter Storm Elliott, without considering that a system's LOLE is averaged across all simulated weather years. Ex. 113 at 19 (Inst. Pol'y Integrity Report); Ex. 96 at 7, 9, 27 (July Resource Adequacy Report). The Department also added more "perfect capacity" (in megawatts) within its modeling than actually needed to bring regions to its targeted Normalized Unserved Energy level. Ex. 113 at 26 (Inst. Pol'y Integrity Report); Ex. 96 at 19, 27, 30, 32, 40. These analytical failings in and of themselves disqualify the report as a viable source of evidence for an emergency finding.

The lack of evidence for a long-term emergency is underscored by the fact that the Department's own analysis premises a resource adequacy shortfall on a type of demand increase (large load buildout), Ex. 96 at 2–3, 15–17 (July Resource Adequacy Report), that the report goes on to admit would likely never actually be allowed to destabilize the grid. Specifically, the report notes that its analysis "is not an indication that reliability coordinators would allow this level of load growth to jeopardize the reliability of the system." *Id.* at 14. In other words, even taking the report at face value, it does not identify a shortfall of a type and nature that could ever justify invocation of the Department's Section 202(c) emergency authority. At best, the report highlights that data centers cannot be built at projected rates unless new generation is built, which is far from the type of emergency situation that could ever provide the basis for a Section 202(c) order.

Finally, on its opening page, the report acknowledges that its analysis is general in nature, looking at the country as a whole, and that the various "entities responsible for the maintenance and operation of the grid" have information "that could further enhance the robustness of reliability decisions" in the sections of the grid they administer. *Id.* at i. This type of generalized analysis based on incomplete information is simply insufficient to justify a Section 202(c) emergency finding for MISO or any other specific region.

*d. The Generic Testimony of a Single MISO Executive on which the Department Relies Is Contradicted by Numerous and More Concrete Other Statements by MISO.*

Finally, the Order cites to testimony by Jennifer Curran, a current MISO executive, that speaks in general terms about MISO's need for capacity. Ex. 67 at 6–7 (August Order) (citing Ex. 100 (Curran Testimony)). As an initial matter, Ms. Curran's testimony is sufficiently vague that it is open to any number of interpretations. Her testimony provides no timeline for the risk she communicates, nor does it state how great the reliability risk is, or how much bigger it could get, from the various systemic trends she discusses. *See* Ex. 100 at 4–6 (Curran Testimony). This generic testimony is expected from an opening statement to Congress; it is also several steps removed from the concrete, tangible, and specific evidence that is necessary for the Department to find that there is a resource adequacy emergency.

The August Order's treatment of Ms. Curran's testimony is a prime indicator of unreasoned decision-making because it misrepresents aspects of the testimony, cherry-picks only favorable statements while omitting unfavorable statements, and wholly ignores related evidence undercutting the Department's position. For example, the August Order misrepresents Ms. Curran's testimony in suggesting she "acknowledged the Nation's current energy crisis." Ex. 67 at 6 (August Order). In fact, Ms. Curran never said or implied that there is any "crisis" or emergency. Moreover, the Department conspicuously omits elements of her testimony cutting against the Department's invocation of Section 202(c) authority. For example, Ms. Curran testified that "[i]mproving existing market and operations processes tool is a cost-effective and timely way to improve reliability in an efficient manner." Ex. 100 at 7 (Curran Testimony). She further testified that the risks of generation plant retirements can be addressed by allowing *local* reliability requirements to determine the pace of retirements. *Id.* Ms. Curran's recommendations for future action do not include the Department's use of Section 202(c) orders, nor do they include coal-fired power generation. *See id.* at 9-10.

The August Order also fails to mention or consider statements by other MISO executives rebutting the Department's conclusion that there is a resource adequacy deficiency. For instance,

> In a statement, MISO said it will "continue coordinating with Consumers Energy to comply with the order." But MISO again stressed that J.H. Campbell did not clear the planning resource auction and is unnecessary for resource adequacy in the 2025/26 planning year. "MISO's 2025-2026 Planning Resource Auction indicated adequate resources to meet anticipated demand. . . .," MISO spokesperson Brandon Morris said in a statement to RTO Insider.

Ex. 117 (RTO Insider Article on August Order). It further ignores testimony from MISO's Internal Market Monitor at a recent FERC technical conference that MISO "is more than adequate" for the Summer of 2025 and that the IMM has no substantial resource adequacy concerns "in the near term." Ex. 35 at 2 (Patton MISO Comments). Finally, the August Order fails to consider that MISO has never requested that a 202(c) order be issued to Campbell; and it has never expressed support for the Department's first Campbell order.

*e. MISO has designed its ERAS proposals to address claimed shortfalls and has not suggested that any further generation/capacity is needed*

There is one place where MISO has projected a resource adequacy need: in the course of requesting FERC approval for its proposed Expedited Resource Addition Study, which FERC approved in July 2025. Ex. 90 at 6, 13–17 (MISO ERAS Transmittal Letter); Ex. 91 (MISO ERAS Decision). But as explained above, *supra* sec. IV.B.3, that projected need spurred MISO to initiate a process that will add at least 26.5 GW (and likely more) of new capacity to MISO's system over the next several years.

The Department minimizes the import of this approval by suggesting that the projects won't reach commercial operation for at least three years and could be further delayed by supply chain constraints. Ex. 67 at 5 (August Order). But the Department's first statement is factually incorrect—projects that are selected for ERAS could begin operation sooner than three years from the application date; they just have up to six years of leeway—and its second statement is far too conjectural to provide a basis for an emergency declaration. Ex. 91 at P 84 (MISO ERAS Decision). The Department cannot defensibly declare an emergency justifying use of its 202(c) authority based on a concern that the expedited interconnection process MISO has established specifically to meet projected resource adequacy needs won't work—absent substantial and specific evidence of that fact, it is pure conjecture.

*3. The Order's Secondary Basis of Near-Term (Summer/Fall) Resource Adequacy Concerns Is Not, and Could Not Be, Sufficient to Warrant Invocation of the Department's 202(c) Authority.*

*i. The Described Concerns Are Insufficiently Specific and Certain to Meet the Statutory Definition of an Emergency.*

The August Order gestures at the possibility of electricity shortfalls in the "near" term. It offers no plausible evidence of such shortfalls. *See infra sec.* V.A.3.ii. That failure to adduce plausible evidence to one side, the generalized, speculative risks described by the August Order are neither specific nor certain enough to qualify as an "emergency" within the meaning of Section 202(c). 16 U.S.C. 824a(c). For the remainder of the summer, the August Order recites: a purported need for Campbell "last June"; a series of "alerts" that did not implicate the plant; and a "40-50%

chance" of "above-normal temperatures." Ex. 67 at 2–3 (August Order). That notional suggestion of *some* possible shortfall, which might (or might not) require Campbell's generation, is not a "specific inadequate power supply situation" enabling the use of the Department's Section 202(c) authority. 10 C.F.R. § 205.371. The fact that contemporaneous weather reports indicated that the final 10 days of MISO's summer season would be marked by a pronounced cooling trend, as explained above *supra* sec. IV.B.1, underscores the problem with relying on general statements like those the Department cites to demonstrate a likelihood of risk over a specific 11-day period.

For the remainder of the August Order's term—which extends into the fall—the Department states only that "MISO's resource adequacy problems are not limited to the summer." Order at 3. The Order does not find that those unspecified "resource adequacy problems" will produce any shortfall in supply implicating Campbell over the term of the Order. At most this conclusory statement asserts the possibility that some resource inadequacy might (or might not) emerge somewhere in MISO—but that does not, and cannot, demonstrate that "an emergency *exists* by reason of a sudden increase in the demand for electric energy" or an identified "shortage of electric energy" or of particular "facilities for the generation or transmission of electric energy." 16 U.S.C. § 824a(c)(1) (emphasis added). *See also Louisville & N.R. Co. v. Sullivan,* 617 F.2d 793, 795 (D.C. Cir 1980) (where statute permits emergency orders based on determination that a "facility or piece of equipment is in unsafe condition and thereby creates an emergency situation," agency may not issue order based on "a generalized poor safety record" without showing of "particular" safety hazard). The Order does not describe or provide support for—even taken on its own terms—any imminent, specific, or certain electricity shortfall. It therefore does not describe an "emergency" within the meaning of Section 202(c). *Id.*

*ii. The Claimed Shortfall Is Unreasoned and Not Supported by Substantial Evidence.*

*a. MISO's Grid Stewardship During the Past 90 Days Demonstrates that the May Order Was Not, and the August Order Is Not, Necessary to meet Summer 2025 Needs.*

The Department's claim that MISO faced "resource adequacy problems" in Summer 2025 was specious in both May and August, and could not support an order to operate Campbell under Section 202(c) to bridge a Summer 2025 supply gap. As discussed above in sec. IV.B.1, system performance for Summer 2025 (June through August) was consistent with MISO's advance forecasts of adequate supplies (even without Campbell) and low risk for the season, and with its having cleared adequate resources to maintain resource adequacy through its 2025-2026 Planning Auction.

While the Order asserts that "the production of electricity from the Campbell Plant will continue to be a critical asset to maintain reliability in MISO this summer," Ex. 67 at 2 (August Order), it offers no evidence in support of that assertion. Most troublingly, after the Order correctly notes that Campbell ran at a 61% capacity factor in June 2025, and that MISO declared a Max Gen Event Step 1b on June 23 (*id.* at 3), it then fails to note that Unit 2 was completely offline from June 1 through June 27 or that Unit 1's production dropped to zero on June 23, in the middle of the Max Gen event. Ex. 68 at 5 (Grid Strategies Sept. Report); Unit 1 remained offline through the end of June. *Id.* This is another a prime indicator of arbitrary and capricious decision-making, because the Department again here misrepresents aspects of the readily available data, cherry picking factoids and ignoring related evidence that would undercut the Department's position.

Furthermore, the Order declines to explain how much excess generation was available but not dispatched in the MISO system during the relatively tight periods this summer, which is crucial to establish that the production of Campbell was necessary to maintain system supply adequacy at any particular time. That Campbell may have been dispatched in particular hours, which would be consistent with the "economic dispatch" that the Department explicitly required MISO to enable in the May Order, does not establish that Campbell's absence would have left the system with insufficient resources. In fact, as established by Public Interest Organizations' expert engineer Rao Konidena, even at peak load on the tightest day of the Summer, MISO had at least 7,941 megawatts of unused surplus resources, which was over ten times what Campbell provided at the time. Ex. 70 at ¶¶ 16–17 (Konidena Decl.); *supra,* sec. IV.B.1. MISO had more than enough resources to meet demand, maintain an operating reserve to cover contingencies, and still have room to spare, and had available to it the use of Load Modifying Resources like demand response. Ex. 70 at ¶¶ 14–23 (Konidena Decl.). Even at peak demand this Summer, MISO did not need Campbell to have sufficient supply to maintain reliability for the region. *Id.*

Public Interest Organizations' expert analyst Michael Goggin also establishes that MISO's declaration of various levels of "Max Gen" events at times when system margins grew relatively smaller is a feature, not a bug, of MISO's resource adequacy management. Ex. 68 at 3–4 (Grid Strategies Sept. Report). And this past summer, MISO's Max Gen event declarations only rose to the first "Max Gen" level out of five. *Id.*; *see supra* secs. IV.A.3, IV.B.1. MISO's protocols allow it to call on several tranches of resources, including Load Modifying Resources, Voluntary Load Reduction, resources currently on outage, and emergency headroom, as needed. Ex. 70 at ¶¶ 10–23 (Konidena Decl.). In short, MISO effectively stewarded all the resources at its disposal this summer to avoid a true grid emergency, exactly as the RTO (and protesters) predicted it would.

*b. None of the MISO Proceedings and Reports Cited by the Order Support Its Claim that the Midwest Faces a Fall 2025 Resource Adequacy Emergency.*

The August Order offers no substantive evidence that it is needed to ensure resource adequacy in the Fall 2025 season (which is most of the period it covers). Instead, it reviews and recites information from several MISO documents, misinterpreting and misrepresenting the materials to allege a resource adequacy crisis that simply does not exist. Its conclusions thus fail to reflect reasoned decision-making.

The first example of this flawed reasoning is the August Order's repetition of a statement it erroneously cited in the May Order: namely, MISO's statement in its 2025–2026 Planning Auction results that "for the northern and central zones, which includes Michigan, new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources." Ex. 67 at 4 (August Order); *see* Ex. 1 at 1 (May Order). As it did in May, the Department fails to note that this statement referred only to the netting of additions and subtractions causing total North/Central offers[11] to decrease in absolute terms from Summer 2024 to 2025. Overall resource offerings in MISO North/Central were ***not*** insufficient relative to the Reserve Margin Requirement, which also decreased from 2024 to 2025. *Compare* Ex. 84 at 16 (MISO 2024-25 Auction Results) (showing a Summer 2024 Reserve Margin Requirement of 100,710 MW in Zones 1-7), *with* Ex. 31 at 18 (MISO 2025-26 Auction Results) (showing a Summer 2025 Reserve Margin Requirement of 99,770.5 MW in Zones 1–7).

This result also tracks MISO's Planning Auction results, which, as explained above, *supra* secs. IV.A.2.ii, IV.B.2, resulted in MISO securing more resources for Fall 2025 than it felt were necessary to ensure resource adequacy. In short, it was clear when MISO released its 2025-2026 Planning Auction results in April of this year—well before the August Order—that the MISO system had no resource adequacy crisis after accounting for Campbell's retirement.

The August Order also gestures to various recent reports in which MISO has forecasted an increasing resource adequacy risk in non-Summer seasons. However, the Department does not appear to have carefully examined what MISO was actually saying in any of these materials. First, it quotes from MISO's 2021 capacity accreditation filing, in which MISO described a shift of reliability risks "from 'Summer only' to a year-round concern," for the proposition that the fall season also experiences meaningful systemic risks. Ex. 67 at 3–4 (August Order) (quoting Ex. 77 at 3–4 (MISO 2021 Transmittal Letter)). The implicated graph in the 2021

[11] Offers in the Planning Auction are stated in terms of accredited megawatts of capacity or "UCAP."

Transmittal Letter shows an incidence of MaxGen events across all four seasons from 2014 through 2022 but says nothing about how serious these events were. A simple review of MISO's actual MaxGen events would have revealed that only two fall days have ever experienced events exceeding the "MaxGen Warning" level—in 2017 and 2018—and neither of those ascended to the level (MaxGen Event Step 5) that entails manual shedding of load. Ex. 32 at 3, 11, 14 (MISO Emergency Declarations); *see supra* sec. IV.A.3, IV.B.1.

Next, the August Order cites MISO's 2023 Attributes Roadmap, which (according to the Order) established that "by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons." Ex. 67 at 4 (August Order) (citing Ex. 85 at 11 (MISO Attributes Roadmap)). But again, the Order fails to discuss the magnitude of risk at issue. The implicated graph on page 11 of the MISO Attributes Roadmap identifies loss of load risks that peak around hour 20 with around 150 hours of expected lost load—but those 150 hours (from 3,750 runs of the model)[12] correspond to a LOLE risk of .05 days/year, or 50% under the industry-standard target of 0.1 days per year. Ex. 86 at 7, 19 (MISO Attributes Roadmap Technical Appendix); *see* Ex. 2 at 2 (Grid Strategies June Report). The Department thus failed to make a reasoned determination, because its discussion of "equal" risk fails to mention that the absolute risk in both seasons remains extremely low.

Furthermore, the graph the Order cites in the MISO Attributes Roadmap doesn't even refer to the present Fall season. It refers to projected risk in Fall 2027 and makes clear that there was minimal such risk in Fall 2023; but it is entirely silent as to the risk profile in Fall 2025, which is the only Fall season that is relevant to the Order's claim of a near-term emergency. And the resource mix for Fall 2025 looks *much* more similar to that in Fall 2023 (when risk was not concentrated in the Fall season) than to MISO's projected Fall 2027 mix—so the 2023 chart is a much more useful predictor of likely risk allocation in Fall 2025. Ex. 68 at 1–2 (Grid Strategies Sept. Report). As discussed further below, the Order may not simply use the possibility of risks in future Fall seasons as evidence that actual risks exist in the current Fall season—particularly where, as here, there is concrete evidence demonstrating that no such risk exists.

Finally, the August Order gestures to MISO's 2024 Reliability Imperative Report, which vaguely mentions "risks in non-summer months that rarely posed challenges in the past." Ex. 67 at 4 (August Order) (quoting Ex. 87 at 12 (MISO's Response to the Reliability Imperative)). But the "Response to the Reliability Imperative" offers no specific information about Fall season risks other than that

[12] For a given season, 15 weather years and 250 random outage samples per weather year are modeled. Ex. 86 at 7 (MISO Attributes Roadmap Technical Appendix). $15 \times 250 = 3{,}750$.

single vague line, and offers little ballast on which to build a legally sound finding of emergency conditions. *See generally* Ex. 87 at *passim* (MISO's Response to the Reliability Imperative).

Notably, while the August Order attempts without justification to sow doubt about resource adequacy in fall seasons generally, the Order does not provide any evidence indicating any actual risk of inadequate supply in the Fall 2025 season. Indeed, the word "Fall" is mentioned only twice in the August Order, both times on page 4, and neither in reference to 2025. This is a staggering abdication of the Department's obligation to provide sound evidentiary backing for its emergency declarations, and further confirms that there is no remotely plausible reason to be concerned about resource adequacy shortfalls in Fall 2025.

c. *No Other Evidence Cited in the Report Supports Its Claimed Emergency.*

The August Order contains several other citations to expert and official documents that purportedly support a finding of an "emergency" in the MISO system, but every remaining piece of evidence is of little to no weight. For example, the August Order relies on NERC's Summer 2025 Reliability Assessment as evidence of "elevated risk of operating reserve shortfalls [in MISO] during periods of high demand or low resource output" with the "period of highest energy shortfall risk [having] shifted from July to August." Ex. 67 at 1–2 (August Order) (quoting Ex. 41 at 5 (NERC 2025 Summer Reliability Assessment)). Putting aside that only 11 days remained in the Summer season after the issuance of the August Order, the fact remains that the same NERC Summer 2025 report provides the following very pertinent statement: "Emergency declarations that can only be called upon when available generation is at maximum capability are necessary to access load-modifying resources (demand response) when operating reserve shortfalls are projected." Ex. 41 at 16 (NERC 2025 Summer Reliability Assessment). This is consistent with the information offered by the Konidena Declaration, discussed *supra* sec. IV.B.1, showing how over 8,000 megawatts of load modifying resources were available to MISO operators during the tightest conditions in Summer 2025. The Department acted arbitrarily and capriciously by citing this NERC document as supposed support for the claimed grid "emergency" without enquiring further into NERC's characterization of conditions. See also Ex. 71 at § IV.A.2.iii (Public Interest Organizations' June Rehearing Request) (detailing the infirmities of the Department's reliance on the NERC 2025 Summer Reliability Assessment).

Meanwhile, any attempt by the Department to rely on the July Resource Adequacy Report as evidence of a Fall 2025 emergency would be inapposite: the Report actually contradicts the Department's emergency finding in the August Order because it concludes that, under the Department's own recommended standards, there is no current or imminent resource adequacy problem anywhere in the United States, with the exception of ERCOT. *See* Ex. 96 at 7 (July Resource

Adequacy Report) (analysis based on loss of load hours (LOLH) and normalized unserved energy (NUSE) standards).

*B. The Order Fails to Set Terms that Best Meet the Emergency and Serve the Public Interest.*

*1. Section 202(c)(1) Authorizes the Department to Require Only Generation that Best Meets the Emergency and Serves the Public Interest.*

Section 202(c)(1) demands the Department only impose requirements that (i) "best" (ii) "meet the emergency and" (iii) "serve the public interest." 16 U.S.C. § 824a(c)(1).

The term "best" demands a comparative judgment that there are no better alternatives. The word "best" is inherently a comparative term and means "that which is 'most advantageous.'" *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (*quoting* Webster's New International Dictionary 258 (2d ed.1953)); *cf. Sierra Club v. Env't. Prot. Agency*, 353 F.3d 976, 980, 983–84 (D.C. Cir. 2004) (explaining that statutory "best available control technology" requirement demands sources in a category clean up emissions to the level that peers have shown can be achieved). Consequently, the Department must, at minimum, consider alternatives and evaluate whether and to what extent a given alternative addresses the emergency and serves the public interest, including deficiencies associated with the alternative.[13]

The Department's obligation to exercise reasoned decision-making further requires consideration of alternatives. The Department need not consider every conceivable alternative, but it must consider alternatives within the ambit of the existing policy as well as alternatives which are significant and viable or obvious. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order).

---

[13] To be sure, the nature and extent to which the Department must consider alternatives depends on the emergency. An emergency that truly requires the Department to act within hours, for instance, permits a more abbreviated consideration than an emergency for which the Department has days to decide.

The Department's regulations and practice identify relevant alternatives for its consideration. The regulations specify information the Department shall consider in deciding to issue an order under Section 202(c), and require an applicant for a 202(c) order to provide the information. 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." *Id.* § 205.373(g)–(h); Ex. 5 at 4 (DOE Order No. 202-22-4).

The Department may then choose only the best alternative. The best alternative is the one which is most advantageous for meeting the stated emergency and serving the public interest.

The statutory command to take only measures that serve the public interest, including with respect to environmental considerations, further constrains the Department's authority. The public interest element demands that the Department advance, or at least consider, the various policies of the Federal Power Act. *Cf. Wabash Valley Power Ass'n*, 268 F.3d at 1115 (interpreting the "consistent with the public interest" standard in Section 203 of the Federal Power Act); *see Gulf States Utils. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 759 (1973); *California v. Fed. Power Comm'n*, 369 U.S. 482, 484–86, 488 (1962). Primary policies of the Federal Power Act include protecting consumers against excessive prices; maintaining competition to the maximum extent possible consistent with the public interest; and encouraging the orderly development of plentiful supplies of electricity at reasonable prices. *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 670 (1976) (orderly development); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374 (1973) (maintaining competition); *Pa. Water & Power Co. v. Fed. Power Comm'n*, 343 U.S. 414, 418 (1952) (excessive prices). And because Section 202(c) expressly protects environmental considerations, these are part of the public interest element too. See *NAACP*, 425 U.S. at 669 ("[T]he words 'public interest' . . . . take meaning from the purposes of the regulatory legislation.").

2. *The Order Fails to Impose Requirements that Best Meet the Claimed Emergency and Serve the Public Interest.*

The August Order determines that additional dispatch of Campbell is necessary to best meet the emergency and serve the public interest. Ex. 67 at 7 (August Order). But the August Order provides no rational basis for that determination. The August Order does not address all of the reasons why Campbell is not the best means to meet the claimed emergency and serve the public.

Most of these reasons are already in the record and already before the Department, as they were part of the Public Interest Organizations' challenge to the May Order. *See, e.g.*, Ex. 3 at 4–17 (Powers June Decl.); Ex. 71 at 36–41 (Public

Interest Organizations' June Rehearing Request). Specifically, and as further discussed below, the August Order continues to:

- not address Campbell's limitations or explain how, in light of those limitations, Campbell could even meet the claimed emergency;
- not examine the expense of—and/or environmental damage caused by—running Campbell, both relevant factors which cause additional dispatch of the plant to harm, rather than serve, the public interest; and
- not address readily available and obvious alternatives which, in point of fact, would better address the claimed emergency.

Additionally, the August Order provides no reasoned basis for determining that Campbell best meets the claimed emergency years away. Transmission and myriad other facilities are available over the multi-year span addressed by the August Order. And the August Order contains nothing to suggest that Campbell is geographically "best," in part because the order fails to identify a resource shortfall that is imminent and specific enough to identify any best-placed resource. Consequently, and for the reasons further discussed in the following subsections, the Order is without support in the record, unreasoned, and unlawful. *Allentown Mack*, 522 U.S. at 374; *State Farm*, 463 U.S. at 42–43, 51; *Burlington Truck Lines*, 371 U.S. at 168; *Butte Cnty.*, 613 F.3d at 194.

i. *The August Order Does Not Address Campbell's Continued Demonstration of Its Unreliability.*

Campbell's age, exacerbated by the last several years spent planning for its retirement, raises significant doubt that Campbell is capable of reliable operation such that it could meet the claimed emergency. In fact, forcing the unreliable Campbell to continue operating actually threatens grid reliability.

The August Order fails to address Campbell's continued showing that it is unreliable. This despite evidence of such unreliability existing in the public record, *e.g.*, Ex. 103 (July 17 Email from Consumers to EGLE) (describing continued failures of Campbell Unit 2); Ex. 104 (CAMPD Campbell Hourly Emissions Data) (showing that Campbell Unit 1 abruptly stopped producing power shortly before MISO load peaked in June 2025), which the Department itself relies on for the August Order, Ex. 67 at 3 n.10 (August Order) (relying on CAMPD data). The evidence of Campbell's unreliability is also potentially in data submitted to the Department. *See* Ex. 1 at 3 (May Order) (requiring daily and periodic information from MISO on Campbell's operations, availability, and economic dispatch).

Even before the planned retirement in May 2025, Campbell suffered from poor reliability. Ex. 3 at 4 (Powers June Decl.). In 2024, the forced outage rate for the units was approximately 15 percent (Unit 1), 48 percent (Unit 2), and 19 percent (Unit 3); in 2023, it was approximately 19 percent (Unit 1), 57 percent (Unit 2), and

22 percent (Unit 3). *Id.* (citing exhibits to Consumers' witness Hoffman's 2024 and 2025 testimonies). Across all units, these rates are substantially worse than the national average for coal-fired units of 12 percent. *Id.* (*citing* Ex. 40 (NERC 2024 Reliability Report)).

The nature of the units' outages in 2023 and 2024 "reflects the impact of worn and difficult-to-repair or replace coal unit components on operational reliability." *Id.* at 4. Outages were long and recurrent. For example, in 2023, Unit 2 experienced four outages totaling 3,445 hours—nearly 40 percent of the year—due to a pump failure, and in 2024, Unit 3 experienced an outage totaling 1,104 hours due to a failure in one of the turbine's gears. *Id.* at 5 (citing exhibits to Consumers' witness Hoffman's 2024 and 2025 testimonies). Across the units, thousands of hours of outages occurred in 2023 and 2024 due to failed and degraded parts, which "are the predictable result of old equipment, no capital investment, and minimal maintenance." *Id.* at 4–5.

The precipitous drop-off in capital expenditures and maintenance at Campbell in recent years likely makes the plant even less reliable. In 2024, Consumers' witness Blumenstock testified that "[p]rojects that are targeted to improve reliability will not be considered" for Units 1 and 2 and, for Unit 3, "[c]apital projects that are targeted to improve reliability will not be considered." Ex. 11 at 19, 21 (Blumenstock 2024 Direct Testimony). Consumers' filings with the Michigan Commission show that for 2022 through 2025, the company's capital spending at Campbell Units 1 and 2 and Campbell Unit 3 is 93% and 90% lower, respectively, than what the company projected it would need to spend if it had planned to keep the plant online longer. Ex. 3 at 6 (Powers June Decl.). Likewise, the company's major maintenance spending at Campbell Units 1 and 2 and at Campbell Unit 3 is 62% and 78% lower, respectively. *Id.*

Consumers' strategic decision to decrease capital expenditures and maintenance in Campbell means Consumers did not undertake projects that it likely believed were necessary for reliable operation past the planned retirement date, *id.*, consistent with witness Blumenstock's 2024 testimony that Consumers was not considering projects targeted to improve reliability, Ex. 11 at 19, 21 (Blumenstock 2024 Direct Testimony). For example, one of the projects Consumers cancelled was a $7.9 million Unit 3 turbine overhaul project originally scheduled for 2024. Ex. 3 at 16 (Powers June Decl.). If that project had been undertaken before April 2024, it likely could have prevented the 1,104-hour outage at Unit 3 that occurred in late April 2024 due to a turbine gear failure. *Id.*

Campbell's poor performance in June 2025, discussed in detail *supra* sec. IV.C.3.i, makes clear that the plant continues to be unreliable. Units 1 and 2 both experienced long outages and were offline during much of the first full month Campbell was supposed to be available to operate pursuant to the May Order. Ex. 69 at 5 (Powers Sept. Decl.); Ex. 102 (CAMPD Campbell Daily Emissions Data).

Indeed, Unit 2 produced power on just four of thirty days in June. *Id.* The August Order does not address this evidence of Campbell's persistent unreliability.

The August Order also fails to come to grips with the dangers to grid reliability that it creates. An unreliable coal plant like Campbell is particularly likely to cause grid disturbances and the "loss of power to homes and local businesses in the areas that may be affected by curtailments or outages." Ex. 67 at 7 (August Order).

> Cold snaps, heat waves, and storms have all exposed coal's fragility during grid stress events. Reliability is not just about being dispatchable, it's about delivering performance under stress. Coal plants struggle to do that consistently. For coal plants to truly meet the constant demands of data centers, they would need to run at high-capacity factors and avoid major outages, all of which fly in the face of current performance trends. If a large coal plant trips offline while supporting a cluster of data centers, the sudden loss of supply could lead to cascading failures across the grid. This is because generation must equal load at all times, datacenter or no datacenter. As a result, relying on coal plants to support these high-density digital loads doesn't enhance reliability, it endangers it. And it's not a matter of *if* the coal plant will fail, but *when*.

Ex. 118 (RMI Analysis of Coal Plants' Threats to Reliability). The Department avers that it is concerned with the grid disturbances, yet puts forward no analysis to address the likelihood that it is actually creating the (otherwise unproven) problem it is supposedly trying to address. This ostrich-like approach to record evidence and public evidence is not reasoned decision-making. *Butte Cnty.*, 613 F.3d at 194; *cf. Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) (rejecting "ostrich-like approach" to agency decision-making).

*ii. The August Order Does Not Address Campbell's Continued Demonstration of Its Inability to Meet the Claimed Emergency.*

Separately, the August Order provides no reasoned basis to conclude that Campbell, even if fully maintained and operational, could meet the claimed emergency, let alone that it is the best way to do so.

Campbell is not designed to turn on quickly in response to times of extreme demand. As discussed *supra* sec. IV.C.3.ii, Campbell's three units take between one to three days to turn on from a cold condition. Ex. 69 at 6 (Powers Sept. Decl.); Ex. 101 at Question 5 (Consumers June Responses to AG). By comparison, the average coal plant takes 12 hours to reach max capacity from a cold start, Ex. 55 at 26 (IEA Flexibility Report); Ex. 118 (RMI Analysis of Coal Plants' Threats to Reliability), while "utility-scale battery storage can dispatch from a cold start to full power in a matter of seconds," Ex. 69 at 17 (Powers Sept. Decl.).

The August Order points to projections of demand growth, including from "data centers driving artificial intelligence." Ex. 67 at 6–7 (August Order). Even assuming *arguendo* the Department has authority under Section 202(c) to address that claimed circumstance (it does not), coal plants' "always-on nature" and "rigidity" are "a poor match for the dynamic and often unpredictable nature of data center demand." Ex. 118 (RMI Analysis of Coal Plants' Threats to Reliability). "[L]arge, voltage-sensitive loads like data centers require flexible, responsive grid solutions, not slow-ramping generators that can take 12 or more hours to come online." *Id.* (relying on NERC).




Source: Ex. 118 (RMI Analysis of Coal Plants' Threats to Reliability)

In short, the August Order fails to examine inherent mismatch between the problem it diagnoses and the mandate it imposes. This is not reasoned decision-making.

Besides, Campbell's long lead time makes it especially unsuitable for any Section 202(c) order: the type of grid emergency contemplated by Section 202(c)'s text and requirement of imminence would need to be addressed on a timescale that Campbell simply would not be able to start up fast enough to meet—thereby either defeating the purported purpose of keeping the plant operational past its retirement date, or forcing the plant to run constantly in anticipation of such emergencies, which would contravene the limitations set forth in Section 202(c)(2), discussed below. Thus, Campbell is plainly not the best means of meeting the range of energy

emergencies MISO might plausibly face, even were there a resource adequacy problem.

*iii. The August Order Does Not Address Campbell's Continued Demonstration of Its Expensive and Uneconomic Nature.*

Further, the expense of operating Campbell renders it unable to serve the public interest, a topic the August Order does not address. As discussed *supra* secs. IV.C.3.iv and IV.C.4.iii, Campbell has been, and continues to be, an expensive plant to run. In 2021, Consumers projected that retiring Campbell in 2025 would avoid $365,008,000 in capital expenditures and major maintenance costs. Ex. 13 at 3–4 (Kapala Direct Testimony). Campbell has gotten more expensive to run since then: the cost of Campbell's power was 21% higher in 2021 than in 2024, rising faster than inflation. Ex. 49 (2025 Energy Innovation Dataset); Ex. 50 at 3 (2025 Energy Innovation Coal Cost Report); *see also* Ex. 51 at 12 (2023 Energy Innovation Coal Cost Report). And as Public Interest Organizations' expert analyst explains, Campbell operated at a loss in June 2025 and is likely to continue doing so going forward. Ex. 68 at 5–6 (Grid Strategies Sept. Report); *see supra* sec. IV.C.3.iv.

Bringing Campbell from a cold start condition to full output to meet any claimed emergency would also be extremely expensive. The estimated cost to "cold start" a coal-fired power plant is $417 per MW of capacity. Ex. 3 at 18–19 (Powers June Decl.) (*citing* Ex. 54 (NARUC Coal Report)). The total nameplate capacity of Campbell Units 1–3 is 1,561 MW. *Id.* at 18. Therefore, the estimated cost to cold start Campbell at its nameplate capacity is approximately $650,000. *Id.* at 19. And while continually operating Campbell may avoid the costs of a cold start, that approach is uneconomic and expensive for other reasons.

Moreover, as discussed above, Consumers has significantly decreased expenditures in Campbell since the Integrated Resource Plan proceeding that established the plant's May 2025 retirement date, forgoing a long list of capital and maintenance projects totaling approximately $161 million. Ex. 3 at 5–6 (Powers June Decl.). As Public Interest Organizations' expert engineer states, "[i]t is reasonable to assume that much of this investment was necessary to ensure continued, nominally reliable operation of Campbell." *Id.* at 16. Consumers itself explains that, "given the ages and designs of the systems, replacement parts are not always readily available. In some instances, replacement parts do not exist at all." *Id.* at 15 (quoting Consumers' witness Hoffman's testimony).

And as discussed *supra* sec. IV.C.3.iii, Campbell's operation results in significant environmental pollution. Thus, even accepting *arguendo* that an emergency exists and Campbell could address it, the Department still has not met its burden to provide a reasoned basis that the directive best meets the emergency and serves the public interest.

*iv. The August Order Does Not Address or Reflect Consideration of Alternatives.*

Other alternatives are available to the Department that better meet the claimed emergency and serve the public interest. MISO has access to robust transmission connectivity between itself and neighboring region to support the stability of its grid. *See, e.g.*, Ex. 35 at 2 (Patton MISO Comments). During the entire period of the August Order, MISO Zone 7 can import more than 4,000 MW. Ex. 37 at 13 (MISO 2025–2026 CIL/CEL Final Results); *see generally* Ex. 65 at 52–53 (DOE Transmission Planning Study) (documenting interregional variability in electricity demand); Ex. 66 at 22–35 (NERC 2024 Interregional Transfer Capability Study, Part 1) (describing transfer capabilities between MISO and other regions).

The Department has long recognized that power pools and utility coordination "are a basic element in resolving electric energy shortages." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981). And recent history bears out the important role of transmission connectivity along with imports and exports. *See, e.g.*, Ex. 43 at § III.A.3.b (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system . . . MISO maintained steadily increasing exports to TVA throughout the day."); Ex. 44 at 43 (PJM Elliott Report) (describing PJM exports of between 8 and 11 GW to TVA and other neighboring regions), 83–84 (describing PJM power exports to MISO and graphically depicting those exports over time); Ex. 36 at 6 (MISO Elliott Max. Gen. Event Overview) ("MISO consistently exported power to southern neighbors with a maximum value of nearly 5 GW."); *see also* Ex. 7 at 1 (DOE Order No. 202-02-1) (providing for usage of interregional transmission).

However, the Department's citation of the NERC 2025 Summer Assessment, which considers interregional connectivity only as a mitigation option, suggests that the Department does not have full confidence in the availability of this resource. As explained above, the Department offers no reasonable basis to question the availability of resources from neighboring regions. But even if there were some barrier to transmission from those regions, the Department has not (and likely could not) explain why the August Order provides a better means of ensuring resource sufficiency than addressing those barriers directly through its power to

require "interchange" and "transmission" of electric energy from those neighboring regions. 16 U.S.C. § 824a(c)(1).[14]

***

The August Order includes no consideration of other alternatives to meet the claimed emergency. This is consistent with the May Order and its supporting memorandum. *See* Exs. 1, 4 (May Order & DOE Campbell Memorandum). And the Order contains no reasoning demonstrating why Campbell is the best alternative, or a better alternative than other options, or is even capable of meeting the claimed emergency. As such, the Order is unlawful.

*C. The August Order Exceeds Other Limits on the Department's Statutory Jurisdiction.*

*1. The Department Lacks Jurisdiction to Impose the Availability Requirements.*

In directing MISO and Consumers Energy to take "all measures" to ensure that the Campbell Plant is "available to operate," Ex. 67 at 8 (August Order), the Department exceeded its authority under Section 202(c) of the Federal Power Act and impermissibly intruded on the authority over generating facilities that Section 201(b) of the statute reserves to the states, 16 U.S.C. §§ 824(b)(1), 824a(c)(1). The sweeping language in the Department's Order would encompass physical and all other changes necessary to revive a generating plant undergoing closure pursuant to a state-approved retirement process. The Federal Power Act's language, structure, legislative history, and interpretation by the courts all confirm that the Department's Order is unlawful.

The structure and language of the Federal Power Act reflect Congress's deliberate choices to preserve the states' traditional authority over generating facilities and to circumscribe the Department's emergency authority in light of the states' role. The first sentence of the Federal Power Act declares that federal regulation extends "only to those matters which are not subject to regulation by the States." *Id.* § 824(a). Section 201(b)(1) states that, except as otherwise "specifically" provided, federal jurisdiction does not attach to "facilities used for the generation of

---

[14] The Department must also incorporate demand response and other alternatives in determining whether an emergency exists, and as a condition precedent to circumstances calling for generation by a polluting resource like Campbell, a requirement consistent with Departmental practice. *See* 16 U.S.C. § 824a(c)(1)–(2); 10 C.F.R. § 205.375; *e.g.*, Ex. 39 at 4–5 (DOE Order No. 202-22-2); Ex. 45 at 2–3 (DOE Order No. 202-21-1); Ex. 17 at 3 (DOE Order No. 202-20-2). MISO has access to demand response and authority over generator outages. *See* Ex. 70 at ¶¶ 20–23 (Konedina Decl.).

electric energy." *Id.* § 824(b)(1). The courts have held that Section 201(b)(1) reserves to the states authority over electric generating facilities, *see, e.g., Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 155 (2016), including the authority to order their closure, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009) (explaining that under Section 201(b), states retain the right "to require the retirement of existing generators" or to take any other action in their "role as regulators of generation facilities"). Congress also recognized the states' exclusive authority over generating facilities in Section 202(b), which provides that FERC's interconnection authority does not include the power to "compel the enlargement of generating facilities for such purposes." 16 U.S.C. § 824a(b).

There is a clear distinction between authority to regulate generation facilities and the Department's authority under Section 202(c) to require generation of electric energy. Electric energy is an electromagnetic wave, and its "generation, delivery, interchange, and transmission" is the creation and propagation of that wave. *See* Brief *Amicus Curiae* of Electrical Engineers, Energy Economists and Physicists in Support of Respondents at 2, *New York v. FERC*, 535 U.S. 1 (2002); *see also* Edison Electric Institute Glossary of Electric Utility Terms (1991 ed.) (defining electric generation as "the act or process of transforming other forms of energy into electric energy"). Section 202(c)(1), like the rest of the Federal Power Act, is written "in the technical language of the electric art" and federal jurisdiction generally "follow[s] the flow of electric energy, an engineering and scientific, rather than a legalistic or governmental test." *Conn. Light & Power v. Fed. Power Comm'n*, 324 U.S. 515, 529 (1945); *see also Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 454, 467 (1972).

The scope of the Department's emergency power under Section 202(c) is bounded both by the provision's specific language and Congress's clear intention and repeated direction in the Federal Power Act to respect the states' authority over generating facilities. When an actual emergency exists, Section 202(c)(1) authorizes the Department to require just two specific things: (1) "temporary connections of facilities" and (2) "generation, delivery, interchange, or transmission of electric energy." *Id.* § 824a(c)(1). The only reference to "facilities" in the authorizing provision of Section 202(c)(1) appears in the clause relating to temporary connections, not in the clause pertaining to "generation" of electric energy. And that clause only authorizes connections "of" facilities; it does not provide authority to regulate the facilities. The differences in Congress's word choice in these clauses—referencing "facilities" in one authorizing provision but not the other—must be given effect. *See, e.g.*, *Gallardo v. Marstiller*, 596 U.S. 420, 430 (2022); *Gomez-Perez v. Potter*, 553 U.S. 474, 486 (2008).

Given Congress's use of the term "generating facilities" elsewhere in the statute, if it had intended to give the Department authority over generating facilities in Section 202(c)(1), it would have done so explicitly. Instead, the provision conspicuously excludes authority to manage the physical characteristics of power

plants. Congress purposely limited and particularized the Department's emergency powers, carefully avoiding intrusion on the states' authority over generating facilities recognized in Section 201(b)(1). *See* S. Rep. No. 74-621, at 19 (explaining that the emergency powers in Section 202(c)(1) "which were indefinite in the original bill have been spelled out with particularity"); *compare* S. 1725, Cong. Tit. II § 203(a) (providing in original, unenacted bill that control of the production and transmission of electric energy "except in time of war or other emergency declared to exist by proclamation of the President, shall, as far as practicable, be by voluntary coordination"), *with* 16 U.S.C. § 824a(c)(1) (providing particularized, specific authorities and circumstances in which the authorities may be exercised).

The Department may require generation of electric power, and a utility may properly take steps at the facility to produce the power. It is commonplace in the electric sector for the federal regulator properly acting within its authority to cause effects in a state regulator's jurisdictional sphere, and vice versa. *See Elec. Power Supply Ass'n*, 577 U.S. at 281. But the federal regulator may neither directly regulate generation facilities nor impose requirements aimed at the facilities, even if nominally regulating within its sphere. *See id.* at 281–82; see also *Hughes*, 578 U.S. at 164–65. Such encroachment is impermissible, even in a real emergency or in a wrongly claimed one. *See Conn. Light & Power*, 324 U.S. at 530 ("Congress is acutely aware of the existence and vitality of these state governments. It sometimes is moved to respect state rights and local institutions even when some degree of efficiency of a federal plan is thereby sacrificed."). Thus, the Department may not require generation that necessitates the utility taking steps reserved to state authority, such as building a new generating unit or refurbishing a broken one.

Congress did not give the Department sweeping authority to order "all measures" needed to make a generation facility "available to operate." *See* Ex. 67 at 8 (August Order). Nowhere does the statute empower the Department to order "all" steps that may be needed to resuscitate Campbell, which could include repairs or modifications to physical facilities and other measures going far beyond electric power generation. Because the plant is at the end of its useful life, with years of forgone maintenance and capital expenditures, rendering it capable of meeting a short-term supply shortfall could essentially require rebuilding significant parts of the plant. On its face, the Department's Order is *ultra vires*. The Order also contravenes Congress's repeated direction in the Federal Power Act to respect the states' authority over generating facilities, which includes the authority that

Michigan exercised to approve Campbell's closure. The Order therefore is unlawful and should be withdrawn.[15]

*2. The Department Lacks Jurisdiction to Disallow Treatment of Campbell as a Capacity Resource.*

The August Order also, unlike the May Order, includes an explicit provision that "[b]ecause this order is predicated on the shortage of facilities for generation of electric energy and other causes, the Campbell Plant shall not be considered a capacity resource." Ex. 67 at 8 (August Order). This provision serves only to increase costs to customers, who will be required to procure duplicative capacity as a result. It is also illegal. Section 202(c) authorizes the Commission to "require by order . . . temporary connections of facilities and . . . generation, delivery, interchange, or transmission of electric energy," and then shields facilities who operate pursuant to a Section 202(c) order from liability for unavoidable violations of federal, state, or local environmental laws or regulations. 16 U.S.C. § 824a(c)(1), (3). Nowhere does the Act suggest that the Department may predetermine or override the reasoned decisions of FERC in its determination of whether just and reasonable wholesale rates require an operating resource to be considered a capacity resource. Indeed, the very nature of 202(c) orders, which are limited to emergencies involving extant resource shortfalls (in which, by definition, there are no alternative capacity resources that might be displaced by the ordered generation) suggests that capacity resource treatment is well outside the Department's 202(c) authority.

The explanation the Order offers for this override, essentially that Campbell cannot be a capacity resource because the order does not deem it a capacity resource, is clearly circular. As a result, the true reasoning behind this provision remains unclear—but its clear effect is to prevent MISO from considering the continued existence of Campbell as it works to ensure resource adequacy across its footprint. MISO's tariff defines a "capacity resource" as any of several types of resources "that are available to meet demand," and its definition of "Planning Resource" makes clear that generators like Campbell must be a Capacity Resource in order to satisfy a region's Reserve Margin Requirement. MISO Tariff Sec. 71.0.0 (Definitions). The Tariff also establishes clear procedures for calculating capacity contribution from all resources. *Id.* at Schedule 53A, Extended Seasonal Accredited Capacity Calculation. Thus, the Order's elimination of capacity treatment for Campbell prevents MISO from following its own tariff in the wake of Campbell's

[15] A utility that takes steps subject to state authority cannot point to a Section 202(c) order as the basis for a right to recover associated costs. *See* 16 U.S.C. § 824a(c)(1) (providing for compensation or reimbursement to be paid based on just and reasonable terms for carrying out an authorized order).

continued operation and the Department's apparent intention to force Campbell to remain operational indefinitely.

The Order also represents a significant and improper intrusion into FERC's authority to ensure that RTOs like MISO justly and reasonably ensure resource adequacy in their footprint; in particular it undermines years of FERC's regulatory oversight of MISO's resource adequacy construct, as codified in its FERC-approved tariff. It is within FERC's purview under Section 205 of the Federal Power Act to provide that oversight, 16 U.S.C. Sec. 824d; and it is within MISO's purview to apply its own tariff in the first instance and decide whether Campbell should qualify as a "Capacity Resource" within MISO's FERC-approved resource adequacy construct. 18 C.F.R. § 35.1(e) ("No public utility shall . . . impose any classification, practice, rule, [or] regulation . . . which is different from that provided in a rate schedule required to be on file with this Commission unless otherwise specifically provided by order of the Commission for *good cause shown*." (emphasis added)).

The Department's intrusion into the oversight relationship between FERC and the RTOs also runs afoul of the filed rate doctrine, which holds that "no change shall be made [in] any [approved] . . . rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public" in another filing with FERC. 16 U.S.C. § 824d(d); *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 829 (D.C. Cir. 2021). Interference in MISO's capacity accreditation procedures effectuates a *de facto* change to its tariff, without the legally required notice. And more generally, "Congress rejected a pervasive regulatory scheme for controlling the interstate distribution of power in favor of voluntary commercial relationships. . . . governed in the first instance by business judgment and not regulatory coercion." *Otter Tail Power Co.*, 410 U.S. at 374 (1973). The Department's interference here in the core operational procedures of MISO's resource adequacy construct improperly upends that relationship.

More broadly, the unavoidable implication of the Order not allowing MISO to include Campbell in its resource adequacy planning is that the Department believes MISO will likely secure the resources it determines are needed to maintain grid security even without Campbell, pursuant to its FERC-approved tariff: the provision would be unnecessary if MISO truly had no alternatives. And that means that either 1) the Department does not trust MISO's assessment of MISO's resource adequacy; or 2) the Department does not trust its own assessment of MISO's resource adequacy.

In either case, the Department's actions are improper. The August Order provides no evidence that MISO cannot be trusted to ensure resource adequacy, so a Department determination that MISO cannot be trusted would be arbitrary and capricious. It would also conflict with the Department's heavy reliance on MISO's statements and studies in support of its assertion that the region faces an emergency in the first place. Conversely, if the Department does not have the

confidence that its own dire predictions that the system does not have enough resources will come true, then it is well short of the confidence necessary for an emergency declaration under Section 202(c).

If left unchecked, this provision could impose completely avoidable cost increases on Michigan and MISO ratepayers. During the pendency of this Order, the principal effect of this provision will be to remove Campbell's ability to provide replacement capacity in the event one of the resources that cleared the auction suffers a catastrophic outage or is otherwise suspended, retired, or shut down for more than 31 days in a season. Midcontinent Independent System Operator, BPM-011-r31, Resource Adequacy Business Practices Manual, at 16 (Feb. 21, 2025); *see* Ex. 119 (ZRC Replacement). Eliminating this compensation pathway will increase the financial cost of the Order, by removing a potential income stream that might have offset Campbell's extremely high operational costs, and by forcing any other region that is impacted by an unexpected plant closure to look for potentially more expensive alternatives for replacement capacity.

Additionally, this provision will have an outsized impact in April 2026 if the Department continues renewing the Order every 90 days; that is when MISO conducts its 2026-27 Planning Auction. Campbell's exclusion from the list of facilities that might offer capacity would ensure that Michigan ratepayers and MISO ratepayers writ large are forced to pay for Campbell's continued operation without any countervailing benefits: they would miss out on a major revenue stream that would have reduced Campbell's operating losses, and by operation of MISO's sloped curve in the Planning Auction, which pays more for capacity the scarcer it is, consumers will end up paying a higher premium for any capacity their utilities secure from the Planning Auction.

In short, including this provision is yet another way in which the Department has misapplied the statute: its inclusion only further ensures that Campbell's principal impact will not be to plug a gap but rather to sabotage MISO's resource planning process.

### D. *The Order Fails to Provide the Conditions Necessary to Override Environmental Standards Under 202(c).*

Where an order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, Section 202(c)(2) requires the Department to "ensure": (1) that the order compels "generation, delivery, interchange, or transmission of electric energy only during hours necessary to meet the emergency and serve the public interest"; (2) that operations are "to the maximum extent practicable . . . consistent with any applicable Federal, State or local environmental law[s]"; and (3) that it minimizes any adverse environmental impact, regardless of the facility's compliance (or non-compliance) with environmental standards. 16 U.S.C § 824a(c)(2). And before renewing or reissuing

such an order, the Department must (4) "consult with the primary Federal agency with expertise in the environmental interest protected by such law or regulation, and shall include in any such renewed or reissued order such conditions as such Federal agency determines necessary to minimize any adverse environmental impacts to the extent practicable," which conditions "shall be made available to the public." 16 U.S.C. § 824a(c)(4)(B). The August Order here violates those statutory obligations.

1. *The Order May Result in a Conflict with Federal, State, or Local Environmental Law or Regulation.*

Section 202(c)(2) imposes mandatory duties on the Department if a 202(c) order "may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation." 16 U.S.C. § 824a(c)(2). The August Order may result in a conflict with environmental requirements.

The statute requires the Department to impose these precautions at the outset where there is a possibility of conflict—a forward-looking inquiry with a necessarily shallow threshold—which then provides a safe harbor if actual noncompliance/violation occurs to carry out the order. The word "may" in this context denotes a mere possibility, not a certainty. This is especially apparent when matched against the term "shall" used in Section 202(c)(2) and the other provisions added to Section 202(c) at the same time. *See* Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, 129 Stat. 1312 § 61002 (codified at 16 U.S.C. § 824a). Congress' use of the two disparate terms must be given effect. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discussing significance of the words "may" and "shall" in the same statutory provision). Moreover, the consequences need not be "noncompliance" or "violation" of environmental law, both of which are terms Congress also used in 2015 adding other provisions to Section 202(c). A "conflict" suffices. *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that courts find "conflict" in the preemption context where, for instance, a law or order "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

Taken together, anytime the Secretary's order causes circumstances that might obstruct the accomplishment or execution of environmental laws or regulations, the Department must comply with the Section 202(c)(2) duties. Congress' approach makes sense for a provision meant for responding to emergency situations. Congress was well aware of environmental issues stemming from 202(c) orders when it imposed the requirements in Section 202(c)(2). *See, e.g.*, Rolsma, 57 Conn. L. Rev. at 807–09 (discussing prior incidents of tension between environmental requirements and responses to emergencies on the grid, and congressional hearings addressing the matter as part of the passage of Section 202(c)(2)). Congress struck a reasonable balance so that environmental concerns are not left by the wayside while allowing the Department to respond to actual emergencies. Rather than requiring

the Department to engage in a probing review of environmental permits at all levels of our federalist system before acting, Congress set a low threshold for imposition of the mandatory duties. And as discussed next in sec. V.D.2, the congressionally-imposed duties allow the Department to act while also limiting that authority to only what is necessary to meet the emergency, again reflecting Congress' regard for environmental concerns even in an emergency.

The Order here may result in a conflict with environmental requirements. The Department acknowledged the possible conflict in the May Order's imposition of the same availability and economic dispatch mandates included in the August Order. The August Order says nothing to indicate that the Department has backed away from that conclusion, and says nothing that would allow it to do so.

Indeed, the Department implicitly acknowledges the possible conflict. The August Order is limited to a 90-day duration. Ex. 67 at 7, 9 (August Order). That temporal limitation exists for a 202(c) order that may result in a conflict with environmental requirements. 16 U.S.C. § 824a(c)(4). And in imposing the 90-day duration, the Department relies on the statutory limitation for an order that may result in a conflict with environmental requirements. Ex. 67 at 7 n.43 (August Order) (citing 16 U.S.C. § 824a(c)(4)).

Moreover, the evidence shows that the August Order may result in a conflict with environmental requirements. For instance, Campbell's air permit requires air pollution control equipment to be "installed, maintained, and operated in a satisfactory manner and in accordance with the Michigan Air Pollution Control rules and existing law." Ex. 69 at 10 (Powers Sept. Decl.) (quoting Campbell's air permit, which is Attachment C to Exhibit 69). Campbell's air pollution control equipment includes selective catalytic reduction for managing nitrogen oxide emissions and pulse jet fabric filters for managing particulate matter emissions. *Id.* at 8. Failure to install, maintain, and operate these air pollution controls in a satisfactory manner can increase emissions. Specifically, over time, trace metals and fly ash from burned coal can poison and foul the catalysts used in selective catalytic reduction. *Id.* Likewise, over time, fly ash erodes and plugs the bags used in pulse jet fabric filters, causing the bags to degrade and potentially causing the bags to rupture. *Id.* When these catalysts and bags degrade, nitrogen oxide and particulate matter emissions increase. *Id.* at 8–9.

Requiring Campbell to operate may result in a conflict with the requirements in Campbell's air permit because Campbell's catalysts and bags may not be installed, maintained, and operated in a satisfactory manner. On June 10, during the time period covered by the May Order, Consumers reported the following:

- The catalysts in the selective catalytic reduction equipment for Campbell Units 2 and 3 were "at end of life." Ex. 101 at Question 2 (Consumers June Response to AG). Additional catalysts would be required if Campbell were

forced to continue operating past the expiration date of the May Order, with one layer of catalyst at Unit 2 costing $3 million and one layer at Unit 3 costing $5 million. *Id.* "Catalyst purchases typically require six-to-twelve-month lead time." *Id.*

- Campbell Unit 3 was "overdue" for a pulse jet fabric filter bag replacement because the company cancelled a prior replacement project "due to expected site closure." *Id.* at Question 15. Without a "full bag changeout," costing between $7 million to $10 million, continuing to operate Campbell Unit 3's pulse jet fabric filter past the expiration date of the May Order could "negatively impact" the equipment's performance. *Id.*

Based on the current state of Campbell's selective catalytic reduction and pulse jet fabric filter equipment, Public Interest Organizations' expert engineer concludes:

> In my professional opinion, and based on the available information, Campbell's SCR [selective catalytic reduction] catalysts and pulse jet fabric filter bags are air cleaning devices that are not installed, maintained, and operated in a satisfactory manner at this time. A SCR catalyst at its end of life cannot do its job to remove $NO_x$ in a satisfactory manner. Nor can a pulse jet fabric filter overdue for bag replacement do its job to effectively remove particulate from the boiler exhaust gas. [] In my professional opinion, including because of the state of the SCR catalysts and pulse jet fabric filters, it appears that operating Campbell violates the air permit, or at minimum may be in serious conflict with the permit.

Ex. 69 at 10 (Powers Sept. Declaration).

The August Order may result in additional conflicts with air pollution laws and regulations. For example, EPA has approved Michigan's regional haze state implementation plan revision. Ex. 114 (2025 EPA MI Haze SIP Approval). The federal Clean Air Act's regional haze program requires states to implement programs to reduce air emissions that cause haze and impair visibility, like nitrogen oxide emissions. Pursuant to the Clean Air Act and its implementing regulations, states must submit regional haze implementation plans to EPA every ten years setting forth how they will further reduce haze-causing air emissions within their borders. 40 C.F.R. § 51.308(f). EPA must then review, and approve or reject, those plans. 42 U.S.C. §§ 7410(k)(3), (l), 7491.

Relevant here, EPA is approving Michigan's plan even though it is based on the flawed assumption that Campbell's air emissions would cease upon retirement in summer 2025. Michigan's Department of Environment, Great Lakes, and Energy informed EPA in a March 2025 supplement to its SIP submittal:

> When retired sometime before May 31, 2025, the permanent shutdown of coal-fired Units 1, 2 and 3 at Consumers Energy – J.H. Campbell Power Plant will represent a reduction in emissions of 2,346 tpy [tons per year] NOX [nitrogen oxides] and 12,850 tpy SO2 [sulfur dioxide] based on the 2016 inventory.

Ex. 115 at 21–22 (Mar. 2025 MI SIP Supplement). The agency reaffirmed its assumption that Campbell would retire and its emissions would cease in a July 2025 Supplement, explaining that the May Order "has been written to expire on August 21, 2025, which [the agency] anticipates will prompt the retirement of the three coal-fired units at the plant on, or shortly thereafter, that date." Ex. 116 at 22–23 (July 2025 MI SIP Supplement). By requiring Campbell to continue operating, then, the August Order may conflict with Michigan's newly-approved regional haze implementation plan and its obligation under the Clean Air Act to reduce haze-causing emissions.

Additionally, Campbell is located directly to the south of Muskegon County and to the north of Allegan County. EPA has designated those two counties as areas in "Serious Nonattainment" with the Clean Air Act's National Ambient Air Quality Standards for ozone.[16] An area is in "non-attainment" when it does not meet federal air quality standards. Campbell emits air pollutants, like nitrogen oxides, that are ozone "precursors," meaning they form ozone in the atmosphere. Ex. 69 at 11 (Powers Sept. Decl.). This means Campbell's air emissions could contribute to Muskegon and Allegan counties' non-attainment with federal ozone standards. *Id.* Thus, by requiring Campbell to continue operating and emitting ozone precursors, the August Order may result in a conflict with air pollution laws and requirements.

2. *The Order Lacks the Conditions Required by Section 202(c).*

   i. *The August Order's Terms Fail to Require Generation Only During Hours Necessary to Meet the Purported Emergency.*

The August Order directly contradicts the Department's obligation to require generation "only during hours necessary to meet the emergency." 16 U.S.C. § 824a(c)(2). The Order instead states: "For the duration of this Order, MISO is

---

[16] *See* EPA, *Michigan Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants*, https://www3.epa.gov/airquality/greenbook/anayo_mi.html (updated Aug. 31, 2025); Michigan Department of Environment, Great Lakes, Energy, *Attainment Status for the National Ambient Air Quality Standards*, https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Programs/AQD/monitoring/maps/naaqs-ambient-status-map.pdf?rev=d83ea7eae32b4a67b15f9e1da7cfb60f (updated Jan. 2025).

directed to take every step to employ *economic dispatch* of the Campbell Plant to *minimize cost* to ratepayers." Ex. 67 at 8 (August Order) (emphasis added). The "emergency" nominally described by the August Order is "the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages." *Id.* at 7. Even if the Department had substantiated that emergency (which it has not), the Act would allow the Department to compel generation only when such losses would occur absent Campbell's operation. 16 U.S.C. 824a(c)(2); *see, e.g.*, Ex. 6 at 9 (DOE Order No. 202-17-4 Summary of Findings) ("authorizing operation of" units subject to emergency order "only when called upon . . . for reliability purposes," according to "dispatch methodology" approved by the Department). "Economic dispatch," in sharp contrast, requires "the lowest-cost resources [to] run first," in pursuit of "the lowest-cost energy available." *City of New Orleans v. FERC,* 67 F.3d 947, 948–49 (D.C. Cir. 1995)*; see also Fla. Power & Light Co. v. FERC,* 88 F.3d 1239, 1241 (D.C. Cir. 1996) (noting distinction between economic dispatch and reserve capacity rules).

By instructing MISO to pursue economic dispatch, the Order's terms permit (indeed, direct) operation of the Campbell Plant even when other—albeit potentially higher cost—resources are available that would prevent any "curtailments or outages"—that is, the claimed emergency. Ex. 67 at 7–8 (August Order). The Order's further instructions—limiting "dispatched units to the times and within the parameters as determined by MISO pursuant to paragraph A," *id.* at 8—just repeats that initial instruction to "employ economic dispatch," without any further limitation that would "ensure" that generation occurs "only during hours necessary to meet the emergency" described by the Order, *id.*; 16 U.S.C. § 824a(c)(2). As such, the August Order's terms fail to require operation "only during the hours necessary to meet the emergency" described by the August Order and violate Section 202(c)(2). 16 U.S.C. § 824a(c)(2).[17]

*ii. The August Order Fails to Ensure Maximum Practicable Compliance with Environmental Rules and Minimize Adverse Environmental Impacts.*

The August Order further fails to "ensure" that Campbell operates, "to the maximum extent practicable," in conformity with applicable environmental rules. *Id.* The August Order paraphrases the statutory text—that "operation of the Campbell Plant must comply with applicable environmental requirements . . . to the maximum extent feasible," but fails to specify *who* bears that responsibility or *what* such operation entails. Ex. 67 at 8 (August Order). It imposes no further conditions beyond requiring Consumers Energy to "pay fees or purchase offsets or allowances

[17] That direction further fails to conform to the statute's command to compel only the generation that will "best meet the emergency." 16 U.S.C. § 824(c)(1).

for emissions." *Id.* The direction to "comply . . . to the maximum extent feasible" is, as a result, wholly unenforceable; the August Order provides no basis for the Department, or anyone else, to determine whether the plant is in fact complying or who might face the consequences of any failure to do so. *See* Ex. 5 at 5–7 (DOE Order No. 202-22-4) (requiring, *inter alia,* reporting of "number and actual hours each day" of operation "in excess of permit limits or conditions," and information describing how generators met requirement to comply with environmental requirements to maximum extent feasible). As such, the August Order does not meet the Department's statutory obligation to "*ensure*" the maximum feasible compliance with applicable environmental standards—an obligation that requires the Department to offer some discrete guidance as to the plant's operations, rather than merely parroting the statutory text. 16 U.S.C. § 824a(c)(2) (emphasis added).

In addition, the August Order fails to "minimize[] any adverse environmental impacts." 16 U.S.C. § 824a(c)(2). That mandate is textually and substantively distinct from the Department's (also unfulfilled) obligation to ensure maximum practicable compliance with environmental standards. *Id.* The August Order claims to minimize impacts by "limit[ing] operation of dispatched units to the times and within the parameters determined by MISO pursuant" to the August Order's "Paragraph A." Ex. 67 at 8 (August Order). But Paragraph A contains only a command that MISO "take all measures necessary to ensure that the Campbell Plant is available to operate" and "employ economic dispatch . . . to minimize cost to ratepayers," and requires Consumers to comply with MISO's orders implementing those commands. *Id.*[18] An instruction minimizing ratepayer costs and demanding availability has no rational relationship to a requirement to minimize environmental impacts. And the Order includes no measures that would mitigate impacts when compliance with environmental standards proves impracticable—measures that have been routinely included in past orders. *See, e.g.*, Ex. 6 at 9 (DOE Order No. 202-17-4 Summary of Findings) (permitting non-compliant operation only during specified hours, and requiring exhaustion of "all reasonably and practically available resources," including demand response and identified behind-the-meter generation resources selected to minimize an increase in emissions); Ex. 5 at 7 (DOE Order No. 202-22-4) (requiring "reasonable measures to

[18] To the extent the Order allows MISO to independently devise conditions limiting environmental impacts, that mere possibility, first, cannot satisfy the Department's own statutory obligation to "ensure" that its "order" minimizes environmental impacts (and limits hours to those necessary to meet the emergency, and mandates the maximum practicable compliance). 16 U.S.C. § 824a(c)(2). And even if it could, the August Order requires MISO to employ "economic dispatch" and "ensure that the Campbell Plant is available to operate—directions that are flatly inconsistent with the statute's requirements related to Campbell's environmental impacts. Ex. 67 at 8 (August Order).

inform affected communities" of non-compliant operations). At a minimum the statute requires the Department to include sufficiently detailed reporting obligations to ascertain what impacts result from emergency operations; without such reporting, the Department has no ability to "ensure" that adverse impacts are minimized. *See, e.g.*, Ex. 110 at 5 (DOE Order No. 202-24-1) (requiring detailed data on emissions of pollutants). The Order here instead only requires "such additional information" as the Department, in the future, may (or may not) "request[] . . . from time to time." Ex. 67 at 8 (August Order). That possibility of future, unspecified inquiry cannot satisfy the statute's demand that the Department "ensure" that its Order minimizes environmental impacts. 16 U.S.C. § 824a(c)(2).

*iii. There is No Indication That the Department Has Conducted the Consultation Required by Section 202(c)(4)(B) or Adopted Conditions Resulting From Consultation.*

Finally, there is no indication in the August Order or otherwise that the Department has, as Section 202(c)(4)(B) requires, "consult[ed] with the primary Federal agency with expertise in the environmental interest protected" by the laws with which the August Order may conflict. 16 U.S.C. § 824a(c)(4)(B). The August Order serves as a renewal or re-issuance of the Department's May Order; its claimed basis is that '[t]he emergency conditions that led to the issuance of Order No. 202-25-3 continue." Ex. 67 at 2 (August Order); *see id.* at 7 (basing order on claim that "the emergency conditions . . . supporting the issuance of Order No. 202-25-3 will continue"); *compare* Ex. 1 at 2 (May Order) (determining that "under the conditions specified below, additional dispatch of the Campbell Plant is necessary"), *with* Ex. 67 at 7 (August Order) (determining that "under the conditions specified below, *continued* additional dispatch of the Campbell Plant is necessary" (emphasis added)). But the Department has provided no evidence of consultation with the Environmental Protection Agency (or any other agency with expertise in Campbell's air and water pollution). *Cf.* Ex. 106 at 2 (DOE Order No. 202-22-2 Amendment No. 1) (stating that "the Department consulted with EPA… and EPA did not request any additional conditions"); Ex. 107 at 2 (DOE Order No. 202-22-1 Amendment No. 2) (same); Ex. 6 at 9–10 (DOE Order No. 202-17-4 Summary of Findings) (including EPA consultation in public record). Nor is there any evidence of "[t]he conditions, if any, submitted" by EPA (or any other agency) following consultation, or "an explanation of [the Department's] determination" that such conditions "would prevent the [August Order] from adequately addressing the emergency"—material that Section 202(c)(4)(B) requires the Department to make "available to the public." 16 U.S.C. § 824a(c)(4)(B); *see* Ex. 108 at 1 (Starfield Email to Hoffman) (made public by Department). If the Department has failed to consult and procure the required conditions, it has violated the statute. *Id.* If it has received and declined conditions, but refused to disclose them or an explanation of why the Department does not believe any such conditions are necessary, that too violates the law. *Id.*

## VI. Request for Stay

Public Interest Organizations further move the Department for a stay of the Order until the conclusion of judicial review. 18 C.F.R. § 385.212.[19] The Department has the authority to issue such a stay under the Administrative Procedure Act and should do so where "justice so requires." 5 U.S.C. § 705. In deciding whether to grant a request for stay, agencies consider (1) whether the party requesting the stay will suffer irreparable injury without a stay; (2) whether issuing a stay may substantially harm other parties; and (3) whether a stay is in the public interest. *Nken v. Holder*, 556 U.S. 418, 434, 436 (2010); *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.,* 184 FERC ¶ 61,020, at P 41 (2023); *ISO Eng. Inc.*, 178 FERC ¶ 61,063, at P 13 (2022), *rev'd on other grounds sub nom. In re NTE Conn., LLC*, 26 F.4th 980, 987–88 (D.C. Cir. 2022).

Injuries under this standard must be actual, certain, imminent, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *ANR Pipeline Co.*, 91 FERC ¶ 61,252, at 61,887 (2000); *City of Tacoma*, 89 FERC ¶ 61,273, at 61,795 (1999) (recognizing that, absent a stay, options for "meaningful judicial review would be effectively foreclosed"). Financial injury is only irreparable where no "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co.*, 758 F.2d at 674 (*quoting Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also In re NTE Conn., LLC*, 26 F.4th 980, 991 (D.C. Cir. 2022). Environmental injury, however, "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

Under those standards, a stay of the August Order is appropriate.

### *A. Intervenors Are Irreparably Harmed by the Order.*

A stay is necessary to ensure that Consumers does not continue with activities that are already causing irreparable harm to Public Interest Organizations, their members, and the public as a result of the Department's Order. *See Consumers Energy v. Midwestern Independent Sys. Operator, Inc.*, Complaint Requesting Fast Track Processing, FERC Docket No. EL25-90, 2 (June 6, 2025), Accession No. 20250606-5231 ("[T]he Campbell Plant is currently being offered into the MISO

---

[19] Pursuant to FPA Section 313(c) and Rule 713(e) of the applicable rules, the filing of a request for rehearing does not automatically stay a Department Order. 16 U.S.C. § 825*l*(c); 18 C.F.R. § 385.713(e).

market and is producing energy when dispatched."); Ex. 73 at 62 (Consumers' July 2025 10-Q) ("Consumers has continued to make J.H. Campbell available in the MISO market").

As noted extensively *supra* sec. IV.C.3.iii, Campbell emits health- and environment-harming air pollutants like nitrogen oxides, sulfur dioxide, particulate matter, and volatile organic compounds. EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000411108 (last visited Sept. 3, 2025). In June 2025 alone, Campbell emitted approximately 694,696 pounds of sulfur dioxide, 483,868 pounds of nitrogen oxides, and 1,453,247,200 pounds of carbon dioxide. Ex. 69 at 11 (Powers Sept. Decl.) (citing Ex. 102 (CAMPD Campbell Daily Emissions Data)). Michiganders' health and environment have already been profoundly and irreparably harmed by pollution from Campbell, which historically has had the highest emissions of sulfur dioxide, carbon dioxide, and volatile organic compounds of any plant in Consumers' generation fleet. Ex. 23 at 11 (Bilsback Direct Testimony). Campbell's closure is set to eliminate 538 tons of particulate matter, 13 tons of volatile organic compounds, 2,918 tons of nitrogen oxides, 5,244 tons of sulfur dioxide, and 8.2 million tons of carbon dioxide emissions per year based on 2019 operational levels. Ex. 23 at 11 (Bilsback Direct Testimony). This translates to ending 36–81 premature deaths and \$389–\$879 million in health impact costs *every year*. *Id.* at 15.

Compounding these pollution problems, recent evidence indicates Campbell's air pollution control equipment may be failing. Campbell uses selective catalytic reduction for managing nitrogen oxide emissions and pulse jet fabric filters for managing particulate matter emissions. Ex. 69 at 8 (Powers Sept. Decl.). On June 10, Consumers indicated that the catalysts in the selective catalytic reduction equipment for Campbell Units 2 and 3 were "at end of life," and that Campbell Unit 3 was "overdue" for a pulse jet fabric filter bag replacement, which could "negatively impact" the equipment's performance. Ex. 101 at Questions 2 and 15 (Consumers June Response to AG). As Public Interest Organizations' expert engineer explains: "A [selective catalytic reduction] catalyst at its end of life cannot do its job to remove $NO_x$ in a satisfactory manner. Nor can a pulse jet fabric filter overdue for bag replacement do its job to effectively remove particulate from the boiler exhaust gas." Ex. 69 at 10 (Powers Sept. Declaration). Campbell's continued operation is thus further likely to subject Public Interest Organizations', their members, and the public to increased and harmful levels of air pollution.

In addition to this air pollution, Campbell is also a major user and polluter of water in its area. Between June 1 and July 31, Campbell withdrew approximately 40 billion gallons of water from Lake Michigan and discharged approximately the same amount back into the lake. Ex. 69 at 11 (Powers Sept. Decl.) (citing Campbell's discharge monitoring reports). Historically, Campbell has used approximately one billion gallons of water per day from Lake Michigan while discharging significant amounts of contaminated wastewater back into the lake,

including cooling water and toxic metals. *See* Ex. 3 at 21 (Powers June Decl.) (citing Ex. 48 (2021 CWA Permit)); EPA, ECHO, https://echo.epa.gov/detailed-facility-report?fid=110000411108 (last visited Sept. 3, 2025).

These health and environmental harms, which flow directly from the Department's Order, are actual, specific, imminent, and deadly. They will affect the lives and well-being of Public Interest Organizations and their members. The stark public health stakes of Public Interest Organizations' request for stay require the Department to pause implementation of its Order until a Court reviews its validity.

Moreover, the economic impacts of complying with the Order will be steep. Consumers has reported to the Securities and Exchange Commission that the net financial impact of complying with the May Order just through June 30, 2025, was $29 million. *See* Ex. 73 at 62 (Consumers' July 2025 10-Q). And Campbell is poised to incur continued losses; its June 2025 operating costs, for instance, exceed market prices in 79% of the hours from July 2024 through June 2025. Ex. 68 at 5–6 (Grid Strategies Sept. Report). The costs for complying with the Department's 202(c) orders to Campbell are to be allocated across eleven states in MISO Zones 1–7. *Consumers Energy Co. v. Midcontinent Indep. Sys. Op., Inc.*, 192 FERC ¶ 61,158, at PP 39, 43 (2025); *see* Ex. 75 (MISO Tariff Zonal Map).

Meanwhile, Campbell's planned retirement represents major cost savings for ratepayers. *See, e.g.*, *supra* secs. IV.C.3.iv, V.B.2.iii; Ex. 53 (Consumers News Release) (describing total cost savings from 2022 updates to Consumers Clean Energy Plan, including Campbell's closure). These are savings that are already being reinvested in newer, more reliable facilities.

There is no clear avenue for corrective relief of those economic injuries. FERC's order suggests that parties may request rehearing or take "other appropriate steps" to preserve arguments for refunds in the event the Department's Section 202(c) orders are modified, 192 FERC ¶ 61,159, at P 42, but there is no guarantee those arguments will be successful. Consequently, absent a stay, FERC's allocation order makes the exorbitant and unnecessary costs of keeping Campbell operational a Sword of Damocles hanging over the heads of ratepayers in MISO Zones 1-7. As such, a stay pending judicial review is necessary to protect ratepayers from unwarranted energy costs increases—especially at a time when energy prices are already on the rise. *See, e.g.,* Stan Huxley, *Average Cost of Utilities in Michigan* (June 1, 2025), https://realestates.network/data-research/average-cost-of-utilities-in-michigan; Kyle Davidson, Michigan Advance, *Detroit Households Face High Energy Costs, Study Says* (Sept. 16, 2024), https://michiganadvance.com/2024/09/16/detroit-households-face-high-energy-costs-study-says; *see also* Ex. 52 at 4 (MI State Energy Profile) (discussing demographic and market data).

Additionally, without a stay, the Department creates other injuries too. It needlessly forces Consumers to continue to divert attention and investment dollars

away from compliance with the 2022 Settlement, thereby exceeding its jurisdiction and denying Public Interest Organizations' members the benefits of Michigan energy policies designed to benefit them and the public. 16 U.S.C. § 824; *see also Hughes*, 578 U.S. at 154 (cleaned up) ("Under the [Federal Power Act], FERC has exclusive authority to regulate the sale of electric energy at wholesale in interstate commerce. . . . But the law places beyond FERC's power, and leaves to the States alone, the regulation of any other sale—most notably, any retail sale—of electricity."). The states' reserved authority includes control over in-state "facilities used for the generation of electric energy." 16 U.S.C. §824(b)(1); *see Pac. Gas & Elec.*, 461 U. S. at 205 ("Need for new power facilities, their economic feasibility, and rates and services, are areas that have been characteristically governed by the States."). And, in forcing ratepayers to reopen and operate an uneconomic, unreliable, and obsolete resource that the state, stakeholders, and owner want to close, *see supra* sec. IV.C, the Department's Order jeopardizes the diversification of generating resources the Department itself has said increases grid reliability and will inherently and unjustifiably add to ratepayer costs. U.S. Dep't of Energy, *Energy Reliability and Resilience,* https://www.energy.gov/eere/energy-reliability-and-resilience (last visited Sept. 7, 2025). There is no clear recourse to remedy those injuries either.

*B. A Stay Would Not Result in Harm to Any Other Interested Parties.*

No other interested parties would be harmed by a stay. The issuance of a stay would not harm end-use electricity consumers because the lack of an actual emergency means that a stay would not disrupt the provision of electricity. *See supra* secs. IV.B–.C, V.A. Furthermore, because Consumers and MISO have both already planned for Campbell's closure, a stay would only have the effect of relieving them of the administrative, compliance, and planning burdens imposed by the Order. *See, e.g.*, Ex. 67 at 7–8 (August Order). On the balancing of equities, there is therefore no meaningful countervailing harm that would follow from a stay.

*C. A Stay is in the Public Interest Given the Significant Evidence Demonstrating There is No Factual or Legal Support for This Order, and the Harm it Produces to the Broader Public.*

There is no public interest served by the Order, and a stay will only benefit the public. First, the Order exceeds the Department's authority; it has provided no reasonable grounds to substantiate any near-term or imminent shortfall in electricity supply that would justify Campbell's continued operation. *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Second, the Order overrides Michigan's exercise of its "authority to choose [its] preferred mix of energy generation resources." *Citizens Action*, 125 F.4th at 239. And third, it would protect the broader public—beyond

Public Interest Organizations and their members—from the onerous costs, and dangerous pollution, produced by unnecessary operation of the Campbell Plant.

## VII. CONCLUSION

For the reasons set forth above, the undersigned Public Interest Organizations respectfully request that the Department grant intervention; grant rehearing and rescind the Order (and any renewals of the Order); and stay the Order.

Filed on September 8, 2025

Submitted by:

[Continued for signatures.]

*/s/ Michael Lenoff*
Michael Lenoff
Benjamin Chagnon
Michael Soules
1001 G St. NW, Suite 1000
Washington, DC 20001
(202) 660-0519
mlenoff@earthjustice.org
bchagnon@earthjustice.org
msoules@earthjustice.org

Shannon Fisk
48 Wall St., 15th Floor
New York, NY 10005
(215) 717-4522
sfisk@earthjustice.org

Lauren Piette
Sameer Doshi
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org
sdoshi@earthjustice.org

Christine Powell
Ada Statler
180 Steuart St., #194330
San Francisco, CA 94105
(415) 217-2035
cpowell@earthjustice.org
astatler@earthjustice.org

*Counsel for Sierra Club and Urban Core Collective*

*/s/ Gregory E. Wannier*
Gregory E. Wannier
Sanjay Narayan
Elena Saxonhouse
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
(415) 977-5646
greg.wannier@sierraclub.org
sanjay.narayan@sierraclub.org
elena.saxonhouse@sierraclub.org

*Counsel for Sierra Club*

*/s/ Howard A. Learner*
Howard A. Learner
Bradley Klein
Environmental Law & Policy Center
35 East Wacker Dr., Suite 1600
Chicago, IL 60601
T: (312) 673-6500
F: (312) 795-3730
hlearner@elpc.org
bklein@elpc.org

Katherine S. Duckworth
Environmental Law & Policy Center
1008 Floral Ave. SE
East Grand Rapids, MI 49506
T: (312) 673-6500
kduckworth@elpc.org

*Counsel for the Environmental Law & Policy Center, Ecology Center, Union of Concerned Scientists, and Vote Solar*

/s/ Caroline Reiser
Caroline Reiser
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington DC, 20005
(202) 717-8341
creiser@nrdc.org

Gavin McCabe
Natural Resources Defense Council
40 W. 20th St., 11th Floor
New York, NY 10011
(212) 727-4529
gmccabe@nrdc.org

Simi Bhat
Karen Chen
Natural Resources Defense Council
111 Sutter St., 21st floor
San Francisco, CA 94104
(415) 875-6110
sbhat@nrdc.org
kchen@nrdc.org

*Counsel for Natural Resources Defense Council*

/s/ Danielle C. Fidler
Danielle C. Fidler
Francis W. Sturges, Jr.
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
dfidler@catf.us
fsturges@catf.us

*Counsel for Michigan Environmental Council*

/s/ Tomás Carbonell
Tomás Carbonell
Ted Kelly
Environmental Defense Fund
555 12th St. NW, #400
Washington, DC 20004
(919) 449-4600
tcarbonell@edf.org
tekelly@edf.org

*Counsel for Environmental Defense Fund*

Attachment: Index of Exhibits

**Index of Exhibits**

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 1 | May Order | DOE Order No. 202-25-3 (May 23, 2025) | https://www.energy.gov/sites/default/files/2025-05/Midcontinent%20Independent%20System%20Operator%20%28MISO%29%20202%28c%29%20Order_1.pdf |
| 2 | Grid Strategies June Report | Michael Goggin, *A Review of DOE's 202(c) Order for the Campbell Coal Plant* (June 18, 2025) | |
| 3 | Powers June Decl. | Declaration of Bill Powers, P.E. (June 15, 2025) (including attachments) | |
| 4 | DOE Campbell Memorandum | DOE, Decision Order Pursuant to Section 202(c) of the Federal Power Act for J.H. Campbell Power Plant (May 23, 2025) | https://www.documentcloud.org/documents/25956475-cuiprivileged-department-of-energy-memorandum-re-jh-campbell-coal-plant-in-michigan-section-202c-federal-power-act-order-may-2025/ |
| 5 | DOE Order No. 202-22-4 | DOE, Order No. 202-22-4 (Dec. 24, 2022) | https://www.energy.gov/sites/default/files/2022-12/PJM%20202%28c%29%20Order.pdf |
| 6 | DOE Order No. 202-17-4 Summary of Findings | Summary of Findings DOE Order No. 202-17-4 (Sep. 14, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/Order%20202-17-4%20Summary%20of%20Findings.pdf |
| 7 | DOE Order No. 202-02-1 | DOE, Order No. 202-02-1 (Aug. 16, 2002) | https://www.energy.gov/sites/default/files/202%28c%29%20order%20202-02-1%20August%2016%2C%202002%20-%20CSC.pdf |
| 8 | Cooke Email to Alle-Murphy | Email from Lot Cooke, DOE to Linda Alle-Murphy Re: Rehearing procedures for DOE Order No. 202-05-3 | https://www.energy.gov/oe/articles/question-and-answer-procedural-questions-application-rehearing-order-no-202-05-02?nrg_redirect=397676 |
| 9 | Order Approving Campbell Settlement Agreement and Settlement Agreement | MPSC Case No. U-21090, Order Approving Settlement Agreement (June 23, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000003KjSDAA0 |
| 10 | Blumenstock 2023 Direct Testimony | MPSC Case No. U-21389, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 2023) (excerpted from larger transcript) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000ACpRQAA1<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000ACV7bAAH |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 11 | Blumenstock 2024 Direct Testimony | MPSC Case No. U-21585, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 2024) (excerpted from larger transcript) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000KfWrgAAF<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000KLJlzAAH |
| 12 | Blumenstock 2025 Direct Testimony | MPSC Case No. U-21870, Direct Testimony & Exhibits of Richard T. Blumenstock on Behalf of Consumers Energy Company (June 2025) (excerpted from larger filing) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000s6UQyAAM<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000s7CdKAAU |
| 13 | Kapala Direct Testimony | MPSC Case No. U-21090, Revised Direct Testimony of Norman J. Kapala on Behalf of Consumers Energy Company (Oct. 2021) (excerpted from larger transcript) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001QqldAAC<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OZHpAAO |
| 14 | Hoffman 2024 Direct Testimony | MPSC Case No. U-21258, Direct Testimony and Exhibits of Nathan J. Hoffman on Behalf of Consumers Energy Company (Mar. 2024) (excerpted from larger transcript) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000ljeStAAI<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000g8QemAAE |
| 15 | Hoffman 2025 Direct Testimony | MPSC Case No. U-21424, Direct Testimony & Exhibits of Nathan J. Hoffman on Behalf of Consumers Energy Company (Mar. 2025) (excerpted from larger filing) | **Testimony and exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000hjHqNAAU |
| 16 | DOE Letter to FERC | Holly Rachel Smith, Deputy Gen. Counsel, U.S. Dep't of Energy to Debbie-Anne A. Reese, Secretary, FERC (dated June 13, 2025, filed June 16, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_num=20250616-4000 |
| 17 | DOE Order No. 202-20-2 | Department of Energy Order No. 202-20-2 (Sept. 6. 2020) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-caiso-september-2020?nrg_redirect=454296 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 18 | Proudfoot Rebuttal Testimony | MPSC Case No. U-21090, Rebuttal Testimony of Paul Proudfoot in Support of the Settlement Agreement on behalf of MPSC Staff (May 13, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 19 | Walz Direct Testimony | MPSC Case No. U-21090, Revised Direct Testimony & Exhibits of Sara T. Walz on Behalf of Consumers Energy Company (June 2021) (excerpted from larger transcript) | **Testimony**: https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000001OEXnAAO<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000NibWaAAJ |
| 20 | King Direct Testimony | MPSC Case No. U-21090, Direct Testimony & Exhibits of Thomas King Jr. on Behalf of Wolverine Power Supply Cooperative, Inc. (2021) (excerpted from larger transcript) | **Testimony:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002paWpAAI<br><br>**Exhibits:** https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000Vibb0AAB |
| 21 | Bleckman Direct Testimony | MPSC Case No. U-21816, Direct Testimony of Marc R. Bleckman on Behalf of Consumers Energy Company (Nov. 2024) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000nPekYAAS |
| 22 | Hahn Direct Testimony | MPSC Case No. U-21592, Direct Testimony of Joshua W. Hahn on Behalf of Consumers Energy Company (Sept. 2024) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000CFqsPAAT |
| 23 | Bilsback Direct Testimony | MPSC Case No. U-21090, Direct Testimony of Kelsey Bilsback on Behalf of ELPC, Ecology Center, UCS, and Vote Solar (Oct. 2021) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002paWpAAI |
| 24 | Mic. Pub. Power Agency Petition to Intervene | MPSC Case No. U-21090, Michigan Public Power Agency's Petition to Intervene (July 19, 2021) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068t000000Qf5I7AAJ |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 25 | 2026 Consumers Energy Capacity Demonstration | MPSC Case No. U-21225, Consumers Energy Company's Capacity Demonstration for Planning Year 2026 (Dec. 21, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000005iOnPAAU |
| 26 | 2027/2028 Consumers Energy Capacity Demonstration | MPSC Case No. U-21393, Consumers Energy Company's Capacity Demonstration for Planning Year 2027/2028 (Feb. 22, 2022) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y00000C8NDHAA3 |
| 27 | 2028/2029 Consumers Capacity Demonstration | MPSC Case No. U-21775, Consumers Energy Company's Capacity Demonstration for Planning Year 2028/2029 (Feb. 24, 2025) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000bz8crAAA |
| 28 | 2028/2029 Michigan Commission Staff Capacity Demonstration Results | MPSC Case No. U-21775, Michigan Public Service Commission Staff, Capacity Demonstration Results: Planning Year 2028/29 (May 12, 2025) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/068cs00000ocKc4AAE |
| 29 | 2024 Consumers ELG Annual Report | Consumers Energy, Notice of Planned Participation; Annual Progress Report Pursuant to 40 C.F.R. 423.19(g)(3); Consumers Energy Company, JH Campbell Complex NPDES Permit No. MI0001422, Steam Electric Effluent Limitations Guidelines (Dec. 16, 2024) | https://www.consumersenergy.com/-/media/CE/Documents/sustainability/coal-combustion-residuals/jhc/2024/2024-seeg-jhc-nopp-annual-progress%20Report_FINAL.pdf |
| 30 | DOE Rehearing Procedures | U.S. Dep't of Energy, DOE 202(c) Order Rehearing Procedures (last visited June 17, 2025) | https://www.energy.gov/ceser/doe-202c-order-rehearing-procedures |
| 31 | MISO 2025–26 Auction Results | MISO, Planning Resource Auction, Results for Planning Year 2025-2026 (Apr. 2025) | https://cdn.misoenergy.org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf |
| 32 | MISO Emergency Declarations | MISO, Maximum Generation Emergency Declarations through June 2024 (Aug. 30, 2024) | https://www.oasis.oati.com/woa/docs/MISO/MISOdocs/Capacity_Emergency_Historical_Information.pdf |
| 33 | MISO Market Capacity Emergency | MISO, Market Capacity Emergency, SO-P-EOP-11-002 Rev: 21 (Mar. 3, 2025) | https://cdn.misoenergy.org/SO-P-EOP-11-002%20Rev%2021%20MISO%20Market%20Capacity%20Emergency683501.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 34 | Ramey MISO Comments | Comments of Todd Ramey on Behalf of Midcontinent ISO, Inc. (May 28, 2025), Docket No. AD24-11-000, Accession No. 20250528-4032 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4032&optimized=false&sid=4f4f3475-8309-4416-8289-2aee6d84c1a8 |
| 35 | Patton MISO Comments | Technical Conference Comments of David B. Patton, Ph.D., MISO Independent Market Monitor (May 28, 2025), Docket No. AD25-7-000, Accession No. 20250528-4006 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250528-4006&optimized=false&sid=2c5ac909-a7f0-47eb-9bb3-c35f89976250 |
| 36 | MISO Elliott Max. Gen. Event Overview | MISO, Overview of Winter Storm Elliott December 23, Maximum Generation Event (Jan. 17, 2023) | https://cdn.misoenergy.org/20230117%20RSC%20Item%2005%20Winter%20Storm%20Elliott%20Preliminary%20Report627535.pdf |
| 37 | MISO 2025-2026 CIL/CEL Final Results | MISO, 2025-2026 PY Seasonal CIL/CEL Final Results (Oct. 24, 2024) | https://cdn.misoenergy.org/20241024%20LOLEWG%20Item%2004%20PY%202025-2026%20Final%20CIL_CEL%20Results654989.pdf |
| 38 | MISO LOLE Presentation | MISO, *LOLE 101: Probabilistic Analyses* | https://cdn.misoenergy.org/LOLE%20101%20Training624875.pdf |
| 39 | DOE Order No. 202-22-2 | Department of Energy Order No. 202-22-2 (Sept. 4, 2022) | https://www.energy.gov/ceser/federal-power-act-section-202c-banc-september-2022 |
| 40 | NERC 2024 Reliability Report | NERC, 2024 State of Reliability (June 2024) (excerpt) | https://www.nerc.com/pa/RAPA/PA/Performance%20Analysis%20DL/NERC_SOR_2024_Technical_Assessment.pdf |
| 41 | NERC 2025 Summer Reliability Assessment | NERC, 2025 Summer Reliability Assessment (May 2025) | https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2025.pdf |

| No. | Exhibit Name | Document Name | URL |
| --- | --- | --- | --- |
| 42 | 2019–24 NERC Summer Reliability Assessments | NERC, Summer Reliability Assessments for 2019-2024 (Compiled) | 2019 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2019.pdf<br><br>2020 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2020.pdf<br><br>2021 Reliability Assessment: https://nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC%20SRA%202021.pdf<br><br>2022 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf<br>2023 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2023.pdf<br><br>2024 Reliability Assessment: https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2024.pdf |
| 43 | Winter Storm Elliott System Operations Inquiry | FERC, NERC, and Regional Entity Staff Report, Inquiry into Bulk-Power System Operations During December 2022 Winter Storm Elliott (Oct. 2023) | https://www.ferc.gov/media/winter-storm-elliott-report-inquiry-bulk-power-system-operations-during-december-2022# |
| 44 | PJM Elliott Report | PJM, *Winter Storm Elliott: Event Analysis and Recommendation Report* (July 17, 2023) | https://www.pjm.com/-/media/DotCom/library/reports-notices/special-reports/2023/20230717-winter-storm-elliott-event-analysis-and-recommendation-report.pdf?ref=blog.gridstatus.io |
| 45 | DOE Order No. 202-21-1 | Department of Energy Order No. 202-21-1 (Feb. 14, 2021) | https://www.energy.gov/oe/articles/federal-power-act-section-202c-ercot-february-2021?nrg_redirect=364318 |
| 46 | FERC Energy Primer | FERC, Energy Primer: A Handbook of Energy Market Basics (Dec. 2023) (excerpt) | https://www.ferc.gov/media/energy-primer-handbook-energy-market-basics |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 47 | 2024 Coal Ash Inspection Report | J.H. Campbell Generating Facility<br><br>2024 Facility Inspection Report (Oct. 2024) | https://www.consumersenergy.com/-/media/CE/Documents/sustainability/coal-combustion-residuals/jhc/2024/2024_JH-Campbell_Dry-Ash-Landfill_Inspection-Report_10-06-24.pdf<br><br>https://www.consumersenergy.com/-/media/CE/Documents/sustainability/coal-combustion-residuals/jhc/2024/2024_JH-Campbell_Dry-Ash-Landfill_Inspection-Report_10-06-24.pdf |
| 48 | 2021 CWA Permit | J.H. Campbell National Pollutant Discharge Elimination System Permit No. MI000142 (Oct. 2021) | https://mienviro.michigan.gov/nsite/map/results/detail/6241586858212305105/documents (type "Notice of NPDES permit issuance" within the "file" field, which should automatically filter results to one file dated 10/21/2021 and titled "CECO-J H Campbell Power Plt -- Notice NPDES permit issuance -- Major modification.pdf"; click the file name to download) |
| 49 | 2025 Energy Innovation Dataset | Energy Innovation, dataset for Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/report/coal-power-28-percent-more-expensive-in-2024-than-in-2021/ |
| 50 | 2025 Energy Innovation Coal Cost Report | Energy Innovation, Coal Power 28 Percent More Expensive In 2024 Than In 2021 (June 5, 2025) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Update.pdf |
| 51 | 2023 Energy Innovation Coal Cost Report | Energy Innovation, Coal Cost Crossover 3.0 (Jan. 2023) | https://energyinnovation.org/wp-content/uploads/Coal-Cost-Crossover-3.0-2.pdf |
| 52 | MI State Energy Profile | U.S. EIA, Michigan State Energy Profile (Oct. 17, 2024) | https://www.eia.gov/state/print.php?sid=mi |
| 53 | Consumers News Release | Consumers Energy, *Landmark Plan to Accelerate End of Coal Era, Provide Reliability and Protect Environment Earns Approval* (June 23, 2022) | https://www.consumersenergy.com/news-releases/news-release-details/2022/06/23/20/43/plan-to-accelerate-end-of-coal-era-provide-reliability-and-protect-environment-earns-approval |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 54 | NARUC Coal Report | National Association of Regulatory Utility Commissioners, Recent Changes to U.S. Coal Plant Operations and Current Compensation Practices (Jan. 2020) (excerpt) | https://www.osti.gov/servlets/purl/1869928 |
| 55 | IEA Flexibility Report | C. Henderson, International Energy Agency, Increasing the flexibility of coal-fired power plants (Sept. 2014) (excerpt) | https://usea.org/sites/default/files/092014_Increasing%20the%20flexibility%20of%20coal-fired%20power%20plants_ccc242.pdf |
| 56 | Blumenstock 2021 Second Rebuttal Testimony | MPSC Filing No. U-21090, Second Rebuttal Testimony of Richard T. Blumenstock on Behalf of Consumers Energy Company (May 9, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 57 | Jester 2021 Direct Testimony | MPSC Filing No. U-21090, Testimony of Douglas B. Jester in Support of Settlement Agreement on Behalf of the Michigan Environmental Council, Natural Resources Defense Council, Sierra Club, and Citizens Utility Board of Michigan (May 9, 2022) (excerpted from larger transcript) | https://mi-psc.my.site.com/sfc/servlet.shepherd/version/download/0688y000002z5EqAAI |
| 58 | MISO Tariff Module E-1 | MISO Tariff Module E-1 – Resource Adequacy | https://docs.misoenergy.org/miso12-legalcontent/Module_E-1_-_Resource_Adequacy.pdf |
| 59 | MISO 2025–2026 Prelim. PRA Report with Final Results | MISO PY 2025-2026 Seasonal Preliminary PRA Report with Final Results (June 16, 2025) | https://cdn.misoenergy.org/PY 2025_2026 Seasonal Preliminary PRA Report 03_18_25686471.xlsxhttps://cdn.misoenergy.org/PY%202025_2026%20Seasonal%20Preliminary%20PRA%20Report%20with%20Final%20Results%2006_15_25703532.xlsx |
| 60 | MISO Tariff Section 38.2.7 | MISO Tariff Section 38.2.7 | https://docs.misoenergy.org/miso12-legalcontent/TariffAsFiledVersion.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 61 | MISO Tariff Attachment Y | MISO Tariff Attachment Y | https://docs.misoenergy.org/miso12-legalcontent/Attachment_Y_-_Notification_of_Potential_Resource_-_SCU_Change_of_Status.pdf |
| 62 | FERC Technical Conference Notice | FERC, *Meeting the Challenge of Resource Adequacy in Regional Transmission Organization and Independent System Operator Regions* (June 2, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250602-3068&optimized=false&sid=457eb824-f5ed-41fa-a043-a0cd8c55cb4b |
| 63 | Palgrave Handbook | M. Hafner & G. Luciana, Palgrave Handbook of International Economics (2022) (excerpt) | https://link.springer.com/book/10.1007/978-3-030-86884-0 |
| 64 | IEA Report | International Energy Agency, The role of CCUS in low-carbon power systems (2020) (excerpt) | https://www.iea.org/reports/the-role-of-ccus-in-low-carbon-power-systems |
| 65 | DOE Transmission Planning Study | DOE, Nat'l Transmission Planning Study, Ch. 2: Long-Term U.S. Transmission Planning Scenarios (2024) | https://www.energy.gov/sites/default/files/2024-10/NationalTransmissionPlanningStudy-Chapter2.pdf |
| 66 | NERC 2024 Interregional Transfer Capability Study, Part 1 | NERC, Interregional Transfer Capability Study: (ITCS) Strengthening Reliability Through the Energy Transformation, Transfer Capability Analysis (Part 1) (Aug. 2024) | https://www.nerc.com/pa/RAPA/Documents/ITCS_Part_1_Results.pdf |
| 67 | August Order | DOE Order No. 202-25-7 (August 20, 2025) | https://www.energy.gov/sites/default/files/2025-08/MISO%20Order%20No.%20202-25-7.pdf |
| 68 | Grid Strategies Sept. Report | Michael Goggin, *A Review of DOE's Second 202(c) Order for the Campbell Coal Plant* (Sept. 2025) | |
| 69 | Powers Sept. Decl. | Declaration of Bill Powers, P.E. (Sept. 3, 2025) (including attachments) | |
| 70 | Konidena Decl. | Declaration of Rao Konidena (Sept. 3, 2025) (including attachment) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 71 | Public Interest Organizations' June Rehearing Request | Request for Rehearing of Sierra Club et al., Order No. 202-25-3 (June 18, 2025) | https://www.energy.gov/sites/default/files/2025-07/PIO%20Request%20for%20Rehearing%20of%20Order%20No.%20202-25-3.pdf |
| 72 | Department's July Notice | U.S. Dep't of Energy, *Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration*, Order No. 202-25-3A (dated July 28, 2025) | https://www.energy.gov/sites/default/files/2025-07/Notice%20of%20Denial%20of%20Rehearing%20by%20Operation%20of%20Law%20and%20Providing%20for%20Further%20Consideration%20-%20Order%20No.%20202-25-3A.pdf |
| 73 | Consumers' July 2025 10-Q | CMS Energy Corp. & Consumers Energy Co., Form 10-Q (July 31, 2025) | https://www.cmsenergy.com/investor-relations/regulatory-filings/Consumers-Energy-SEC-Filings/default.aspx |
| 74 | DOE 202(c) Webpage | U.S. Dep't of Energy, DOE's Use of Federal Power Act Emergency Authority (last visited Aug. 30, 2025), https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority | https://www.energy.gov/ceser/does-use-federal-power-act-emergency-authority |
| 75 | MISO Tariff Zonal Map | MISO, Attachment VV to FERC-Approved Tariff | https://etariff.ferc.gov/TariffBrowser.aspx?tid=1162 |
| 76 | Secretary Wright's West Virginia Remarks | Charles Young, West Virginia News, *Energy Secretary Chris Wright: Future of U.S. Coal is "long and bright"* (July 5, 2025) | https://www.wvnews.com/news/wvnews/energy-secretary-chris-wright-future-of-u-s-coal-is-long-and-bright/article_948eb88e-2509-42a3-b985-07c47f1ee151.html |
| 77 | MISO 2021 Transmittal Letter | Transmittal Letter, FERC Docket No. ER22-495-000 (Nov. 30, 2021), Accession No. 20211130-5166 | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20211130-5166 |
| 78 | McFarlane Testimony | Testimony of Shawn McFarlane, FERC Docket No. ER22-495 (Nov. 30, 2021), Accession No. 20211130-5166 (Tab C) | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20211130-5166 |
| 79 | MISO 2022 Accreditation Order | *Midcontinent Indep. Sys. Op., Inc.*, 180 FERC ¶ 61,141 (Aug. 31, 2022) | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20220831-3093 |
| 80 | MISO 2023-24 LOLE Study Report | MISO, Planning Year 2023-2024 Loss of Load Expectation Study Report (May 2023) | https://cdn.misoenergy.org/PY%202023-2024%20LOLE%20Study%20Report626798.pdf |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 81 | Joundi Testimony | Testimony of Zakaria Joundi, FERC Docket No. ER24-1638 (Mar. 28, 2024), Accession No. 20240328-5329 (Tab E) | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20240328-5329 |
| 82 | MISO 2024-25 LOLE Study Report | MISO, Planning Year 2024-2025 Loss of Load Expectation Study Report (April 2024) | https://cdn.misoenergy.org/LOLE%20Study%20Report%20PY%202024-2025631112.pdf |
| 83 | MISO 2025-26 LOLE Study Report | MISO, Planning Year 2025-2026 Loss of Load Expectation Study Report (April 2025) | https://cdn.misoenergy.org/PY%202025-2026%20LOLE%20Study%20Report685316.pdf?v=20250313114401 |
| 84 | MISO 2024-25 Auction Results | MISO, Planning Resource Auction Results for Planning Year 2024-25 (Corrected) (April 26, 2024) | https://cdn.misoenergy.org/2024%20PRA%20Results%20Posting%20202404256 32665.pdf |
| 85 | MISO Attributes Roadmap | MISO Attributes Roadmap (Dec. 2023) | https://cdn.misoenergy.org/2023%20Attributes%20Roadmap631174.pdf |
| 86 | MISO Attributes Roadmap Technical Appendix | MISO, Technical Appendix: Attributes Roadmap (June 2024) | https://cdn.misoenergy.org/2023%20Attributes%20Technical%20Appendix631176.pdf |
| 87 | MISO's Response to the Reliability Imperative | MISO's Response to the Reliability Imperative (Feb. 2024) | https://cdn.misoenergy.org/2024+Reliability+Imperative+report+Feb.+21+Final504018.pdf |
| 88 | August 20 weather report | Jennifer Gray, Taste of Fall On The Way: Here's Who Will Feel The Big Cooldown First, USA National Forecast (Aug. 20, 2025) | https://web.archive.org/web/20250820225303/https://weather.com/forecast/national/news/2025-08-20-first-taste-of-fall-plains-midwest-south-forecast |
| 89 | 2025 OMS-MISO Survey | 2025 OMS-MISO Survey Results (June 6, 2025) | https://cdn.misoenergy.org/20250606%20OMS%20MISO%20Survey%20Results%20Workshop%20Presentation702311.pdf |
| 90 | MISO ERAS Transmittal Letter | Re: Midcontinent Independent System Operator, Inc. Revisions to the Open Access Transmission, Energy and Operating Reserve Tariff Expedited Resource Addition Study Filing, Docket No. ER25-2454-000 (June 6, 2025), Accession No. 20250606-5228 | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250606-5228&optimized=false&sid=c2678d58-1762-48e9-bcca-059a2a848538 |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 91 | MISO ERAS Decision | Order Accepting Tariff Revisions, Subject to Condition, 192 FERC ¶ 61,064 (July 21, 2025) | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20250721-3077&optimized=false&sid=c2678d58-1762-48e9-bcca-059a2a848538 |
| 92 | Energy Emergency EO | Exec. Order No. 14,156, Declaring a National Energy Emergency | 90 Fed. Reg. 8433 (Jan. 29, 2025) |
| 93 | Grid EO | Exec. Order No. 14,262, Strengthening the Reliability and Security of the U.S. Electric Grid | 90 Fed. Reg. 15,521 (Apr. 14, 2025) |
| 94 | NY Times Coal Article | Brad Plumer & Mira Rojanasakul, *Trump Signs Orders Aimed at Reviving a Struggling Coal Industry*, NY Times (Sept. 3, 2025). | https://www.nytimes.com/2025/04/08/climate/trump-order-coal-mining.html |
| 95 | Eddystone May Order | DOE Order No. 202-25-4 (May 30, 2025) | https://www.energy.gov/sites/default/files/2025-05/Federal%20Power%20Act%20Section%20202%28c%29%20PJM%20Interconnection.pdf |
| 96 | July Resource Adequacy Report | DOE, Resource Adequacy Report: Evaluating the Reliability and Security of the United States Grid (July 2025) | https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf |
| 97 | DOE July 7 Press Release | *DOE, Department of Energy Releases Report on Evaluating U.S. Grid Reliability and Security* (July 7, 2025) | https://www.energy.gov/articles/department-energy-releases-report-evaluating-us-grid-reliability-and-security |
| 98 | Eddystone August Order | DOE Order No. 202-25-8 (Aug. 28, 2025) | https://www.energy.gov/sites/default/files/2025-08/202c%20Order%20No.%20202-25-8.pdf |
| 99 | PIOs' RFR of July Resource Adequacy Report | Motion to Intervene and Request for Rehearing of Natural Resources Defense Council, the Ecology Center, Environmental Defense Fund, Environmental Law and Policy Center, Public Citizen, Sierra Club, and Vote Solar, DOE Resource Adequacy Report (Aug. 8, 2025). | https://sustainableferc.org/wp-content/uploads/2025/08/2025-08-06_NRDC-et-al-Request-for-Rehearing-DOE-Resource-Adequacy-Report.pdf |

| No. | Exhibit Name | Document Name | URL |
| --- | --- | --- | --- |
| 100 | Curran Testimony | Testimony of Jennifer Curran before the House Committee on Energy and Commerce, Subcommittee on Energy (March 25, 2025) | https://www.congress.gov/119/meeting/house/118040/witnesses/HHRG-119-IF03-Wstate-CurranJ-20250325.pdf |
| 101 | Consumers June Responses to AG | Excerpt of Consumers Energy, Informal Response to Michigan Attorney General Questions re: Campbell (June 10, 2025) | |
| 102 | CAMPD Campbell Daily Emissions Data | EPA, Clean Air Markets Program Data (CAMPD), June daily emissions data by unit for the Campbell Plant (6/1/2025–6/30/2025) | https://campd.epa.gov/data/custom-data-download. To access daily emissions data, select "emissions" from the "data type" menu; select "daily emissions" from the "data subtype" menu; and then select "apply." On the next screen, set 06/01/2025 as the start date and 06/30/2025 as the end date; search for and select "J H Campbell" from the "facility" menu; and then select "apply." |
| 103 | July 17 Email from Consumers to EGLE | Joseph Firlit, Consumers, email to April Lazzaro, EGLE, July 17, 2025 | |
| 104 | CAMPD Campbell Hourly Emissions Data | EPA, Clean Air Markets Program Data (CAMPD), June hourly emissions data by unit for the Campbell Plant (6/1/2025–6/30/2025) | https://campd.epa.gov/data/custom-data-download. To access hourly emissions data, select "emissions" from the "data type" menu; select "hourly emissions" from the "data subtype" menu; and then select "apply." On the next screen, set 06/01/2025 as the start date and 06/30/2025 as the end date; search for and select "J H Campbell" from the "facility" menu; and then select "apply." Select "preview data." |
| 105 | DOE Order No. 202-08-1 | DOE Order No. 202-08-1 (Sept. 14, 2008) | https://www.energy.gov/sites/prod/files/202%28c%29%20order%20202-08-1%20September%2014%2C%202008%20-%20CenterPoint%20Energy.pdf |
| 106 | DOE Order No. 202-22-2 Amendment No. 1 | DOE Order No. 202-22-2 Amendment No. 1 (Sept. 8, 2022) | https://www.energy.gov/sites/default/files/2022-09/Amendment%20No.%201%20to%20Order%20202-22-2%20sb%20A_S3%20Hogan.pdf |

| No. | Exhibit Name | Document Name | URL |
| --- | --- | --- | --- |
| 107 | DOE Order No. 202-22-1 Amendment No. 2 | DOE Order No. 202-22-1 Amendment No. 2 (Sept. 8, 2022) | https://www.energy.gov/sites/default/files/2022-09/Amendment%202%20to%20Order%20202-22-1_FINAL_9.8.2022%20sb%20A_S3%20Hogan.pdf |
| 108 | Starfield Email to Hoffman | Email from Lawrence Starfield, EPA to Patricia Hoffman, DOE Re: DOE section202(c) order (Sept. 11, 2017) | https://www.energy.gov/sites/default/files/2017/09/f36/2017-9-11%20EPA%20consultation%20renewal.pdf |
| 109 | MISO ERAS News Release | MISO, Expedited Resource Addition Study Attracts Large, Diverse Applicant Pool (Aug. 26, 2025) | https://www.misoenergy.org/meet-miso/media-center/2025---news-releases/expedited-resource-addition-study-attracts-large-diverse-applicant-pool/ |
| 110 | DOE Order No. 202-24-1 | DOE Order No. 202-24-1 (Oct. 9, 2024) | https://www.energy.gov/sites/default/files/2024-10/Duke%20202%28c%29%20Order_100924%20FINAL_JMG%20signed.pdf |
| 111 | MISO June Operations Report | MISO Monthly Operations Report: June 2025 | https://cdn.misoenergy.org/202506%20Market%20and%20Operations%20Report709571.pdf |
| 112 | Witmeier 2024 Queue Cap Testimony | Errata to Att. X Queue Cap Proposal and Exemptions to Queue Cap, Tab A, Prepared Direct Testimony of Andrew Witmeier, at 21:4, Docket No. ER25-507-000 (Nov. 21, 2024) ("Witmeier 2024 Queue Cap Testimony"), Accession No. 20241213-5063. | https://elibrary.ferc.gov/eLibrary/filelist?accession_number=20241213-5063&optimized=false&sid=1e90ede4-da17-4482-8e6d-e346192d0609 |
| 113 | Inst. Pol'y Integrity Report | Inst. Pol'y Integrity, Enough Energy: A Review of DOE's Resource Adequacy Methodology (July 2025) | https://policyintegrity.org/files/publications/IPI_EnoughEnergy_FinalReport.pdf |
| 114 | 2025 EPA MI Haze SIP Approval | Air Plan Approval; Michigan; Second Period Regional Haze Plan, 90 Fed. Reg. 42833 (Sept. 5, 2025) | https://www.govinfo.gov/content/pkg/FR-2025-09-05/pdf/2025-17096.pdf |
| 115 | Mar. 2025 MI SIP Supplement | Excerpt of EGLE, Supplement to Michigan's August 23, 2021 Regional Haze State Implementation Plan Revision for the Second Planning Period (Mar. 2025) | |

| No. | Exhibit Name | Document Name | URL |
|---|---|---|---|
| 116 | July 2025 MI SIP Supplement | Excerpt of EGLE, Supplement to Michigan's August 23, 2021 Regional Haze State Implementation Plan Revision for the Second Planning Period (July. 2025) | |
| 117 | RTO Insider Article on August Order | John Cropley & Amanda Durish Cook, DOE Orders Mich. Coal Plant to Remain Available Another 90 Days, RTO Insider (Aug. 21, 2025). | https://www.rtoinsider.com/113044-doe-orders-mich-coal-plant-to-remain-available-another-90-days/ |
| 118 | RMI Analysis of Coal Plants' Threats to Reliability | Gabriella Tosado, Ashtin Massie & Joe Daniel, *Reality Check: We Have What's Needed to Reliably Power the Data Center Boom, and It's Not Coal Plants*, RMI (Aug. 12, 2025) | https://rmi.org/reality-check-we-have-whats-needed-to-reliably-power-the-data-center-boom-and-its-not-coal-plants/ |
| 119 | ZRC Replacement | ZRC replacement and instructions in the MECT, Resource Adequacy Subcommittee (May 5, 2023 | https://cdn.misoenergy.org/20230524%20RASC%20Item%2004b%20ZRC%20Replacement628921.pdf |
| 120 | 2024 OMS-MISO Survey | 2024 OMS-MISO Survey Results (June 20, 2024) | https://cdn.misoenergy.org/20240620%20OMS%20MISO%20Survey%20Results%20Workshop%20Presentation635585.pdf |
| 121 | Witmeier 2025 ERAS Testimony | Prepared Direct Testimony of Andrew Witmeier, FERC Docket No. ER25-2454-000, (June 6, 2025), Accession No. 20250606-5228 | https://elibrary.ferc.gov/eLibrary/filelist?accession_Number=20250606-5228 |
| 122 | GridLab Report | GridLab Analysis: Department of Energy Resource Adequacy Report (July 11, 2025) | https://gridlab.org/gridlab-analysis-department-of-energy-resource-adequacy-report/ |
| 123 | Duke University Rethinking Load Growth Study | Tyler H. Norris et al., Rethinking Load Growth: Assessing the Potential for Integration of Large Flexible Loads in US Power Systems, Duke University Nicholas Institute for Energy, Environment & Sustainability (Feb. 2025) | https://nicholasinstitute.duke.edu/sites/default/files/publications/rethinking-load-growth.pdf |